**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NORTHERN VIRGINIA HEMP<br>AND AGRICULTURE LLC, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>THE COMMONWEALTH OF<br>VIRGINIA, *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:23-cv-01177

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

COME NOW Northern Virginia Hemp and Agriculture LLC ("NOVA Hemp"), Rose

Lane, an individual, and Franny's Operations, Inc. ("Franny's Farmacy"), by and through their

undersigned attorneys, pursuant to Federal Rule of Civil Procedure 65, and hereby respectfully

request that this Court enter an order granting the Plaintiffs a preliminary injunction, and

enjoining the Defendants from (1) implementing or enforcing those portions of Virginia law that

impose a limit on substances containing tetrahydrocannabinol ("THC") according to their

concentration of "total [THC]" or a "synthetic derivative of [THC]" instead of just the

concentration of Delta-9 THC as defined in the Agriculture Improvement Act of 2018 under 7

U.S.C. § 1639o(1)[1]; and (2) implementing or enforcing those portions of Virginia law that

restrict interstate commerce outside of the Commonwealth.[2] In support thereof, Plaintiffs state as

follows:

---

[1] Va. Code §§ 3.2-4112, 3.2-4126(B), 3.2-5145.1, 3.2-5145.4, 4.1-600, 4.1-606(7), 18.2-247(D),
18.2-371.2, 54.1-3401, 54.1-3408, 54.1-3408.3(A), and 59.1-200(A)(70).
[2] Va. Code § 3.2-4116(C).

## INTRODUCTION

Humans have cultivated the Cannabis sativa plant, also known as cannabis or marijuana, for thousands of years. The plant naturally contains tetrahydrocannabinol, also known as THC, that is a psychoactive drug when ingested, as well as tetrahydrocannabolic acid, or THCA, which itself is a non-psychotropic cannabinoid. THCA synthesizes into THC when the plant is dried and heated or cured. While there are several natural and synthetic molecular variations (or "isomers") of THC, the most potent and prevalent one is Delta-9 THC.

Marijuana, including non-intoxicating derivatives thereof like industrial hemp, was first made illegal under federal law pursuant to the Controlled Substances Act of 1970. Since that time, the U.S. Supreme Court ruled in *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001) and *Gonzales v. Raich*, 545 U.S. 1 (2005) that Congress had the power to regulate and criminalize marijuana, even for medical purposes and even if the states otherwise legalized it. Specifically, the Court in *Raich* held that even when marijuana was lawfully cultivated, possessed, and consumed under *state* laws, and was *not* transported over state lines, the CSA's prohibition, implemented under the interstate commerce clause, still applied.

However, over the next decade, opinions began to change, especially with regard to hemp, a product of cannabis that has a low concentration of THC that is often used to make things like clothing and rope.

In 2018, Congress passed, and President Trump signed into law, the Agriculture Improvement Act (the "Farm Act") which, for the first time, legalized hemp and treated it separately from marijuana, which was still illegal under the CSA. First, the Farm Act defined hemp as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether

growing or not, with a Delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). It then expressly excised hemp from the definition of marijuana under the CSA. 21 U.S.C. § 802(16). While the Farm Act added "tetrahydrocannabinols" as a new Schedule 1 drug under the CSA, it excluded hemp from that definition. 21 U.S.C. § 812(c).

The Farm Act empowered the Secretary of Agriculture to issue regulations to enforce the Farm Act's requirements. 7 U.S.C. § 1639r. Pursuant to that authority, the Secretary promulgated 7 C.F.R. § 990.1, which reiterated the federal government's understanding that legalized hemp was solely defined according to its Delta-9 THC content. The Secretary also promulgated 7 C.F.R. § 990.63, which states: "No State or Indian Tribe may prohibit the transportation or shipment of hemp lawfully produced" under federal regulations. Thus, the federal government's position was clear: (1) hemp was any derivative or extract of the Cannabis sativa plant that had no more than a certain amount of Delta-9 THC, and (2) the States had no authority to interfere with the interstate commerce of hemp, which extended even to hemp that solely circulated intrastate, per *Raich*.

The Commonwealth of Virginia subsequently adopted the federal definition of hemp into its law and obtained approval from the federal government to implement a plan regarding the regulation of hemp and medical marijuana within its borders. Subsequently, growers, manufacturers, distributors, retail stores, and consumers began engaging in commerce in Virginia, making, buying, selling, and transporting various products that were legal hemp under 7 U.S.C. § 1639o(1) and Virginia law.

Such was the environment in Virginia until July 1, 2023, when Virginia Senate Bill 903 went into effect. There were two main changes that SB 903 implemented that are being challenged in this lawsuit. *First*, SB 903 established a stricter standard for hemp that is referred

to herein as the "total THC" standard. While the federal standard only considered the concentration of Delta-9 THC for the determination of whether a substance was legal hemp, the "total THC" standard narrowed that scope by including all natural and synthetic isomers of THC (like Delta-8 and Delta-10 THC) into that calculation. In other words, a substance that had 0.1% Delta-9 THC and 0.4% Delta-8 THC would be legal under 7 U.S.C. § 1639o(1), but illegal under the "total THC" standard that added those concentrations together. That "total THC" standard is now applied to all "hemp products" (including edible, topical, and smokable hemp products sold at retail), "industrial hemp extracts," "cannabis oils," and other "substances" containing THC. Products that do not meet the "total THC" standard are illegal as marijuana under Virginia law. Separately, the "total THC" standard imposes civil liability under the Virginia Consumer Protection Act ("VCPA") on anyone who sells a product that contains *any* amount of synthetic THC. As a result of the stricter "total THC" standard, many hemp products that before July 1, 2023 were manufactured, bought, sold, and transported in Virginia as legal hemp under the federal standard were suddenly made illegal and lumped back in with marijuana, or exposed a seller to civil liability under the VCPA.

*Second*, SB 903 prohibited a registered processor of industrial hemp from selling "industrial hemp or a substance containing an industrial hemp extract . . . to a person if the processor knows or has reason to know that such person will use the industrial hemp or substance containing an industrial hemp extract in a substance that" violates the "total THC" standard applicable to hemp products. Va. Code § 3.2-4116(C). On its face, this provision makes it illegal for a processor to sell to anyone, anywhere in the world, who might create a product in violation of the "total THC" standard, even if the buyer resides in a jurisdiction where doing so is completely legal. This aspect of SB 903 criminalizes actions outside of the borders of the

Commonwealth and impedes lawful interstate commerce, in violation of federal and constitutional law.

Plaintiffs represent a variety of businesses and people who manufactured, transported, bought, or sold hemp in Virginia and elsewhere prior to July 1, 2023, who are now irreparably harmed by SB 903's "total THC" standard because numerous products that are legal under federal law are now illegal under Virginia law. SB 903 exceeded Virginia's authority in that regard because Congress, through the Farm Act, expressly or impliedly set the standard for what is legal hemp throughout the United States, and further mandated that legal hemp be protected in interstate commerce. Therefore, Plaintiffs respectfully request that this Court enjoin SB 903 to the extent it deviates from the standard set forth in 7 U.S.C. § 1639o(1), and prohibits commercial activities outside the borders of the Commonwealth.

## FACTUAL BACKGROUND

I.      A Brief History of Hemp in the United States.

Hemp and marijuana are varieties of the *Cannabis sativa* plant, which has been cultivated by humans for thousands of years.[3] Cannabis contains a variety of chemicals, of which 61 are cannabinoids.[4] Delta-9 THC is the principal psychoactive cannabinoid in cannabis.[5] There are isomers of THC that are psychoactive to a lesser degree, including Delta-7, Delta-8 and Delta-10 THC.[6] Fresh cannabis also contains tetrahydrocannanbinolic acid, or THCA, which is a non-

---

[3] *See* Mark Tancig, Christine Kelly-Begazo, Navdeep Kaur, Lakesh K. Sharma, & Zachary Brym, *Industrial Hemp in the United States: Definition and History*, https://edis.ifas.ufl.edu/publication/AG458 (2021).

[4] *See* Priyamvada Sharma, PhD., Pratima Murthy, and M.M. Srinivas Bharath, *Chemistry, Metabolism, and Toxicology of Cannabis: Clinical Implications*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3570572/ (Fall 2012).

[5] *Id.*

[6] *See* Nunzia La Maida, Alessandro Di Giorgi, Simona Pichini, Francesco Paolo Busardo, & Marilyn A. Huestis, *Recent challenges and trends in forensic analysis: Δ9-THC isomers*

psychoactive compound that converts into THC through decarboxylation—generally from drying or heating.[7] As the precursor for Delta-9 THC, Delta-9 THCA represents up to 90% of the total potential THC of a cannabis plant.[8]

Hemp is a low-THC variety of the cannabis plant.[9] Hemp fiber was used by ancient civilizations in a variety of ways, including for medicinal purposes and to make paper and textiles, including original Gutenberg Bibles.[10] While its origins are likely in Central and Southwest Asia, the Spanish brought the plant to the New World in 1545.[11] British colonists were required by law to grow hemp for a variety of uses, including food and clothing, both for their own use as well as for export to England.[12] Hemp was integral to the maritime industry, as hemp was naturally resistant to decay and easy to cultivate. It was used for the lines, sails, and caulking of the Mayflower, and more than 120,000 pounds of hemp fiber was used on the USS Constitution, also known as "Old Ironsides," the world's oldest ship still afloat.[13] In fact, the word "canvas," the material most sails of yore were made from, was itself derived from the word

---

*pharmacology, toxicology and analysis*, Jour. Of Pharm. and BioMedical Analysis, Vol. 220, https://www.sciencedirect.com/science/article/abs/pii/S0731708522004083 (Oct. 25, 2022).
[7] *See* Guillermo Moreno-Sanz, *Can You Pass the Acid Test? Critical Review and Novel Therapeutic Perspectives of Δ9-Tetrahydrocannabinolic Acid A*, Cannabis and Cannabinoid Research, Vol 1., No. 1, https://www.liebertpub.com/doi/10.1089/can.2016.0008 (June 1, 2016).
[8] *Id.*
[9] *See* note 2, *supra*.
[10] *See* Deutsche Welle, *A brief cultural history of hemp*, *Hindustan Times*, https://www.hindustantimes.com/lifestyle/art-culture/a-brief-cultural-history-of-hemp-101643634036146.html (January 31, 2022).
[11] *See* note 1, *supra*.
[12] *See* Oscar H. Will III, *The Forgotten History of Hemp Cultivation in America*, https://www.farmcollector.com/farm-life/strategic-fibers (2004).
[13] *Id.*

cannabis.[14] George Washington and Thomas Jefferson both grew hemp, and Jefferson even penned the first drafts of the Declaration of Independence on hemp paper.[15]

The hemp industry grew and peaked in the mid-1800's, until the advent of steam ships caused a decline in demand for hemp sails and rope.[16] By the time of World War I, Kentucky was the only state with a significant hemp industry.[17] Worldwide production of hemp decreased through the 20th century as other fiber crops and synthetic fibers led to a drop in demand.[18]

The federal government began taxing and regulating hemp production with the 1937 Marihuana Tax Act, Pub. L. 75-238, 50 Stat. 511 (repealed 1970), which only further discouraged production.[19] Ultimately, hemp as a domestic crop in the United States largely ended by 1958.[20]

In 1970, Congress passed the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, which classified marijuana, including hemp, as a Schedule 1 drug, making it illegal to grow, possess, or use throughout the United States. In making that classification, Congress had determined that marijuana did not "have a currently accepted medical use" unlike Schedule 2 drugs. In other words, the CSA did not distinguish between marijuana used recreationally and hemp being used for medical or industrial purposes—both were equally prohibited.

---

[14] https://www.etymonline.com/word/canvas
[15] *See* note 4 and note 8, *supra.*
[16] *See* note 1 and note 4, *supra.*
[17] *See* note 8, *supra.*
[18] *See* note 4 and note 8, *supra.*
[19] https://www.cbp.gov/about/history/did-you-know/marijuana ("In principle, the Marihuana Tax Act of 1937 stopped only the use of the plant as a recreational drug. In practice, though, industrial hemp was caught up in anti-dope legislation, making hemp importation and commercial production in this country less economical.").
[20] *See* note 8, *supra.*

Over the ensuing decades, minds began to change about the reasonableness of the federal government's blanket ban on marijuana. California was the first state to pass a law, known as Proposition 215, legalizing the limited use of marijuana for medicinal purposes, which was codified as the Compassionate Use Act of 1996. Cal. Health & Safety Code Ann. § 11362.5, *et seq*. Under that Act, "seriously ill" citizens were given a "right to obtain and use marijuana for medical purposes" as recommended by a physician, making it legal for patients and caregivers to possess and cultivate marijuana for that purpose. *Id*. The federal government, however, continued to enforce the CSA in California, including against those who cultivated and used marijuana strictly for medical purposes in full compliance with California law.

The matter came to a head in *Gonzales v. Raich*, 545 U.S. 1 (2005), in which the U.S. Supreme Court was asked to determine whether the CSA trumped California law. In a 6-3 decision penned by Justice Stevens, the Court held that the CSA was within Congress' power under the Commerce Clause, and it extended to the intrastate cultivation and use of marijuana notwithstanding state law to the contrary. *Id*. at 22 ("we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA").[21] The majority further held that "[i]t is beyond peradventure that federal power over commerce is 'superior to that of the States to provide for the welfare or necessities of their inhabitants,' however legitimate or dire those necessities may be." *Id*. at 29 (*quoting Sanitary District of Chicago v. United States*, 266 U.S. 405, 426 (1925)). In other words, the CSA, as a "necessary and proper" implementation of the

---

[21] The majority took particular note of Congress' finding that "Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." *Id*. at 12, n.20 (quoting 21 U.S.C. § 801(6)).

Commerce Clause, U.S. Const., Art I, §8, prevailed over state law pursuant to the Supremacy Clause. *Gonzales*, 545 U.S. at 22, 29.

Despite that ruling, minds slowly began to change on Capitol Hill about hemp. The Agricultural Act of 2014 established the Hemp Research Pilot Program, 7 U.S.C. § 5940(b), which allowed hemp cultivation for research purposes only by institutions of higher learning or state departments of agriculture. The 2014 law specifically defined "industrial hemp" as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a Delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 5940(a)(2). Such was the state of federal law until the Farm Act in 2018.

## II.     The Farm Act Legalizes Hemp by Delta-9 THC Concentration.

In the Farm Act, Congress decided to act on hemp and carve it out as a legal product separately from marijuana, creating a new interstate market for hemp. It began by defining "hemp" in the same fashion as the 2014 law did: "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a Delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1).[22]

The Farm Act simultaneously defined marijuana, which remained a Schedule 1 drug, as specifically excluding hemp from its ambit, thus making hemp legal under federal law for the first time since the CSA was enacted. 21 U.S.C. § 802(16). The Farm Act also added "tetrahydrocannabinols, except for tetrahydrocannabinols in hemp" as a Schedule 1 drug, which emphasized that hemp was no longer criminalized under the CSA. 21 U.S.C. § 812(c).

---

[22] Under federal regulations, the total Delta-9 THC concentration for hemp is derived from the sum of the Delta-9 THC and Delta-9 THCA (the precursor for Delta-9 THC) in the product on a dry weight basis. 7 C.F.R. § 990.1.

Importantly, the Farm Act included a note under Sec. 10114 with regard to interstate commerce, stating that, as a rule of construction, "Nothing in this title or an amendment made by this title prohibits the interstate commerce of hemp [as defined in 7 U.S.C. § 1639o(1)] or hemp products." The same note stated: "No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State or territory of the Indian Tribe, as applicable." Further to that note, and pursuant to authority granted under 7 U.S.C. § 1639r(a)(1)(A) of the Farm Act, the Secretary of Agriculture promulgated 7 C.F.R. § 990.63, which states: "No State or Indian Tribe may prohibit the transportation or shipment of hemp lawfully produced" under federal regulations.

The Farm Act went on to grant the States and Indian tribes "primary regulatory authority over the production of hemp" in their respective territories by submitting to the Secretary of Agriculture a plan to monitor and regulate that production. 7 U.S.C. § 1639p. Such a plan had to include certain terms, including "a practice to maintain relevant information regarding land on which hemp is produced" and a "procedure for testing . . . Delta-9 [THC] concentration levels of hemp produced in the State or territory of the Indian tribe." 7 U.S.C. § 1639p(a)(2)(A). However, States and Indian tribes were allowed to pass laws regarding the production of hemp that were "more stringent" than required by federal law. 7 U.S.C. § 1639p(a)(3)(A).

### III.   Virginia Law Before July 1, 2023.

After the Farm Act was enacted, the Commonwealth of Virginia submitted a plan that was approved by the U.S. Department of Agriculture pursuant to 7 U.S.C. § 1639p (the "Virginia Plan").[23] The Virginia Plan, by its terms, only concerned the cultivation of hemp within the

---

[23] *See:* https://www.ams.usda.gov/sites/default/files/media/VAHempPlan.pdf. A copy of the Virginia Plan is attached hereto as **Exhibit One**. Notably, the Virginia Plan has not been modified since passage of SB 903.

Commonwealth. Prior to July 1, 2023, Virginia law incorporated the Farm Act's definition of hemp and implemented the Virginia Plan in accordance with that definition.

## IV.   SB 903 Creates a New "Total THC" Standard.

After receiving reports of children getting ill from consuming hemp products containing Delta-8 THC, lawmakers in Richmond sought a way to curb access to such products.[24] Ultimately, the bill approved by the legislature and signed by Governor Youngkin on April 12, 2023, SB 903, discarded the federal standard for hemp, which only measures the concentration of Delta-9 THC, and implemented a stricter "total THC" standard that limited legal hemp according to concentrations of all natural and synthetic isomers of THC, including Delta-8, Delta-9, and Delta-10 THC, considered together. As a result, hundreds of products that are legal hemp under federal law are now illegal in Virginia because the "total THC" level includes isomers that are not relevant under the federal standard. Notably, SB 903 did not provide a transitional period—it went into full effect immediately on July 1, 2023. SB 903 implements the new "total THC" standard in a variety of ways.

**Hemp Products:** SB 903 modifies the definition of a "hemp product"[25] to mean a finished product containing industrial hemp that, when offered for retail sale, "(a) contains a total [THC] concentration of no greater than 0.3 percent and (b) contains either no more than two milligrams of total [THC] per package or an amount of cannabidiol[26] that is no less than 25 times greater than the amount of total [THC] per package." Va. Code § 3.2-4112. The total THC levels

---

[24] *See* Madison Hirneisen, *Lawmakers approve Youngkin's amendments to hemp bills*, The Center Square, https://www.thecentersquare.com/virginia/article_d3789714-d98a-11ed-a433-7b6449e69f06.html (April 12, 2023).

[25] "Hemp products" includes edible, topical, and smokable hemp products. Va. Code § 3.2-4112.

[26] Cannabidiol ("CBD") is a non-psychoactive compound found in cannabis that has some medicinal properties. *See*: https://www.cancer.gov/publications/dictionaries/cancer-drug/def/cannabidiol

for hemp products are measured by using "any naturally occurring or synthetic [THC]," regardless of whether it was Delta-9 THC or an isomer thereof. *Id.* Virginia's new law further forbids the sale of any other "substance intended for human consumption, orally or by inhalation," under the same "total THC" standard as for hemp products. Va. Code § 3.2-4126(B).

**Industrial Hemp:** SB 903 preserves the original definition of "industrial hemp" as being "any part of the plant Cannabis sativa, including seeds thereof, whether growing or not, with a concentration of [THC] that is no greater than that allowed by federal law." Va. Code § 3.2-4112, *and see* Va. Code § 3.2-5145.1. However, SB 903 mandates that a processor of industrial hemp "shall not sell industrial hemp . . . to a person if the processor knows or has reason to know that such person will use the industrial hemp or substance containing industrial hemp extract in a substance that (i) contains a total [THC] concentration that is greater than 0.3 percent or (ii) contains more than two milligrams of total [THC] per package and does not contain an amount of cannabidiol that is at least 25 times greater than the amount of total [THC] per package."[27] Va. Code § 3.2-4116(C). In other words, although Virginia still recognizes industrial hemp in the same manner that the Farm Act defines hemp, SB 903 forbids a processor of that hemp to sell the product to anyone, anywhere in the world, who might use it to make a product that violates the new "total THC" standard, even if it is perfectly legal to do so where that buyer is located.

**Industrial Hemp Extracts:** SB 903 also modifies the definition of "industrial hemp extract" to mean an extract of industrial hemp offered for retail sale that meets the same "total

---

[27] As with hemp products, the total THC concentration is calculated by adding together "any naturally occurring or synthetic [THC]," regardless of whether it was Delta-9 THC or an isomer thereof. Va. Code § 3.2-4112.

THC" standard as hemp products.[28] Va. Code §§ 3.2-5145.1, 3.2-5145.4. Identical to the restriction on sale imposed upon processors of industrial hemp, SB 903 prohibits industrial hemp producers and processors from selling industrial hemp extracts to anyone, anywhere, who the producer "knows or has reason to know" will use that extract to violate the "total THC" standard. Va. Code § 3.2-4116(C).

**Cannabis Oils:** "Cannabis oil" is redefined to mean "any formulation of processed Cannabis plant extract, which may include industrial hemp extracts, including isolates and distillates, acquired by a pharmaceutical processor pursuant to Va. Code § 54.1-3442.6, or a dilution of the resin of the Cannabis plant that contains no more than 10 milligrams of [THC] per dose." Va. Code § 54.1-3408.3(A). The prior definition limited the measure of THC to only Delta-9 THC, in accordance with the federal standard. Pharmaceutical processors and cannabis dispensing facilities must abide by that limit to obtain a permit, and may not acquire industrial hemp extracts that violate Virginia's new "total THC" standard. Va. Code § 54.1-3442.6.

**Definition of Marijuana In Virginia:** While the CSA excludes hemp from the definition of marijuana under the Delta-9 THC standard, in Virginia the definition of "marijuana" excludes "hemp products" and "industrial hemp extracts" as defined above, which are based on the new "total THC" standard. Va. Code §§ 4.1-600, 18.2-247(D), 54.1-3401, 54.1-3408. Marijuana is still otherwise illegal in Virginia. *See* Va. Code §§ 18.2-247(D), 18.2-248, and 18.2-371.2.

**Virginia Consumer Protection Act ("VCPA"):** Finally, SB 903 makes it unlawful to "sell or offer for sale any substance intended for human consumption, orally or by inhalation, that contains a synthetic derivative of [THC]" regardless of concentration, subject to limited

---

[28] As with hemp products, the total THC levels for industrial hemp extracts are measured by using "any naturally occurring or synthetic [THC]," regardless of whether it was Delta-9 THC or an isomer thereof. Va. Code § 3.2-4112.

exceptions. Va. Code § 59.1-200(A)(70). Violators can face civil penalties of between $2,500 and $5,000 per violation. *See* Va. Code § 59.1-206.

**The Resulting Banned Products:** As a result of the "total THC" standard imposed under SB 903, which includes the VCPA ban on products containing any synthetic THC, hundreds of products that were legal under federal law are now illegal as marijuana in Virginia, or subject to civil liability under the VCPA (the "Banned Products"). A list of Banned Products is attached hereto as **Exhibit Two**.[29] The list of Banned Products *does not* include products that are banned in Virginia for not complying with the packaging requirements of Va. Code §§ 3.2-4123 (for hemp products) or 3.2-5145.4:1 (for industrial hemp extracts)—this lawsuit is not challenging those portions of SB 903.

## V.     The Plaintiffs.

### I.     *NOVA Hemp – Virginia Licensed Retailer.*

NOVA Hemp is a Virginia limited liability corporation authorized to do business in the Commonwealth of Virginia. *See* Affidavit of Travis Clay Lane, attached hereto as **Exhibit Three**, ¶3. NOVA Hemp operates a retail store in the Commonwealth that sells a variety of products containing THC pursuant to valid registration issued to it. *Id.* at ¶4. NOVA Hemp is harmed by SB 903 in that approximately 95% of the products it manufactured and sold prior to July 1, 2023 were Banned Products that it can no longer sell. *Id.* at ¶6. NOVA Hemp is also barred from importing and selling any hemp products that conflict with the new THC standard imposed by SB 903. *Id.* at ¶10.

---

[29] This list is not exhaustive, as there are new products developed every day. It represents the list of products identified through the reasonable efforts of counsel.

NOVA Hemp expects its gross revenue to drop by approximately 90% from not being able to sell Banned Products under the new Virginia law that would otherwise be legal under federal law. *Id.* at ¶7. NOVA Hemp's loss in revenues and increased compliance costs have already caused it to lose approximately $40,000 per month compared with its previously projected revenues. *Id.* at ¶11. NOVA Hemp anticipates having to lay off employees, reduce production, and potentially close its retail store and production facility as a direct result of SB 903. *Id.* at ¶8. NOVA Hemp cannot simply substitute products that are legal under the federal and Virginia laws, as consumer demand for those products is significantly less than the demand for the Banned Products. *Id.* at ¶9. NOVA Hemp risks losing its registration or face other sanctions if it sells any Banned Products.

NOVA Hemp is also harmed in that its employees and officers may face criminal charges under Va. Code §§ 18.2-247, 248, and 371.2 for possession or sale of Banned Products that are legal hemp under federal law but now are included in the definition of "marijuana" under SB 903, which increases compliance costs, especially in light of the fact that SB 903 did not permit NOVA Hemp a transitional period to adjust its business. *Id.* at ¶7.

## II.   *Rose Lane – Virginia Consumer.*

Rose Lane is an elderly resident of the Commonwealth of Virginia. *See* Affidavit of Rose Lane, attached hereto as **Exhibit Four**, ¶¶2, 3. Ms. Lane suffers from arthritis, among other ailments, that causes her pain, discomfort, difficulty sleeping, and other problems. *Id.* at ¶4. While Ms. Lane has been prescribed a variety of medications by her primary care doctor to treat those symptoms, none have worked. *Id.* at ¶5.

For several years, Ms. Lane has been using a variety of hemp products and tinctures that successfully address those symptoms. *Id.* at ¶7. Those products, which she takes before going to

15

bed at night, enable her to sleep without discomfort or pain, and allow her to wake up the next morning feeling rested and energetic. *Id.* She uses those products responsibly, and they are the only products she has found that relieve her symptoms. *Id.* at ¶12.

The products she has been using for her arthritis symptoms are now banned under the new Virginia SB 903 law. She can no longer purchase them. *Id.* at ¶¶7, 9, *and see* Ex. Two (list of Banned Products). There are no other hemp products she has found that meet the new Virginia THC standard and adequately treat her symptoms. *Id.* at ¶10.

Ms. Lane is greatly concerned that her arthritis symptoms will get much worse if she is denied access to the hemp products and tinctures she has been using, resulting in her suffering constant pain and being unable to get a good night's sleep, among other problems. *Id.* at ¶12. Ms. Lane is also greatly concerned that since she still possesses a small quantity of these now-banned hemp products for her personal, responsible use, she could be prosecuted for possession of marijuana under Va. Code § 18.2-247(D). *Id.* at ¶11.

### III.    *Franny's Farmacy – Out-of-State Manufacturer and Franchisor.*

Franny's Farmacy is a North Carolina corporation that has its principal offices in North Carolina. *See* Affidavit of Francis Tacy, attached hereto as **Exhibit Five**, ¶3. Franny's Farmacy manufactures hemp products for retail sale that are compliant with the requirements of North Carolina law and the Farm Act, using hemp that it grows but also purchases from other growers. *Id.* at ¶¶5, 7. Franny's Farmacy then ships those products to retail stores in North Carolina and other states, including Virginia. *Id.* at ¶5. One such store in Warrenton, VA, is a franchise established through Franny's Franchising, Inc., a North Carolina corporation which itself is a subsidiary of Franny's Farmacy. *Id.* at ¶¶4, 6. Franny's Farmacy also has franchise retail locations in Connecticut, Florida, Georgia, and North Carolina. *Id.* at ¶6.

16

As a result of SB 903, over 100 products that Franny's Farmacy manufactures that are compliant with North Carolina and federal law are now illegal in Virginia because they have a total THC concentration that exceeds the new standard established by the Virginia law. *Id.* at ¶¶7-8. This has harmed Franny's Farmacy in several distinct ways.

*First*, Franny's Farmacy can no longer purchase hemp from Virginia growers and processors because those sellers face sanctions for selling to a manufacturer of hemp products that violates Virginia's new "total THC" standard, like Franny's Farmacy. *Id.* at ¶13. Thus, Franny's Farmacy cannot purchase hemp from the Virginia market, which will likely increase costs as Franny's Farmacy can only buy from non-Virginia sources. *Id.*

*Second*, Franny's Farmacy cannot ship its banned products into Virginia for sale at its franchise store. *Id.* at ¶8. That store has suffered a 90% drop in sales since SB 903 went into effect, since the banned products were the popular ones for sale. *Id.* at ¶10. Franny's Farmacy cannot simply manufacture new products that are compliant with Virginia law to make up the shortfall, because the banned products are far more popular. *Id.* at ¶11.

*Third*, SB 903 increases costs for Franny's Farmacy when it needs to ship its products to its franchise in Connecticut, or other places north of Virginia. *Id.* at ¶9. A shipper taking Franny's Farmacy hemp products, which are legal outside of Virginia but illegal under Virginia's new "total THC" standard, from the manufacturing facility in North Carolina to the Connecticut franchise will have to avoid Virginia entirely, as otherwise that shipper incurs a risk of criminal sanction as its cargo is considered illegal marijuana once it crosses into Virginia. *Id.* That means that, to avoid Virginia, a driver would have to navigate a path through Tennessee, then Kentucky, then West Virginia, to get around Virginia, adding hundreds of miles compared to the

17

straightforward route up I-95 through Virginia. Franny's Farmacy incurs greater shipping costs as a result of that detour. *Id.*

*Fourth*, workers at the Franny's Farmacy franchise in Virginia face potential civil or criminal penalties if they stock, sell, or handle any products that violate the new "total THC" standard imposed by SB 903, increasing compliance costs. *Id.* at ¶12. Like NOVA Hemp, the lack of a transitional period for SB 903 increased risks for Franny's Farmacy as it scrambled to adjust its business.

In total, Franny's Farmacy estimates that it has lost at least $200,000 in reduced revenues or increased costs as a direct and proximate result of SB 903, with said losses being likely to worsen as SB 903 decimates the Virginia hemp market. *Id.* at ¶14.

### IV.    *Economic Studies of Virginia's Hemp Industry.*

In addition to the harms noted by the individual Plaintiffs, the economic harm to Virginia as a result of SB 903 will be substantial. Whitney Economics, a firm that specializes in the economic study of the hemp and cannabis industries, estimated that sales of hemp-derived cannabinoids in 2023 would reach $562 million in Virginia alone, just in the retail market, employing 4,263 workers and paying an estimated $161 million in wages, with a net positive economic impact of over $2.5 billion on the Virginia economy. *See* Beau Whitney, *Hemp Derived Cannabinoids: An Economic Impact Analysis of Cannabinoid Retail in Virginia*, p. 4 (March 9, 2023), attached hereto as **Exhibit Six**. After SB 903 was enacted, the same firm did another analysis, this time of the effect that the new law would have on the hemp industry in Virginia. The result: a reduction of approximately $450 million in retail sales, potentially leading to the loss of approximately 3,400 jobs, and resulting in a reduction of approximately $130 million in wages. *See* Beau Whitney, *Virginia Hemp Ban: The Economic Impacts of SB 903*, p. 6

(August 30, 2023), attached hereto as **Exhibit Seven**. In other words, SB 903 will cause the Virginia market for hemp products to shrink by approximately 80%, closing numerous stores and putting thousands out of work—and that's before considering the effect of lost sales and income taxes to the Commonwealth's revenue, and a myriad other economic effects.

Moreover, in August 2023 the Commonwealth began issuing fines against businesses like NOVA Hemp and the Franny's Farmacy franchise that were found to stock and sell products that violate the new "total THC" standard. *See* Graham Moomaw, *Hemp retailers face big fines as Va.'s tougher THC law takes effect*, *Virginia Mercury*, https://www.nvdaily.com/hemp-retailers-face-big-fines-as-va-s-tougher-thc-law-takes-effect/article_ffdf29ee-191c-5474-be49-314126a1d8ae.html (Aug. 6, 2023). There is no question, then, that the Commonwealth, including the Defendants herein, intend to enforce SB 903 to its fullest extent, including against the named Plaintiffs.

### VI.   The Defendants Are each Responsible for Enforcing Discrete Portions of SB 903 being Challenged Herein.

The Defendants each have different measures of authority to enforce the new "total THC" standard against the Plaintiffs.

The Commonwealth of Virginia is named as the ultimate source of authority for the enforcement of the laws of the Commonwealth. Governor Glenn Youngkin is named as a defendant in his official capacity as the chief executive responsible for executing the laws of the Commonwealth. Attorney General Jason Miyares, also named as a defendant in his official capacity, is vested with authority to enforce the criminal laws regarding marijuana, Va. Code §§ 18.2-247(D) and 18.2-371.2, as well as bring actions under the VCPA. *See* Va. Code § 59.1-203(A).

The Board of Agriculture and Consumer Services (the "Agriculture Board") is empowered to regulate industrial hemp extracts, including developing regulations for testing those extracts to ensure they meet the "total THC" levels noted above. *See* Va. Code § 3.2-5145.5. Sellers or manufacturers of industrial hemp extracts, including those who manufacture or sell an industrial hemp extract that does not meet the THC levels set under SB 903, can face civil penalties, including a fine of up to $10,000 per day. *See* Va. Code § 3.2-5145.2:1.

Joseph Guthrie, named in his official capacity as the Commissioner of the Virginia Department of Agriculture and Consumer Services (the "Commissioner"), is authorized to access the premises of registered sellers of hemp products to enforce the "total THC" standard, including testing products to make sure they meet the "total THC" levels noted above, Va. Code § 3.2-4125, and is empowered to subject sellers to civil penalties for failing to abide by those laws, including fines up to $10,000 per day. Va. Code § 3.2-4126. Sellers of hemp products and industrial hemp extracts must obtain a registration from the Commissioner and pay a fee. *See* Va. Code §§ 3.2-4122, 3.2-5100. The Commissioner also can investigate and request an action be brought to stop violations of the VCPA. *See* Va. Code § 59.1-203(D).

The Virginia Cannabis Control Authority (the "Authority") has the power to "control the possession, sale, transportation, and delivery of marijuana and marijuana products" in the Commonwealth. Va. Code § 4.1-604(2). The Authority can issue regulations to control marijuana and hemp products in the Commonwealth, including establishing "a maximum [THC] level for retail marijuana products, which shall not exceed (i) five milligrams per serving for edible marijuana products and where practicable an equivalent amount for other marijuana products or (ii) 50 milligrams per package for edible marijuana products and where practicable an equivalent amount for other marijuana products." Va. Code § 4.1-606(7). The Authority also

20

can investigate and request an action be brought to stop violations of the VCPA. *See* Va. Code § 59.1-203(E).

The remaining defendants are all Commonwealth's Attorneys for the various counties and cities of the Commonwealth, each named as a defendant in his or her official capacity, as each has authority to enforce Virginia's criminal laws regarding marijuana, Va. Code §§ 18.2-247(D) and 18.2-371.2, and to bring actions under the VCPA. *See* Va. Code § 59.1-203(A).

## ARGUMENT

This Motion seeks to preserve the status quo that existed before issue in controversy occurred—i.e. the federal standard for marijuana that Virginia enforced before SB 903 was implemented.[30] *See Nat. Home Ins. Co. v. State Corp. Comm'n of Commonwealth of Virginia*, 838 F. Supp. 1104, 1115-16 (E.D. Va. 1993) ("Legislation is future-oriented and changes the existing status quo through the making of a new rule or regulation.") (*citing Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908)). In other words, Plaintiffs seek a preliminary injunction enjoining the Defendants from implementing or enforcing SB 903 solely to the extent that its "total THC" standard for hemp and its products, or determining whom licensed cannabis growers can sell their products to, conflicts with the federal standard under 7 U.S.C. § 1639o(1), which was in effect in Virginia until July 1, 2023.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*,

---

[30] There are two types of preliminary injunctions: prohibitory injunctions that maintain the "status quo," as this Motion requests, *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013), and mandatory injunctions that alter the status quo and require a party to take a certain action. *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). Mandatory injunctions must meet an "even more exacting" standard than prohibitory injunctions. *Vollette v. Watson*, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) (Davis, J.).

649 F.3d 287, 290 (4th Cir. 2011) (*quoting Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). It is "never awarded as a matter of right." *Winter*, 555 U.S. at 24. Because of its extraordinary character, and the fact that this Court is acting on an incomplete record in determining whether to grant the requested relief, a preliminary injunction is "to be granted only sparingly." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 524 (4th Cir. 2003).

A plaintiff must show four things to obtain a preliminary injunction: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing cases). Each factor must be separately considered. *Pashby*, 709 F.3d at 321. Plaintiffs bear the burden of establishing each factor. *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009). All four factors must be met—it is not a balancing test. *Id.*

The Plaintiffs herein are entitled to a preliminary injunction against SB 903's new standard for legal hemp products, as all four *Winter* prongs weigh in their favor.[31] As a preliminary matter, however, Plaintiffs must establish that this Court has jurisdiction to hear this case and grant relief.

## I. This Court Has Jurisdiction Over this Matter and Can Grant Relief.

### A. *The Plaintiffs Each Have Standing.*

It is axiomatic that standing is a threshold jurisdiction issue that must be determined before a court can consider the merits of a case. *See Steel Co. v. Citizens for a Better*

---

[31] Per Rule 52(a)(2) of the Federal Rules of Civil Procedure, this Court must make particularized findings of fact and conclusions of law supporting its decision to grant or deny a preliminary injunction; such findings being necessary in order for an appellate court to "meaningfully review that decision." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999).

*Environment*, 523 U.S. 83, 88 (1998). Standing is determined at the commencement of a lawsuit.

*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.5 (1992). The *Lujan* Court elaborated on

the standard for standing as follows:

> "[T]he irreducible constitutional minimum of standing contains three elements: [1] the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, [2] there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[, and 3] it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id.* at 560-61 (citing cases) (cleaned up). Plaintiffs bear the burden of proving each of those

elements. *Id.* at 561.

Each of the Plaintiffs has standing under the *Lujan* factors. First, with regard to SB 903's

"total THC" standard, the Plaintiffs have suffered an injury in fact because the Banned Products

that were legal under the Farm Act, and which Plaintiffs each could legally manufacture, buy,

sell, transport, or otherwise transact in the Commonwealth prior to July 1, 2023, are now illegal

as marijuana, or subject to liability under the VCPA. The injury is "concrete and particularized"

because those Banned Products are known and defined. That harm is actual because SB 903 has

already gone into effect as of July 1, 2023. The injury is "fairly traceable" to the Defendants

because each of the Defendants plays a role in enforcing the new "total THC" standard against

the Plaintiffs, to deny them access to the products that are legal under federal law, and to impose

punitive measures—criminal and civil liability, fines, or the revocation of permits or

registration—on those Plaintiffs that violate the "total THC" standard. If this Court enters the

requested injunction, it is "likely" that the harm will abate because the Banned Products would

again be legal in Virginia for the Plaintiffs to manufacture, buy, sell, transport, or otherwise

transact in as they did prior to July 1, 2023.

Second, Franny's Farmacy as manufacturer of hemp products some of which are Banned Products, is directly affected by Va. Code § 3.2-4116(C) in that it cannot buy industrial hemp or industrial hemp extracts from any Virginia licensed processor, as those processors face fines and other civil sanctions if they do so. There is an injury in fact that is "concrete and particularized" because Franny's Farmacy has been denied the ability to purchase industrial hemp and industrial hemp extracts from sellers in Virginia, reducing its options for purchase and increasing costs of finding alternative sellers. The harm is actual because SB 903 is in effect. The harm is "likely traceable" to the Defendants because the Commissioner enforces Va. Code § 3.2-4116(C) against the Virginia licensed processors. And finally, if the requested injunction is entered and the federal standard is reinstated, the harm to Franny's Farmacy will abate as it will again be able to purchase industrial hemp and industrial hemp extracts from Virginia processors.

Third, as a result of SB 903, Banned Products may no longer be shipped through Virginia on route to another State where the Banned Products are legal, because those hemp products become illegal marijuana upon entering the Commonwealth. Thus, Franny's Farmacy, which manufactures federally-compliant hemp products in North Carolina and seeks to ship them to its franchise in Connecticut will incur significant additional costs because the shipping company will have to route a path from North Carolina to Connecticut that avoids Virginia entirely or else its drivers might risk criminal liability. Such a route would have to go through Tennessee, Kentucky, and West Virginia, adding hundreds of miles to a route that normally would just follow I-95 through Virginia and into Maryland.

### B.    *Plaintiffs' Claim Is Ripe.*

Plaintiffs must also show that their claim is "ripe," in that it constitutes a live controversy that does not involve "abstract disagreements over administrative policies." *Pashby*, 709 F.3d at

24

317 (*quoting Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967)). The matter in controversy should be "final and not dependent on future uncertainties or intervening agency rulings." *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002). Here, there is no question that this matter is ripe, as SB 903's "total THC" standard is now the law of Virginia, having gone into effect on July 1, 2023, with no transitional period whatsoever. There are no contingencies required for the new standard to come into conflict with the existing Farm Act standard, or to cause harm to the Plaintiffs by banning them from having access to or engage in commercial transactions with hemp products that are protected in interstate commerce under federal law.

### C.    *This Court Has Subject Matter Jurisdiction.*

This Court has an "independent obligation to assess subject matter jurisdiction" since without that jurisdiction, this Court lacks the "very power to hear [the] case." *Gaines Motor Lines, Inc., v. Klaussner Furniture Industries, Inc.*, 734 F.3d 296, 302 (4th Cir. 2013). Under 28 U.S.C. § 1331, this Court has "original jurisdiction in all civil actions arising under the Constitution, laws, or treaties of the United States." The foundation of this case concerns the extent that the Farm Act preempts SB 903 under the Commerce and Supremacy Clauses of the U.S. Constitution, which gives this Court jurisdiction. This Court also has "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies," which the Farm Act clearly qualifies as. 28 U.S.C. § 1337(a). The claims under 42 U.S.C. § 1983 enforcing the Commerce Clause similarly raise federal questions that fall under 28 U.S.C. § 1331.

Finally, although this case includes claims by a foreign corporation against the Commonwealth of Virginia, injunctive and prospective relief is still available from this Court

notwithstanding the Eleventh Amendment. *See Kimble v. Solomon*, 599 F.2d 599, 603-04 (4th Cir. 1979) (*citing Ex parte Young*, 209 U.S. 123 (1908)).

### D.   This Court Has the Power to Grant Relief.

This Court can award the relief requested by the Plaintiffs, which is to declare whether SB 903's treatment of hemp has been federally preempted by 7 U.S.C. § 1639o(1) of the Farm Act. *See* 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57. Moreover, this Court is vested with the authority to enter a preliminary injunction enjoining enforcement of a state statute that conflicts with federal law. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-34 (1975); *and see Ex parte Young*, 209 U.S. 123 (1908) and Federal Rule of Civil Procedure 65.

**In summation**: the Plaintiffs have standing to bring their claims, Plaintiffs' claims are ripe, this Court has subject matter jurisdiction, and can grant the requested relief. Plaintiffs are thus eligible to receive preliminary injunctive relief if they meet the four *Winter* factors, as discussed next.

## II.   Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs must make a "clear showing" that they are likely to succeed on the merits at trial. *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009). However, such a showing need not demonstrate a "certainty of success" for a preliminary injunction to issue. *Pashby*, 709 F.3d at 321. Here, it is clear that the Plaintiffs are likely to succeed on the merits of this case because the federal government expressly decided in the Farm Act that hemp, as solely defined by its concentration of Delta-9 THC, was to be legal throughout the United States and protected in interstate commerce. This was a lawful exercise of the federal government's Commerce Clause power. Virginia simply lacks the authority to impose its more stringent "total THC" standard because the Farm Act has preempted such efforts through the Supremacy Clause.

26

Prior efforts by other states to impose similar restrictions were properly enjoined, and this one should fare no differently. In addition, it is also clear that SB 903's attempt to extend the "total THC" standard to other states through its restriction on the sale of industrial hemp violates the dormant Commerce Clause.

The Supremacy Clause, U.S. Const., Art. IV, §2, mandates that Congress, acting within its constitutional limits, is empowered to pre-empt and supersede state law in multiple ways. First, it can state that it is doing so in express terms. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Alternatively, "Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 713 (1985) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Pre-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough County*, 471 U.S. at 713. Such a conflict exists where the State's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). State laws can also be preempted by federal regulations. *See, e.g., Capital Cities Cable, Inc. v. Crisp*, 457 U.S. 691, 699 (1984). However, there is an "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230.

27

The first issue in this case is whether SB 903's "total THC" standard has been preempted by the Farm Act's hemp standard under 7 U.S.C. § 1639o(1) that only measures Delta-9 THC. The second is whether Virginia's prohibition on the sale of industrial hemp or industrial hemp extracts to anyone, anywhere, who might use those products to violate the "total THC" standard is precluded under the dormant Commerce Clause. For the following reasons, Plaintiffs are likely to prevail on the merits of these inquiries, and thus this factor weighs in favor of a preliminary injunction.

## A.   *Federal Law Preempts the Virginia "total THC" Standard.*

Under well-established authority, "[p]re-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (*quoting FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990)). Implied preemption includes field preemption, *Arizona v. United States*, 567 U.S. 387, 399 (2012), and two versions of conflict preemption. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963) (impossibility preemption); *and see Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (obstacle preemption). Each will be examined in turn.

### 1.   **Express Preemption.**

For matters of express preemption, the focus is on "statutory intent," and this court should "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Id.*, *and see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("When a federal law contains an express preemption clause, we 'focus on the plain wording of the clause, which necessarily

contains the best evidence of Congress' preemptive intent.'") (*quoting CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

The language of the Farm Act is unequivocal. It specifically defines hemp solely in reference to its concentration of Delta-9 THC, which by doing so naturally excluded consideration of the other natural and synthetic isomers of THC, including Delta-8, or consideration of its concentration of CBD. 7 U.S.C. § 1639o(1). Congress then excised that definition of hemp from the CSA's prohibition on marijuana and THC, making it clear that hemp was now legal throughout the United States. 21 U.S.C. §§ 802(16) and 812(c). Congress expressly noted its intentions of preemption in Sec. 10114 of the Farm Act: "No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State or territory of the Indian Tribe, as applicable." The Secretary of Agriculture thereupon codified that mandate into a federal regulation that states: "No State or Indian Tribe may prohibit the transportation or shipment of hemp lawfully produced" under federal regulations. 7 C.F.R. § 990.63.

The ordinary meaning of these provisions could not be more obvious. Congress legalized hemp solely according to its concentration of Delta-9 THC and mandated that the interstate commerce in hemp as so defined could not be inhibited by the States. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690-91 (9th Cir. 2022) (holding that Delta-8 THC products were legal under the "plain meaning" of 7 U.S.C. § 1639o(1), and affirming preliminary injunction for copyright infringement). Congress did not allow the States to impose a stricter standard for hemp. The only explicit carve-out granted to the States and Indian tribes was the grant of "primary regulatory authority over the ***production*** of hemp" pursuant to a plan submitted to and approved by the Secretary of Agriculture. 7 U.S.C. § 1639p (emphasis added).

29

While States and Indian tribes were allowed to pass laws regarding the ***production*** of hemp that were "more stringent" than required by federal law, 7 U.S.C. § 1639p(a)(3)(A), that carve-out, by its terms, did not extend to the manufacturing, purchase, sale, consumption, or manufacturing of hemp products.[32] Indeed, the Virginia Plan does not address any of those other aspects of hemp commerce—it expressly established "a registration program to allow a person to ***grow*** industrial hemp[33] in the Commonwealth and requires that anyone seeking to ***grow*** industrial hemp in the Commonwealth apply to the Commissioner for a registration to do so[,]" and then set forth procedures "to monitor and randomly test industrial hemp, at the cost of the ***grower***," and only tested such industrial hemp according to the federal standard. *See* note 23, *supra* (emphases added). The Commonwealth has not altered the Virginia Plan since SB 903 went into effect. While arguably the Commonwealth could amend the Virginia Plan to be more stringent with regard to the ***growing*** of cannabis, it has not chosen to do so, nor would such a plan be able to extend to the manufacture, sale, purchase, consumption, or transport of hemp, as federal law limits its ambit solely to cultivation. *See* 7 U.S.C. § 1639p(a)(2)(A) (requiring State plans to include, for example, "relevant information regarding land on which hemp is produced"); *and see* 7 CFR § 990.3(a) (same).

The "total THC" standard is clearly at odds with 7 U.S.C. § 1639o(1). Because the former includes all isomers of THC, while the latter only measures Delta-9 THC, a host of products that are legal under the federal standard are now illegal as marijuana in Virginia. *See*

---

[32] *See also* USDA Executive Summary of New Hemp Authorities, USDA Office of the General Counsel (May 28, 2019), https://www.ams.usda.gov/sites/default/files/HempExecSumandLegalOpinion.pdf (interpreting "production of hemp" as "growing of hemp" only).

[33] "Industrial hemp" under Virginia law remains the same as the federal standard. *See* Va. Code § 3.2-4112, *and see* Va. Code § 3.2-5145.1

Ex. Two (listing the Banned Products). While the "total THC" standard does not ban *all* hemp, it inevitably bans a large subset of hemp that is protected under Sec. 10114 of the Farm Act and 7 C.F.R. § 990.63.

The Farm Act's mandate that hemp be protected in interstate commerce constitutes federal preemption in the same way that the federal Endangered Species Act recently preempted California from enforcing laws outlawing the importation of alligator and crocodile products in *April in Paris v. Bonta*, 2:19-cv-02471-KJM-CKD (E.D. Cal. March 6, 2023) (ECF 78), decision attached hereto as **Exhibit Eight**. Specifically, California's law made it "unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or a part or product thereof, of a crocodile or alligator." Cal. Pen. Code §§ 653o(b)(1) and 653r. The Endangered Species Act, meanwhile, created a regulatory structure that enabled alligators to be hunted and used to make products for interstate commerce. *See* 16 U.S.C. § 1539(a). Pursuant to that authority, the U.S. Fish and Wildlife Service promulgated regulations for those activities. *See* 50 C.F.R. § 17.42, *et seq*. The Endangered Species Act further stated that any State law was "void to the extent that it may effectively . . . prohibit what is authorized" under the Act or the regulations promulgated thereunder. 16 U.S.C. § 1535(f).

Under that rubric, the federal district court issued a preliminary injunction enjoining the California law, and then entered summary judgment in favor of the challengers of the law, holding that California's law was preempted by the Act. That court relied in part on *Man Hing Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760 (9th Cir. 1983), another case in which a California law prohibiting trade of a product, this time products made from elephants, was held to be preempted under the Endangered Species Act because, again, federal law authorized such trade pursuant to the permit process the Act put in place. *See id.* at 763-64 (quoting 50 C.F.R. §

17.40(e)). The Ninth Circuit rejected a reading of the Act that would enable a State to supersede the federal regulation of trade by banning that which the federal government had authorized the trade of.

In both *April in Paris* and *Man Hing*, federal law expressly permitted the interstate trade of a commodity, and federal preemption precluded efforts by a State to ban that commodity. Here, the Farm Act precludes the Commonwealth from banning any products that have been deemed legal hemp pursuant to its Delta-9 THC level for the exact same reasons. This case is a mirror image of *Gonzales v. Raich*, in which the federal government's ban on marijuana superseded the State's ability to legalize any subset of marijuana, even for health reasons. Like the federal government's Commerce Clause power to make marijuana illegal throughout the country, it surely also possesses the power under the same Clause to render hemp (as Congress chose to define it) legal throughout the country. Under *Gonzales*, a State cannot legalize any cannabis with, say, a Delta-9 THC concentration above 0.3 percent, as that exceeds the level set in 7 U.S.C. § 1639o(1). But similarly, the State cannot make illegal any cannabis with a Delta-9 THC concentration of 0.3 percent or below based on some other metric not relevant to the federal standard, especially since the Farm Act does not provide States with the power to enforce stricter standards except when it comes to cultivation, and it expressly mandates that products meeting the federal standard are protected in interstate commerce. In other words, if a State cannot legalize a commodity for intrastate purposes because that would frustrate an interstate ban on that commodity, per *Gonzales*, a State cannot conversely ban a commodity that Congress has authorized for interstate commerce, as that would inevitably frustrate Congress' authority as well.

For these reasons, Congress has expressly preempted SB 903's "total THC" standard, and thus Plaintiffs are likely to succeed on the merits.

### 2.      Field Preemption.

Field preemption prohibits state regulation of "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. For example, in *Pacific Gas and Electric Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983), the U.S. Supreme Court held that while the Atomic Energy Act gave the states authority over the construction and operation of nuclear power plants and the regulation of the energy so produced, "the Federal Government maintains complete control of the safety and 'nuclear' aspects of energy generation" such that it "occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States," such that "safety regulation of nuclear plants by States is forbidden." *Id.* at 212. In other words, field preemption exists where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 509 (1989) (*citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)). "Statutory text and structure provide the most reliable guideposts in this inquiry." *PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014) (*citing Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).

Under the Farm Act, Congress has "occupied the field" as to whether a given substance is legal as hemp, or illegal as marijuana, having made the decision as to the relative health and safety of hemp as Congress chose to define it for the general public, just as the Atomic Energy Act preserved federal authority over the safety of nuclear power throughout the country. While the States were permitted to establish regulatory plans over the cultivation of hemp, like they had

33

authority over the construction of nuclear plants in *Pacific Gas*, Congress has made the determination for everyone that hemp meeting a particular concentration of Delta-9 THC is safe for possession, use, purchase, sale, and transport throughout the country. It did not permit nor invite the States to turn any subset of hemp back into illegal marijuana, whether based on a State's safety concerns or otherwise.

The situation is the inverse of *Gonzales v. Raich*, under which the criminalization of marijuana pursuant to the CSA was deemed part of "a closed regulatory system" regulating the interstate commerce of that substance. 545 U.S. at 13. To allow the States to legalize a subset of marijuana "would leave a gaping hole in the CSA," just as to allow States to criminalize a subset of hemp would leave a gaping hole in the Farm Act. *Id.* at 22. If the Commonwealth's "total THC" standard is permitted to stand, States could effectively render the Farm Act useless by criminalizing ever-lower levels of THC in hemp. That is surely not what Congress intended to allow. Therefore, Congress has occupied the field of defining what is considered legal hemp throughout the country, and the Commonwealth is preempted from imposing its stricter "total THC" standard.

### 3.   Conflict Preemption.

Conflict preemption arises when the state law conflicts with a federal statute. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "Assessing a conflict preemption claim required 'a two-step process of first ascertaining the construction of two statutes and then determining the constitutional question [of] whether they are in conflict.'" *H&R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (*quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)). "In making this determination, a court

'should not seek out conflicts . . . where none clearly exists.'" *Id.* (*quoting College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005)).

There are two kinds of conflict preemption. Impossibility preemption is where "it is impossible for a private party to comply with both state and federal law." *Id.* Obstacle preemption is when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. It is not impossible for a person to comply with both SB 903 and the Farm Act, as there are substances and products that are legal under both. However, SB 903 stands as a clear obstacle to the purposes and objectives of the Farm Act in creating an interstate market for hemp by making a large number of products that are legal under the federal standard now illegal in Virginia.

A state law is an obstacle to federal law when it "interferes with the *methods* by which the federal statute was designed to reach [its] goal." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (*quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)) (emphasis in original). "A decision about [obstacle preemption] requires the court independently to consider national interests and their putative conflict with state interests . . . [it is] more an exercise of policy choices by a court than strict statutory construction." *Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988).

By excluding hemp as defined under 7 U.S.C. § 1639o(1) from the definition of marijuana in the CSA, Congress clearly decided it was in the national interest for hemp *as it defined it* to be legal throughout the United States. Under the Farm Bill, hemp was transformed into an agricultural commodity. Products of hemp were henceforth subject to the same regulations that other agricultural commodities were subject to by the Food and Drug

Administration and the USDA.[34] The only involvement allowed to the states was the opportunity to regulate the cultivation of hemp within their respective borders—if a state chose not to submit a regulatory plan, then the federal government would impose its own. *See* 7 U.S.C. § 1639p & q.

By implementing the "total THC" standard, the Commonwealth has converted a large segment of hemp from a legal product back into marijuana, an illegal Schedule 1 drug. *See* Va. Code §§ 4.1-600, 18.2-247, 18.2-248, and 18.2-371.2. Not only that, but even for those who are permitted to grow industrial hemp under the Virginia Plan, they are now prohibited from selling their hemp to anyone, anywhere in the world, who might use their product to create anything that might violate the "total THC" standard—even if it is legal to create such a product in the buyer's location. Va. Code § 3.2-4116(C). Both of these laws clearly serve as an obstacle to Congress' intent of treating hemp, as it defined it, as an agricultural product, regulated under existing federal standards, and intended to be transported throughout the country without impediment. Virginia not only subjects a trucker moving hemp from, say, North Carolina to Maryland, through Virginia via Route 95, to criminal sanctions for doing so if the hemp s/he carries happens to violate the "total THC" standard, but it also seeks to export that standard outside of the Commonwealth's borders by forbidding an industrial hemp grower from selling to a buyer in Maryland who wishes to manufacture a hemp product that complies with the federal standard but does not abide by the "total THC" standard, even though the buyer is compliant with Maryland

---

[34] *See* Amy Abernathy, Principal Deputy Commissioner of the FDA, *Hemp Production and the 2018 Farm Bill* (testimony before the U.S. Senate, July 25, 2019), https://www.fda.gov/news-events/congressional-testimony/hemp-production-and-2018-farm-bill-07252019 ("The 2018 Farm Bill explicitly preserved FDA's authorities over hemp products. Therefore, hemp products must meet any applicable FDA requirements and standards, just like any other FDA-regulated product. For example, FDA's existing authorities over foods, dietary supplements, human and veterinary drugs, and cosmetics apply to hemp products to the extent such hemp products fall within those categories."); *and see* 7 U.S.C. § 1639r(c).

law. The problem would only grow worse should additional states each pass conflicting standards for what is and isn't hemp, making every interstate transaction fraught with uncertainty over whether a given product might be legal or illegal. This is clearly not the simple, straightforward regime that Congress intended. Hence, SB 903 is preempted by the Farm Act also under conflict preemption, entitling the Plaintiffs to injunctive relief.

> **B.**     ***SB 903 Also Violates the Dormant Commerce Clause.***

While the Commerce Clause is an affirmative grant of power to Congress over interstate commerce, it also "implies a 'negative' or 'dormant' constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce." *Brown v. Hovatter*, 561 F.3d 357, 362 (4th Cir. 2009) (*citing Dennis v. Higgins*, 498 U.S. 439, 447 (1991)). That dormant Commerce Clause serves to "rebuff[ ] attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949).[35] "Thus, not all economic harms or anticompetitive choices are remedied through the application of the dormant Commerce Clause, but rather only those that *unjustifiably burden* interstate commerce." *Brown*, 561 F.3d at 363 (emphasis in original).

At the "very core" of the dormant Commerce Clause is an "antidiscrimination principle" that "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state

---

[35] The dormant Commerce Clause does not apply when the State "is acting as a market *participant*, rather than as a market *regulator*." *Brooks v. Vassar*, 462 F.3d 341, 355 (4th Cir. 2006) (*quoting South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 93 (1984)) (emphasis in original). Here, since the Commonwealth is a regulator and not a participant, the dormant Commerce Clause applies.

competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. ___, p.7 (2023) (Gorsuch, J.)
(cleaned up, quotations omitted). "If there is no discrimination, a court will consider on the
second tier whether the state laws 'unjustifiably . . . burden the interstate flow of articles of
commerce.'" *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 668 (4th Cir. 2018)
(quoting *Oregon Waste Sys. Inc. v. Dept. of Environmental Quality of Oregon*, 511 U.S. 93, 98
(1994)). The latter tier employs the so-called *Pike* test, "under which the challenged law 'will be
upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the
putative local benefits.'" *Id.* (quoting *Pike v Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The
*Pike* test requires a plaintiff to plead facts plausibly showing that a challenged law imposes
"substantial burden on interstate commerce" followed by a "showing that those burdens clearly
outweigh the benefits of a state or local practice." *Nat'l Pork Producers Council*, 598 U.S. at p.3
(Sotomayor, J. concurring in part) and p.3 (Roberts, C.J., concurring in part and dissenting in
part).[36]

The "total THC" standard of SB 903, since it applies to all hemp regardless of where it
comes from, is not in itself a discriminatory law that appears to favor the Commonwealth's
economic interests over those who reside elsewhere. However, the restrictions on the ability of
in-state processors of industrial hemp to sell to anyone, ***anywhere***, who might use their hemp to
create a product that violates the "total THC" standard is patently discriminatory to interstate
commerce, as it will effectively forbid out-of-state buyers, like Franny's Farmacy, from having
access to Virginia hemp. *See* Va. Code § 3.2-4116(C) ("A processor shall not sell industrial
hemp or a substance containing an industrial hemp extract . . . to a person if the processor knows

---

[36] The fractured opinion in *Nat'l Pork Producers Council* can be difficult to parse, but it is clear
that a majority of the justices agreed to apply *Pike* in this fashion.

or has reason to know that such person will use the industrial hemp or substance containing an industrial hemp extract in a substance that [exceeds the "total THC" standard in SB 903]"). This is so because the law forbids a Virginia grower from selling to anyone who does not abide by Virginia's standard, when no other State has imposed that standard. Additionally, it would require Virginia hemp growers to gather information about buyers outside the Commonwealth to ensure compliance—an onerous task at best. The obvious result of the restriction in Va. Code § 3.2-4116(C) is to prevent Virginia growers from selling their product to anyone but in-state manufacturers, which results in a burden *"on the flow of interstate commerce*—the flow of goods, materials, and other articles of commerce across state lines." *Brown*, 561 F.3d at 364 (emphasis in original). Just as courts have struck down State laws that attempted to regulate prices for goods in other states, *see, e.g.*, *Healy v. Beer Institute*, 491 U.S. 324 (1989) (invalidating Connecticut law requiring beer producers to affirm that their prices in Connecticut were no higher than the prices in neighboring states, in an effort to prevent Connecticut residents from crossing state lines to purchase cheaper beer), Va. Code § 3.2-4116(C) seeks to regulate out-of-state buyers of industrial hemp with the "total THC" standard even if the buyer resides in a State with no such standard. Otherwise, those buyers will not be able to purchase Virginia industrial hemp or its extracts. Naturally, Virginia buyers already forced to comply with the "total THC" standard will not be so burdened. Such an obvious discriminatory effect on out-of-state buyers like Franny's Farmacy violates the "antidiscrimination principle." *Nat'l Pork Producers Council*, 598 U.S. at p.7 (majority opinion).

Alternatively, the *Pike* test weighs heavily against SB 903. Not only does the restriction on the sale of industrial hemp and its extracts specifically burden sales to out-of-state buyers like Franny's Farmacy, as explained above, but the "total THC" standard itself burdens interstate

commerce by converting products legal under federal law into illegal marijuana upon crossing into Virginia. A trucker carrying a load of hemp from North Carolina to Maryland would have to drive completely around Virginia to avoid any danger of being pulled over and arrested for possessing marijuana as cargo—a comically long detour through Tennessee, Kentucky, and then West Virginia—instead of just going up I-95. Indeed, by being smack-dab in the middle of the East Coast, SB 903 turns Virginia into a giant roadblock for the transport of federally-legal hemp throughout those eastern States. As a result, manufacturers of retail hemp products that are legal outside of Virginia but become illegal marijuana upon crossing into Virginia, like Franny's Farmacy, face much higher costs as their shippers will either increase charges to cover the cost of the detour, or to account for the inherent risk their drivers will take shipping Banned Products through Virginia.

To what benefit? The Commonwealth will certainly claim that Delta-8 THC products are harmful to minors, but that problem is ameliorated (if not eliminated) by the fact that this lawsuit is not seeking to challenge SB 903's packaging laws that forbid products packaged in a way that could be attractive to minors. The prohibition on the sale of industrial hemp and its extracts to any buyer on Earth who might use it to violate the "total THC" standard is not extracting any benefit measurable to Virginia—it only denies such products to those in other States who are otherwise legally able to manufacture, buy, sell, and transact in federally-legal hemp, like Franny's Farmacy. Compared to the massive disruption and burden caused by SB 903, any possible benefits are miniscule at best.

In sum, SB 903 violates both the core antidiscrimination principle of the dormant Commerce Clause, and inflicts economic burdens to interstate commerce far in excess of any

benefits rendered to Virginia in violation of the *Pike* test, making it likely that the Plaintiffs will ultimately prevail on the merits.

### C.   Courts Have Enjoined Similar Prior Efforts by the States.

Although Virginia is the first State to enact a law in conflict with the federal standard, courts in other States have issued preliminary injunctions against similar efforts to attack Delta-8 THC and related products in contravention to the Farm Act.

In *Kentucky Hemp Association v. Quarles*, Case No. 21-CI-00836 (Boone Cir. Ct., Div. I, Feb. 28, 2022) (copy attached as **Exhibit Nine**), the state trial court entered an injunction enjoining Kentucky officials from taking any punitive action against those who were engaging in the possession, sale, purchase, use, or transportation of hemp as defined under the Farm Act. Those officials were acting under an administrative decision by the Kentucky Department of Agriculture that classified Delta-8 THC as a Schedule I controlled substance, hence illegal as marijuana. The state trial court held that the language of 7 U.S.C. § 1639o(1), which extended to cover "all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not," of cannabis, by definition included Delta-8 THC since that was a derivative, extract, and/or isomer of the plant. Since Congress (and the Kentucky legislature) did not make an exemption for Delta-8 THC, the definition of hemp as enshrined in the enacted legislation—which only measured Delta-9 THC concentrations—controlled, and Kentucky officials could not act on their own to criminalize products with Delta-8 THC in them.

A similar injunction was entered against a Georgia district attorney in *SASS Group, LLC v. State of Georgia*, Case No. 2022CV362007 (Fulton Sup. Ct. April 15, 2022) (attached hereto as **Exhibit Ten**). There, a state official sought to enforce criminal penalties and civil asset forfeitures against the plaintiffs for their possession or sale of hemp products containing hemp-

derived substances other than Delta-9 THC, which were legal under Georgia law that adopted the same standard as the Farm Act. Again, the state court found that while Delta-8 and Delta-10 THC products were "not specifically excepted from the statute . . . if the state had intended that hemp products containing Delta-9-THC and Delta-10-THC products to remain controlled substances, then it would have explicitly limited" the definition of hemp accordingly.

The case of *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541 (7th Cir. 2020) involved a challenge to an Indiana law that criminalized the manufacture, possession, or delivery of smokable hemp. The district court granted a preliminary injunction enjoining enforcement of the law on the basis that it was preempted by the Farm Act. On appeal, the Seventh Circuit agreed that an injunction was warranted, although with a narrower scope. The Seventh Circuit chose to read the Farm Act's preemption clause ("No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State") narrowly, and the clause permitting the States to regulate the "production" of hemp "more stringent[ly]" more broadly, even though the latter grant of power clearly applies only to cultivation of the plant. 7 U.S.C. § 1639p(a)(3)(A); *and see* 7 U.S.C. § 1639p(a)(2) (setting forth requirements of a State plan, which includes the need to "maintain relevant information regarding land on which hemp is produced in the State"); *and see* the Virginia Plan (which was approved under that same statute, which only addresses cultivation of hemp as opposed to the manufacture of hemp products). While the Seventh Circuit agreed that Indiana could not prohibit the possession of smokable hemp as it was being transported through the State, the panel was "unconvinced that the express preemption clause, standing alone, precludes a state from prohibiting the possession and sale of industrial hemp within the state." 965 F.3d at 547. The panel also held that conflict preemption did not prohibit Indiana from

criminalizing smokable hemp, likening the situation to that of the salvia plant, a psychoactive

drug not listed in the CSA that is nevertheless illegal in most states. *Id.* at 548. Thus, the panel

concluded that an injunction "preventing Indiana from enforcing its law against those

transporting smokable hemp through Indiana in interstate commerce" would be appropriate. *Id.*

at 549.

Notably, the *C.Y. Wholesale* decision does not discuss the scope of interstate commerce

as it was applied in *Gonzales*, which exposes the fundamental error in the panel's reasoning. As

explained in Sections II-A-1 and 2, supra, in *Gonzales*, the U.S. Supreme Court emphasized that

"interstate commerce" included purely intrastate activities that "substantially affect" interstate

commerce. 545 U.S. at 17. Under that rubric, to allow a state to legalize a subset of marijuana for

health reasons would frustrate Congress' desire to ban all interstate commerce in marijuana,

leaving a "gaping hole" that could not have been intended. *Id.* at 22. Concurrently, to allow a

state to ban a substance that Congress intended to be protected in interstate commerce would

create a similar loophole, one that would render the Farm Bill a dead letter if all the states

independently decided to make hemp illegal. The Seventh Circuit also did not address how, for

example, a shipment of hemp from another state to a buyer in Indiana (or a shipper in Indiana to

another state) would not qualify as interstate commerce, or "transportation or shipment . . .

through the State," which it certainly would. Had the Seventh Circuit's view of the scope of

interstate commerce prevailed in *Gonzales*, and the federal ban on marijuana only concerned the

transport of marijuana from one state to another, then the California law on medical marijuana

would have passed muster.

The Seventh Circuit's comparison of hemp to salvia fails because there is no federal law

or regulation protecting salvia in interstate commerce, while hemp enjoys such protection. *See* 7

C.F.R. § 990.63. Once Congress decided that hemp shall be protected in interstate commerce, it expressly and implicitly forbid the States from passing laws that might "substantially affect" that commerce, which certainly would include the possession, sale, purchase, and manufacture of hemp products, even on an intrastate basis, just like California's medical marijuana did in *Gonzales*. In sum, while the Seventh Circuit was correct in holding that an injunction was appropriate, its proposed ambit was too narrow in light of the scope of interstate commerce as defined in *Gonzales*.

For the reasons stated above, Plaintiffs are likely to prevail on the merits because SB 903 has either been expressly or impliedly preempted by federal law, or it violates the dormant Commerce Clause, thus fulfilling the first *Winter* factor.

### III.    Plaintiffs Are Each Likely to Suffer Irreparable Harm Without an Injunction.

A preliminary injunction should not be issued simply to prevent the possibility of some remote future injury—there must be a "sufficient immediacy and reality" of such. *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (*quoting Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (threat of injury must be both "real and immediate," not "conjectural" or "hypothetical")). It must be "likely" that the asserted harm will occur if no injunction is issued. *Aslanturk v. Hott*, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020); *and see Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007) (when a court "cannot say with confidence that the harm is more likely than not to occur at all," the movant has failed to meet their burden) (*quoting In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 530 (4th Cir. 2003)).

As described above, the immediate effect of SB 903's "total THC" standard has been to make the Banned Products that are legal hemp under federal law now illegal as marijuana in Virginia. The Plaintiffs each are persons or corporations that manufactured, purchased, sold,

44

consumed, or transported those Banned Products inside the Commonwealth prior to July 1, 2023,

but no longer can without risking arrest, fines, loss of registration, or other punishments available

under Virginia law because those Banned Products are now considered to be illegal marijuana.

Plaintiffs are therefore not only irreparably harmed through the harm they will suffer in lost

business and lost access to products, which cannot be later recovered against the Commonwealth

at fault for enacting the unconstitutional provision, but they are also irreparably harmed because

they face punitive and criminal consequences if they choose to ignore Virginia's blatantly

unconstitutional law. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("To punish a

person because he has done what the law plainly allows him to do is a due process violation of

the most basic sort."); *and see Morales*, 504 U.S. at 381-82 (upholding injunction against

enforcement of state laws that were pre-empted by the Airline Deregulation Act of 1978); *and

see Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (holding that a company suffers

irreparable harm from paying an allegedly unconstitutional tax where there was "no remedy

whereby restitution of the money so paid may be enforced"). Indeed, as noted above, the

Commonwealth has started issuing fines under the new law. "[C]omplying with a regulation later

held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and

concurring in the judgment).

Those harms are not limited to the Plaintiffs, as the aforementioned study of the

economic impact of SB 903 shows that the law will result in a reduction of around $450 million

in retail sales in Virginia, potentially leading to the loss of approximately 3,400 jobs, and

resulting in a reduction of approximately $130 million in wages. *See* Ex. Seven, p. 6. SB 903 by

itself is projected to wipe out roughly 80% of the retail market for hemp products. *Id.* To that

must be added the increased costs that hemp companies like Franny's Farmacy will face when they ship their products up and down the East Coast, as transporters of federally-legal hemp products will have to detour around Virginia to avoid potential criminal or civil liability as their cargos become illegal marijuana in the Commonwealth.

The Defendants may argue that since the Plaintiffs did not bring this lawsuit until approximately two months after SB 903 went into effect, there is no irreparable harm. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (holding that "delay" in pursuing claims can "indicate an absence of the kind of irreparable harm required to support a preliminary injunction.") (*quoting Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (CA2 1985)). Simply put, Plaintiffs were unsure as to how SB 903 was going to be enforced. It wasn't until approximately a month after SB 903 went into effect that the Commonwealth began issuing fines and taking other punitive measures against entities in the same position as the Plaintiffs. The instant situation is similar to that in the *Kentucky Hemp Association* case, where, as here, the plaintiffs initiated their lawsuit until after "enforcement action ensued," and then "elected to serve all parties and await appearances of counsel before moving for injunctive relief." Ex. Nine, p.13. That court noted that "delay is not as determinative because the alleged harm [of ongoing government enforcement] might be of a continuing nature." *Id.* at p.14. The same is true here.

The Plaintiffs are being and will continue to be irreparably harmed if SB 903's "total THC" standard is not enjoined. This factor clearly weighs in the Plaintiffs' favor.

## IV.    The Balance of Equities and the Public Interest Favors the Plaintiffs.

When a case is against the government, the last two prongs of the *Winter* test "merge" into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 524 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Where a state law conflicts with the purposes of a federal law, the public interest favors the latter. *See Seaman v. Virginia*, 593 F. Supp. 3d 293, 328 (W.D. Va. 2022) (while "States have an interest in seeing that their statutes are given effect . . . the Supremacy Clause provides that federal law is supreme in the event of a conflict, and therefore any State interest in enforcement of its laws must comparably give way when they conflict with federal law.") (citations omitted); *and see R.K. v. Lee*, 575 F. Supp. 3d 957, 992-93 (M.D. Tenn. 2021) (issuing injunctive relief against Tennessee law that conflicted with the ADA).

While the Commonwealth certainly has an interest in enforcing SB 903 and will also argue that SB 903 was enacted for the purpose of protecting minors from various products containing isomers of Delta-9 THC, there are several reasons why the equities and public interest nevertheless weigh in favor of an injunction.

*First*, as argued above, SB 903 conflicts with the Farm Act, and under the Supremacy Clause the federal law takes precedence. In other words, there is a stronger public interest in enforcing federal laws than there is in enforcing a conflicting State law.

*Second*, in enacting the Farm Act, Congress already analyzed the effect that legalizing hemp would have on public health and welfare, and decidedly concluded that only Delta-9 THC was a danger as opposed to the various isomers. As the decision in *Gonzales* makes clear, if a

State comes to a different conclusion as to whether a particular product is beneficial to the public's health and well-being, the answer is to petition Congress to change course.

*Third*, the injunction sought herein does not seek to enjoin the operation of the packaging laws contained in SB 903, which should largely, if not entirely, curb those hemp products that attract minors.

*Fourth*, without injunctive relief, the Plaintiffs would face irreparable harm as noted above, while there is no comparable harm to the Commonwealth separate and apart from the public health issue already addressed above.

*Fifth*, the Commonwealth has no public interest in enforcing its laws beyond its own boundaries, as Va. Code § 3.2-4116(C) seeks to do by prohibiting the sale of Virginia products to anyone anywhere in the world who might use them to create products that violate the "total THC" standard.

Taken together, the equities and public interest, considered as one under *Nkem*, both weigh decisively in favor of the Plaintiffs.

## V.   Conclusion.

WHEREFORE, the Plaintiffs herein respectfully request that the Court grant this Motion and enter the preliminary injunction requested as against the Defendants, along with any other relief this Court deems just and necessary.

Respectfully submitted,

James N. Markels (VSB #68399)
Email: jnm@cwattorney.com
Thomas W. Croessmann (VSB #88086)
Email: twc@cwattorney.com
Philip R. Croessmann (VSB #27779)
Email: prc@cwattorney.com

48

CROESSMANN & WESTBERG, P.C.
8000 Towers Crescent Drive, #1575
Vienna, VA 22182
Phone: (703) 483-3550
Facsimile: (703) 349-3414