**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **NORTHERN VIRGINIA HEMP**<br>**AND AGRICULTURE LLC,** *et al.*,<br><br>    *Plaintiffs*,<br><br>**v.**<br><br>**THE COMMONWEALTH OF**<br>**VIRGINIA,** *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No. 1:23-cv-01177-LMB-IDD**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION [ECF #6]**

COME NOW Northern Virginia Hemp and Agriculture LLC ("NOVA Hemp"), Rose

Lane, an individual, and Franny's Operations, Inc. ("Franny's Farmacy"), by and through their

undersigned attorneys, pursuant to Federal Rule of Civil Procedure 65, and hereby respectfully

request that this Court enter an order granting the Plaintiffs a preliminary injunction, and

enjoining the Defendants from (1) implementing or enforcing those portions of Virginia law[1]

that impose a limit on substances containing tetrahydrocannabinol ("THC") according to their

concentration of "total [THC]" or a "synthetic derivative of [THC]" instead of just the

concentration of Delta-9 THC as defined in the Agriculture Improvement Act of 2018 (the "Farm

Act") under 7 U.S.C. § 1639o(1); and (2) implementing or enforcing those portions of Virginia

law that restrict interstate commerce outside of the Commonwealth.[2] In support thereof,

Plaintiffs state as follows:

---

[1] Va. Code §§ 3.2-4112, 3.2-4126(B), 3.2-5145.1, 3.2-5145.4, 4.1-600, 4.1-606(7), 18.2-247(D), 18.2-371.2, 54.1-3401, 54.1-3408, 54.1-3408.3(A), and 59.1-200(A)(70).
[2] Va. Code § 3.2-4116(C).

**FACTUAL BACKGROUND**

**I.       Recent Marijuana and Hemp Law in the United States.**

In 1970, Congress passed the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*., which classified marijuana, including hemp, as a Schedule 1 drug, making it illegal to grow, possess, or use throughout the United States. In making that classification, Congress had determined that marijuana did not "have a currently accepted medical use" unlike Schedule 2 drugs. In other words, the CSA did not distinguish between marijuana used recreationally and hemp being used for medical or industrial purposes—both were equally prohibited.

California was the first state to pass a law legalizing the limited use of marijuana for medicinal purposes, which was codified as the Compassionate Use Act of 1996. Cal. Health & Safety Code Ann. § 11362.5, *et seq*. Under that Act, "seriously ill" citizens were given a "right to obtain and use marijuana for medical purposes" as recommended by a physician, making it legal for patients and caregivers to possess and cultivate marijuana for that purpose. *Id.* The federal government enforced the CSA in California, including against those who cultivated and used marijuana strictly for medical purposes in accordance with California law.

The matter came to a head in *Gonzales v. Raich*, 545 U.S. 1 (2005), in which the U.S. Supreme Court was asked to determine whether the CSA's ambit reached the activity protected under California's law pursuant to the Commerce Clause, U.S. Const., Art I, §8. In a 6-3 decision penned by Justice Stevens, the Court held that it did, and the CSA lawfully prohibited the intrastate cultivation and use of marijuana notwithstanding State law to the contrary. *Id.* at 22 ("we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the

CSA").[3] The majority further held that "[i]t is beyond peradventure that federal power over commerce is 'superior to that of the States to provide for the welfare or necessities of their inhabitants,' however legitimate or dire those necessities may be." *Id.* at 29 (*quoting Sanitary District of Chicago v. United States*, 266 U.S. 405, 426 (1925)). In other words, the CSA, as a "necessary and proper" implementation of the Commerce Clause prevailed over state law pursuant to the Supremacy Clause. *Gonzales*, 545 U.S. at 22, 29.

Over time, minds slowly began to change on Capitol Hill about hemp. The Agricultural Act of 2014 established the Hemp Research Pilot Program, 7 U.S.C. § 5940(b), which allowed hemp cultivation for research purposes only by institutions of higher learning or state departments of agriculture. The 2014 law specifically defined "industrial hemp" as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a Delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 5940(a)(2).

In the Farm Act, Congress created a new interstate market for hemp. It began by defining "hemp" in the same fashion as the 2014 law did: "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a Delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). By its terms, it did not include consideration of Delta-8 THC or any other THC isomers in that definition.

The Farm Act simultaneously defined marijuana, which remained a Schedule 1 drug under the CSA, as specifically excluding hemp from its ambit, thus making hemp legal under federal law for the first time since the CSA was enacted. 21 U.S.C. § 802(16). The Farm Act also

---

[3] The majority took particular note of Congress' finding that "Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." *Id.* at 12, n.20 (quoting 21 U.S.C. § 801(6)).

added "tetrahydrocannabinols, except for tetrahydrocannabinols in hemp" as a Schedule 1 drug, which emphasized that hemp was no longer criminalized under the CSA. 21 U.S.C. § 812(c).

Importantly, the Farm Act included a note under Sec. 10114 with regard to interstate commerce, stating that, as a rule of construction, "Nothing in this title or an amendment made by this title prohibits the interstate commerce of hemp [as defined in 7 U.S.C. § 1639o(1)] or hemp products." The same note stated: "No State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State[.]" Further to that note, and pursuant to authority granted under 7 U.S.C. § 1639r(a)(1)(A) of the Farm Act, the Secretary of Agriculture promulgated 7 C.F.R. § 990.63, which states: "No State . . . may prohibit the transportation or shipment of hemp lawfully produced" under federal regulations.

The Farm Act granted States "primary regulatory authority over the production of hemp" in their respective territories by submitting to the Secretary of Agriculture a plan to monitor and regulate that production. 7 U.S.C. § 1639p. Such a plan had to include certain terms, including "a practice to maintain relevant information regarding land on which hemp is produced" and a "procedure for testing . . . Delta-9 [THC] concentration levels of hemp produced in the State[.]" 7 U.S.C. § 1639p(a)(2)(A). However, States were allowed to pass laws regarding the production of hemp that were "more stringent" than required by federal law. 7 U.S.C. § 1639p(a)(3)(A).

After the Farm Act was enacted, Virginia submitted a plan pursuant to 7 U.S.C. § 1639p that was approved by the U.S. Department of Agriculture (the "Virginia Plan"), a copy of which is attached hereto as **Exhibit One**. The Virginia Plan, by its terms, only concerned the cultivation of hemp within the Commonwealth. Prior to July 1, 2023, Virginia law incorporated the Farm Act's definition of hemp and implemented the Virginia Plan in accordance with that definition.

## II.     Virginia Senate Bill 903 ("SB 903") Created a New "Total THC" Standard.

After receiving reports of children getting ill from consuming hemp products containing Delta-8 THC, lawmakers in Richmond sought a way to curb access to such products.[4] The resulting law, SB 903, implemented two major changes of note: (1) instead of the Delta-9 THC standard implemented by the Farm Act, Virginia law required products to meet a "total THC" standard that assessed the combined concentration of all forms of THC, thus making hundreds of products that meet the federal standard now illegal in Virginia; and (2) it prohibited cannabis processors from selling their raw product to anyone, anywhere in the world, who might use the processed hemp to make a retail product that violated the "total THC" standard. Notably, SB 903 did not provide a transitional period—it went into full effect immediately on July 1, 2023.

The "total THC" standard requires that hemp products,[5] industrial hemp extracts, or any other consumable substance "(a) contain[ ] a total [THC] concentration of no greater than 0.3 percent and (b) contain[ ] either no more than two milligrams of total [THC] per package or an amount of cannabidiol[6] that is no less than 25 times greater than the amount of total [THC] per package." Va. Code §§ 3.2-4112, 3.2-4126(B), 3.2-5145.1, 3.2-5145.4, 4.1-600. Cannabis oils are limited to "10 milligrams of [THC] per dose." Va. Code § 54.1-3408.3(A). The total THC levels for these products are measured by using "any naturally occurring or synthetic [THC]," regardless of whether it was Delta-9 THC or an isomer thereof. *Id.* Only those products that meet the "total THC" standard are excluded from Virginia's definition of marijuana. Va. Code §§ 4.1-

---

[4] *See* Madison Hirneisen, *Lawmakers approve Youngkin's amendments to hemp bills*, The Center Square, https://www.thecentersquare.com/virginia/article_d3789714-d98a-11ed-a433-7b6449e69f06.html (April 12, 2023).

[5] "Hemp products" includes edible, topical, and smokable hemp products. Va. Code § 3.2-4112.

[6] Cannabidiol (aka "CBD") is a non-psychoactive compound found in cannabis that has some medicinal properties. *See*: https://www.cancer.gov/publications/dictionaries/cancer-drug/def/cannabidiol

600, 18.2-247(D), 54.1-3401, 54.1-3408. Marijuana is still otherwise illegal in Virginia except in small amounts for personal use. *See* Va. Code §§ 18.2-247(D), 18.2-248, 18.2-248.1, and 18.2-371.2. Also, SB 903 made it unlawful under the Virginia Consumer Protection Act ("VCPA") to "sell or offer for sale any substance intended for human consumption, orally or by inhalation, that contains a synthetic derivative of [THC]" regardless of concentration, subject to limited exceptions. Va. Code § 59.1-200(A)(70). Violators face civil penalties of between $2,500 and $5,000 per violation. *See* Va. Code § 59.1-206.

As a result of this "total THC" standard, hundreds of products that were legal under federal law are now illegal as marijuana in Virginia, or subject to civil liability under the VCPA (the "Banned Products"). A list of Banned Products is attached hereto as **Exhibit Two**.[7] The list of Banned Products ***does not*** include products that are banned in Virginia for not complying with the packaging requirements of Va. Code §§ 3.2-4123 (for hemp products) or 3.2-5145.4:1 (for industrial hemp extracts)—this lawsuit is not challenging those portions of SB 903.

While SB 903 preserved the federal definition of industrial hemp, Va. Code § 3.2-4112, *and see* Va. Code § 3.2-5145.1, it mandates that a processor of industrial hemp "shall not sell industrial hemp . . . to a person if the processor knows or has reason to know that such person will use the industrial hemp or substance containing industrial hemp extract in a substance that [violates the "total THC" standard]." Va. Code § 3.2-4116(C). In other words, SB 903 forbids a processor of that hemp to sell the product to anyone, anywhere in the world, who might use it to make a product that violates the new "total THC" standard, even if it is legal to do so where that buyer is located, and even if that buyer has no intention of selling those products in Virginia.

---

[7] This list is not exhaustive, as there are new products developed every day. It represents the list of products identified through the reasonable efforts of counsel.

### III.    The Defendants Are each Responsible for Enforcing Discrete Portions of SB 903 Being Challenged Herein.

The Commonwealth of Virginia is named as the ultimate source of authority for the enforcement of the laws of the Commonwealth. Governor Glenn Youngkin is named as a defendant in his official capacity as the chief executive responsible for executing the laws of the Commonwealth. Attorney General Jason Miyares, also named as a defendant in his official capacity, is vested with authority to enforce the criminal laws regarding marijuana, Va. Code §§ 18.2-247(D) and 18.2-371.2, as well as sue under the VCPA. *See* Va. Code § 59.1-203(A).

The Board of Agriculture and Consumer Services (the "Board") is empowered to regulate industrial hemp extracts, including developing regulations for testing those extracts to ensure they meet the "total THC" levels noted above. *See* Va. Code § 3.2-5145.5. Sellers or manufacturers of industrial hemp extracts, including those who manufacture or sell an industrial hemp extract that does not meet the THC levels set under SB 903, can face civil penalties from the Board, including a fine of up to $10,000 per day. *See* Va. Code § 3.2-5145.2:1.

Joseph Guthrie, named in his official capacity as the Commissioner of the Virginia Department of Agriculture and Consumer Services (the "Commissioner"), is authorized to access the premises of registered sellers of hemp products to enforce the "total THC" standard, including testing products to make sure they meet the "total THC" levels noted above, Va. Code § 3.2-4125, and is empowered to subject sellers to civil penalties for failing to abide by those laws, including fines up to $10,000 per day. Va. Code § 3.2-4126. Sellers of hemp products and industrial hemp extracts must obtain a registration from the Commissioner and pay a fee. *See* Va. Code §§ 3.2-4122, 3.2-5100. The Commissioner also can investigate and request an action be brought to stop violations of the VCPA. *See* Va. Code § 59.1-203(D).

The Virginia Cannabis Control Authority (the "Authority") has the power to "control the possession, sale, transportation, and delivery of marijuana and marijuana products" in the Commonwealth. Va. Code § 4.1-604(2). The Authority can issue regulations to control marijuana and hemp products, including establishing "a maximum [THC] level for retail marijuana products, which shall not exceed (i) five milligrams per serving for edible marijuana products and where practicable an equivalent amount for other marijuana products or (ii) 50 milligrams per package for edible marijuana products and where practicable an equivalent amount for other marijuana products." Va. Code § 4.1-606(7). The Authority also can investigate and request an action be brought to stop violations of the VCPA. *See* Va. Code § 59.1-203(E).

The remaining defendants are all Commonwealth's Attorneys for the various counties and cities of the Commonwealth, each named as a defendant in his or her official capacity, as each has authority to enforce Virginia's criminal laws regarding marijuana, Va. Code §§ 18.2-247(D) and 18.2-371.2, and to bring actions under the VCPA. *See* Va. Code § 59.1-203(A).

## ARGUMENT

This Motion seeks a preliminary injunction to preserve the status quo that existed before issue in controversy occurred—i.e. the federal standard for marijuana that Virginia enforced before SB 903 was implemented. *See Nat. Home Ins. Co. v. State Corp. Comm'n of Commonwealth of Virginia*, 838 F. Supp. 1104, 1115-16 (E.D. Va. 1993) ("Legislation is future-oriented and changes the existing status quo through the making of a new rule or regulation.") (*citing Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908)).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (*quoting Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008)). It is "never awarded as a matter of right." *Winter*, 555 U.S. at 24. Because of its extraordinary character, and the fact that this Court is acting on an incomplete record in determining whether to grant the requested relief, a preliminary injunction is "to be granted only sparingly." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 524 (4th Cir. 2003).

　　　To get a preliminary injunction, a plaintiff must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing cases). Each factor must be separately considered. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Plaintiffs bear the burden of establishing each factor. *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009). All four factors must be met—it is not a balancing test. *Id.* Each factor will be addressed in turn.[8]

## I.　Plaintiffs Are Likely to Succeed on the Merits.

　　　Plaintiffs must make a "clear showing" that they are likely to succeed on the merits at trial. *Id.* However, such a showing need not demonstrate a "certainty of success" for a preliminary injunction to issue. *Pashby*, 709 F.3d at 321. Here, the Plaintiffs are likely to succeed on the merits because the federal government expressly decided in the Farm Act that hemp, as solely defined by its concentration of Delta-9 THC, was to be legal throughout the United States and protected in interstate commerce. This was a lawful exercise of the federal government's Commerce Clause power. Virginia simply lacks the authority to impose its more stringent "total THC" standard because the Farm Act has preempted such efforts through the Supremacy Clause.

---

[8] Per Rule 52(a)(2) of the Federal Rules of Civil Procedure, this Court must make particularized findings of fact and conclusions of law supporting its decision to grant or deny a preliminary injunction; such findings being necessary in order for an appellate court to "meaningfully review that decision." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999).

In addition, SB 903's attempt to extend the "total THC" standard to other states through its restriction on the sale of industrial hemp clearly violates the dormant Commerce Clause.

The Supremacy Clause, U.S. Const., Art. IV, §2, mandates that Congress, acting within its constitutional limits, is empowered to pre-empt and supersede state law in multiple ways. First, it can state that it is doing so in express terms. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Alternatively, "Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 713 (1985) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Pre-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough County*, 471 U.S. at 713. Such a conflict exists where the State's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Federal regulations can also preempt state laws. *See*, *e.g.*, *Capital Cities Cable, Inc. v. Crisp*, 457 U.S. 691, 699 (1984). However, there is an "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230.

The first issue in this case is whether SB 903's "total THC" standard has been preempted by 7 U.S.C. § 1639o(1). The second is whether Virginia's prohibition on the sale of industrial hemp or industrial hemp extracts to anyone, anywhere, who might use those products to violate

the "total THC" standard is precluded under the dormant Commerce Clause. Plaintiffs are likely

to prevail on the merits of each, and thus this factor weighs in favor of a preliminary injunction.

### A.     Federal Law Preempts the Virginia "total THC" Standard.

Under well-established authority, "[p]re-emption may be either express or implied, and is

compelled whether Congress' command is explicitly stated in the statute's language or implicitly

contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383

(1992) (*quoting FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990)). Implied preemption

includes field preemption, *Arizona v. United States*, 567 U.S. 387, 399 (2012), and two versions

of conflict preemption. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-

43 (1963) (impossibility preemption); *and see Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)

(obstacle preemption). Each will be examined in turn.

### 1.     Express Preemption.

For matters of express preemption, the focus is on "statutory intent," and this Court

should "begin with the language employed by Congress and the assumption that the ordinary

meaning of that language accurately expresses the legislative purpose." *Id.*, *and see Chamber of

Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("When a federal law contains an

express preemption clause, we 'focus on the plain wording of the clause, which necessarily

contains the best evidence of Congress' preemptive intent.'") (*quoting CSX Transp., Inc. v.

Easterwood*, 507 U.S. 658, 664 (1993)).

The language of the Farm Act is unequivocal. It specifically defines hemp solely in

reference to its concentration of Delta-9 THC, which by doing so naturally excluded

consideration of the other natural and synthetic isomers of THC, including Delta-8, or

consideration of its concentration of CBD or total content by weight. 7 U.S.C. § 1639o(1).

Congress then excised hemp from the CSA's prohibition on marijuana and THC, making it clear that hemp was now legal throughout the United States. 21 U.S.C. §§ 802(16) and 812(c). Congress expressly noted its intent to preempt in Sec. 10114 of the Farm Act: "No State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State[.]" The Secretary of Agriculture thereupon codified that mandate into a federal regulation that states: "No State . . . may prohibit the transportation or shipment of hemp lawfully produced" under federal regulations. 7 C.F.R. § 990.63.

The ordinary meaning of these provisions could not be more obvious. Congress legalized hemp solely according to its concentration of Delta-9 THC and mandated that the interstate commerce in hemp as so defined could not be inhibited by the States. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690-91 (9th Cir. 2022) (holding that Delta-8 THC products were legal under the "plain meaning" of 7 U.S.C. § 1639o(1), and affirming preliminary injunction for copyright infringement). Congress did not allow the States to impose a stricter standard for hemp. The only explicit carve-out granted to the States and Indian tribes was the grant of "primary regulatory authority over the ***production*** of hemp" pursuant to a plan submitted to and approved by the Secretary of Agriculture. 7 U.S.C. § 1639p (emphasis added). While States and Indian tribes were allowed to pass laws regarding the ***production*** of hemp that were "more stringent" than required by federal law, 7 U.S.C. § 1639p(a)(3)(A), that carve-out, by its terms, did not extend to the manufacturing, purchase, sale, consumption, or manufacturing of hemp products.[9] Indeed, the Virginia Plan does not address any of those other aspects of hemp

---

[9] *See also* USDA Executive Summary of New Hemp Authorities, USDA Office of the General Counsel (May 28, 2019), https://www.ams.usda.gov/sites/default/files/HempExecSumandLegalOpinion.pdf (interpreting "production of hemp" as "growing of hemp" only).

commerce—it expressly established "a registration program to allow a person to *grow* industrial hemp in the Commonwealth and requires that anyone seeking to *grow* industrial hemp in the Commonwealth apply to the Commissioner for a registration to do so[,]" and then set forth procedures "to monitor and randomly test industrial hemp, at the cost of the *grower*," and only tested such industrial hemp according to the federal standard. *See* Ex. 1 (emphases added). Virginia has not altered the Virginia Plan since SB 903 went into effect. While arguably Virginia could amend the Virginia Plan to be more stringent regarding the *growing* of cannabis, it has not chosen to do so, nor would such a plan be able to extend to the manufacture, sale, purchase, consumption, or transport of hemp, as federal law limits its ambit solely to cultivation. *See* 7 U.S.C. § 1639p(a)(2)(A) (requiring State plans to include, for example, "relevant information regarding land on which hemp is produced"); *and see* 7 CFR § 990.3(a) (same).

The "total THC" standard clearly conflicts with 7 U.S.C. § 1639o(1). Because the former includes all isomers of THC, while the latter only measures Delta-9 THC, a host of products that are legal under the federal standard are now illegal as marijuana in Virginia. *See* Ex. 2 (listing the Banned Products). While the "total THC" standard does not ban *all* hemp, it inevitably bans a large subset of hemp that is protected under Sec. 10114 of the Farm Act and 7 C.F.R. § 990.63.

The Farm Act's mandate that hemp be protected in interstate commerce constitutes federal preemption in the same way that the federal Endangered Species Act recently preempted California from enforcing laws outlawing the importation of alligator and crocodile products in *April in Paris v. Bonta*, 2:19-cv-02471-KJM-CKD (E.D. Cal. March 6, 2023) (ECF 78), decision attached hereto as **Exhibit Three**. Specifically, California's law made it "unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or a part or product thereof, of a crocodile or alligator." Cal. Pen. Code §§ 653o(b)(1)

and 653r. The Endangered Species Act, meanwhile, created a regulatory structure that enabled alligators to be hunted and used to make products for interstate commerce. *See* 16 U.S.C. § 1539(a). Pursuant to that authority, the U.S. Fish and Wildlife Service promulgated regulations for those activities. *See* 50 C.F.R. § 17.42, *et seq*. The Endangered Species Act further stated that any State law was "void to the extent that it may effectively . . . prohibit what is authorized" under the Act or the regulations promulgated thereunder. 16 U.S.C. § 1535(f).

Under that rubric, the federal district court issued a preliminary injunction enjoining the California law, and then entered summary judgment in favor of the challengers of the law, holding that California's law was preempted by the Act. That court relied in part on *Man Hing Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760 (9th Cir. 1983), another case in which a California law prohibiting trade of a product, this time products made from elephants, was held to be preempted under the Endangered Species Act because, again, federal law authorized such trade pursuant to the permit process the Act put in place. *See id.* at 763-64 (quoting 50 C.F.R. § 17.40(e)). The Ninth Circuit rejected California's position that the Act permitted the State to ban that which the Act expressly permitted.

In both *April in Paris* and *Man Hing*, federal law protected the interstate trade of a commodity, and federal preemption precluded efforts by a State to ban that commodity. Here, the Farm Act precludes the Commonwealth from banning any products that have been deemed legal hemp pursuant to its Delta-9 THC level for the exact same reasons. This case is a mirror image of *Gonzales v. Raich*, in which the federal government's ban on marijuana superseded the State's ability to legalize any subset of marijuana, even for health reasons. Like the federal government's Commerce Clause power to make marijuana illegal throughout the country, it surely also possesses the power under the same Clause to render hemp (as Congress chose to

14

define it) legal throughout the country. Under *Gonzales*, a State cannot legalize any cannabis with, say, a Delta-9 THC concentration above 0.3 percent, as that exceeds the level set in 7 U.S.C. § 1639o(1). But similarly, the State cannot make illegal any cannabis with a Delta-9 THC concentration of 0.3 percent or below based on some other metric not relevant to the federal standard, especially since the Farm Act does not provide States with the power to enforce stricter standards except when it comes to cultivation, and it expressly mandates that products meeting the federal standard are entitled to interstate commerce. If a State cannot legalize a commodity for intrastate purposes because that would frustrate an interstate ban on that commodity, per *Gonzales*, a State cannot conversely ban a commodity that Congress has authorized for interstate commerce, as that would inevitably frustrate Congress' authority as well.

For these reasons, Congress has expressly preempted SB 903's "total THC" standard, and thus Plaintiffs are likely to succeed on the merits.

## 2.   Field Preemption.

Field preemption prohibits state regulation of "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. For example, in *Pacific Gas and Electric Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983), the U.S. Supreme Court held that while the Atomic Energy Act gave the states authority over the construction and operation of nuclear power plants and the regulation of the energy so produced, "the Federal Government maintains complete control of the safety and 'nuclear' aspects of energy generation" such that it "occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States," such that "safety regulation of nuclear plants by States is forbidden." *Id.* at 212. In other words, field preemption exists where "Congress has legislated comprehensively to occupy an

entire field of regulation, leaving no room for the States to supplement federal law." *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 509 (1989) (*citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)). "Statutory text and structure provide the most reliable guideposts in this inquiry." *PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014) (*citing Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).

Under the Farm Act, Congress has "occupied the field" as to whether a given substance is legal as hemp, or illegal as marijuana, having made the decision as to the relative health and safety of hemp as Congress chose to define it for the general public, just as the Atomic Energy Act preserved federal authority over the safety of nuclear power throughout the country. The States have only been invited to establish regulatory plans over the ***cultivation*** of hemp, like States had authority over the construction of nuclear plants in *Pacific Gas*. But Congress did not permit nor invite the States to turn any subset of hemp back into illegal marijuana, whether based on a State's safety concerns or otherwise.

The situation is the inverse of *Gonzales v. Raich*, under which the criminalization of marijuana pursuant to the CSA was deemed part of "a closed regulatory system" regulating the interstate commerce of that substance. 545 U.S. at 13. To allow the States to legalize a subset of marijuana "would leave a gaping hole in the CSA," just as to allow States to criminalize a subset of hemp would leave a gaping hole in the Farm Act. *Id.* at 22. That is surely not what Congress intended to allow. Therefore, Congress has occupied the field of defining what is considered legal hemp throughout the country, and Virginia's stricter "total THC" standard is preempted.

### 3. <u>Conflict Preemption.</u>

Conflict preemption arises when the state law conflicts with a federal statute. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "Assessing a conflict preemption claim

required 'a two-step process of first ascertaining the construction of two statutes and then determining the constitutional question [of] whether they are in conflict.'" *H&R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (*quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)). "In making this determination, a court 'should not seek out conflicts . . . where none clearly exists.'" *Id.* (*quoting College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005)).

There are two kinds of conflict preemption. Impossibility preemption is where "it is impossible for a private party to comply with both state and federal law." *Id.* Obstacle preemption is when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. It is not impossible for a person to comply with both SB 903 and the Farm Act, as there are substances and products that are legal under both. However, SB 903 stands as a clear obstacle to the purposes and objectives of the Farm Act in creating an interstate market for hemp by making a large number of products that are legal under the federal standard now illegal in Virginia.

A State law is an obstacle to federal law when it "interferes with the *methods* by which the federal statute was designed to reach [its] goal." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (*quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)) (emphasis in original). "A decision about [obstacle preemption] requires the court independently to consider national interests and their putative conflict with state interests . . . [it is] more an exercise of policy choices by a court than strict statutory construction." *Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988).

By excluding hemp as defined under 7 U.S.C. § 1639o(1) from the definition of marijuana in the CSA, Congress clearly decided it was in the national interest for hemp ***as so***

17

*defined* to be legal throughout the United States. Under the Farm Bill, hemp was transformed into an agricultural commodity. Products of hemp were henceforth subject to the same regulations that other agricultural commodities were subject to by the Food and Drug Administration and the USDA.[10] The only involvement allowed to the States was the opportunity to regulate the cultivation of hemp within their respective borders—if a State chose not to submit a regulatory plan, then the federal government would impose its own. *See* 7 U.S.C. § 1639p & q.

By implementing the "total THC" standard, the Commonwealth has converted a large segment of hemp from a legal product back into marijuana, an illegal Schedule 1 drug. *See* Va. Code §§ 4.1-600, 18.2-247, 18.2-248, 18.2-248.1, and 18.2-371.2. Not only that, but even for those who are permitted to grow industrial hemp under the Virginia Plan, they are now prohibited from selling their hemp to anyone, anywhere in the world, who might use their product to create anything that might violate the "total THC" standard—even if it is legal to create such a product in the buyer's location. Va. Code § 3.2-4116(C). Both laws clearly serve as an obstacle to Congress' intent of treating hemp, as it defined it, as an agricultural product, regulated under existing federal standards, and intended to be transported throughout the country without impediment. Virginia not only subjects a trucker moving hemp from, say, North Carolina to Maryland, through Virginia via Route 95, to criminal sanctions for doing so if the hemp s/he carries happens to violate the "total THC" standard, but it also seeks to export that

---

[10] *See* Amy Abernathy, Principal Deputy Commissioner of the FDA, *Hemp Production and the 2018 Farm Bill* (testimony before the U.S. Senate, July 25, 2019), https://www.fda.gov/news-events/congressional-testimony/hemp-production-and-2018-farm-bill-07252019 ("The 2018 Farm Bill explicitly preserved FDA's authorities over hemp products. Therefore, hemp products must meet any applicable FDA requirements and standards, just like any other FDA-regulated product. For example, FDA's existing authorities over foods, dietary supplements, human and veterinary drugs, and cosmetics apply to hemp products to the extent such hemp products fall within those categories."); *and see* 7 U.S.C. § 1639r(c).

standard outside of Virginia's borders by forbidding an industrial hemp grower from selling to a buyer in Maryland who wishes to manufacture a hemp product that complies with the federal standard but does not abide by the "total THC" standard, even though the buyer is compliant with Maryland law. The problem would only grow worse should additional states each pass conflicting standards for what is and isn't hemp, making every interstate transaction fraught with uncertainty over whether a given product might be legal or illegal. This is clearly not the simple, straightforward regime that Congress intended. Hence, SB 903 is preempted by the Farm Act also under conflict preemption, entitling the Plaintiffs to injunctive relief.

## B.    SB 903 Also Violates the Dormant Commerce Clause.

While the Commerce Clause is an affirmative grant of power to Congress over interstate commerce, it also "implies a 'negative' or 'dormant' constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce." *Brown v. Hovatter*, 561 F.3d 357, 362 (4th Cir. 2009) (*citing Dennis v. Higgins*, 498 U.S. 439, 447 (1991)). That dormant Commerce Clause serves to "rebuff[ ] attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949).[11] "Thus, not all economic harms or anticompetitive choices are remedied through the application of the dormant Commerce Clause, but rather only those that *unjustifiably burden* interstate commerce." *Brown*, 561 F.3d at 363 (emphasis in original).

---

[11] The dormant Commerce Clause does not apply when the State "is acting as a market *participant*, rather than as a market *regulator*." *Brooks v. Vassar*, 462 F.3d 341, 355 (4th Cir. 2006) (*quoting South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 93 (1984)) (emphasis in original). Here, since the Commonwealth is a regulator and not a participant, the dormant Commerce Clause applies.

At the "very core" of the dormant Commerce Clause is an "antidiscrimination principle" that "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. ___, p.7 (2023) (Gorsuch, J.) (cleaned up, quotations omitted). "If there is no discrimination, a court will consider on the second tier whether the state laws 'unjustifiably . . . burden the interstate flow of articles of commerce.'" *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 668 (4th Cir. 2018) (*quoting Oregon Waste Sys. Inc. v. Dept. of Environmental Quality of Oregon*, 511 U.S. 93, 98 (1994)). That tier employs the *Pike* test, "under which the challenged law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (*quoting Pike v Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The *Pike* test requires a plaintiff to plead facts plausibly showing that a challenged law imposes "substantial burden on interstate commerce" followed by a "showing that those burdens clearly outweigh the benefits of a state or local practice." *Nat'l Pork Producers Council*, 598 U.S. at p.3 (Sotomayor, J. concurring in part) and p.3 (Roberts, C.J., concurring in part and dissenting in part).[12]

The "total THC" standard of SB 903, since it applies to all hemp regardless of where it comes from, is not in itself a discriminatory law that appears to favor the Commonwealth's economic interests over those who reside elsewhere. However, the restrictions on the ability of in-state processors of industrial hemp to sell to anyone, ***anywhere***, who might use their hemp to create a product that violates the "total THC" standard is patently discriminatory to interstate commerce, as it will effectively forbid out-of-state buyers, like Franny's Farmacy, from having

---

[12] The fractured opinion in *Nat'l Pork Producers Council* can be difficult to parse, but it is clear that a majority of the justices agreed to apply *Pike* in this fashion.

access to Virginia hemp. *See* Va. Code § 3.2-4116(C) ("A processor shall not sell industrial hemp or a substance containing an industrial hemp extract . . . to a person if the processor knows or has reason to know that such person will use the industrial hemp or substance containing an industrial hemp extract in a substance that [exceeds the "total THC" standard in SB 903]"); *and see* Affidavit of Francis Tacy, attached hereto as **Exhibit Four**, ¶13. This is so because the law forbids a Virginia processor from selling to anyone who does not abide by Virginia's standard, when no other State has imposed that standard. Additionally, it would require processors to gather information about buyers outside the Commonwealth to ensure compliance—an onerous task at best. The obvious result of the restriction in Va. Code § 3.2-4116(C) is to prevent Virginia processors from selling their product to anyone but in-state manufacturers, which results in a burden "*on the flow of interstate commerce*—the flow of goods, materials, and other articles of commerce across state lines." *Brown*, 561 F.3d at 364 (emphasis in original). Just as courts have struck down State laws that attempted to regulate prices for goods in other states, *see*, *e.g.*, *Healy v. Beer Institute*, 491 U.S. 324 (1989) (invalidating Connecticut law requiring beer producers to affirm that their prices in Connecticut were no higher than the prices in neighboring states, in an effort to prevent Connecticut residents from crossing state lines to purchase cheaper beer), Va. Code § 3.2-4116(C) seeks to regulate out-of-state buyers of industrial hemp with the "total THC" standard even if the buyer resides in a State with no such standard, preventing those buyers from having access to Virginia industrial hemp or its extracts. Virginia buyers already forced to comply with the "total THC" standard will not be so burdened. Such an obvious discriminatory effect on out-of-state buyers like Franny's Farmacy violates the "antidiscrimination principle." *Nat'l Pork Producers Council*, 598 U.S. at p.7 (majority opinion).

Alternatively, the *Pike* test weighs heavily against SB 903. Not only does the restriction on the sale of industrial hemp and its extracts specifically burden sales to out-of-state buyers like Franny's Farmacy, as explained above, but the "total THC" standard itself burdens interstate commerce by converting products legal under federal law into illegal marijuana upon crossing into Virginia. A trucker carrying a load of hemp from North Carolina to Connecticut would have to drive completely around Virginia to avoid any danger of being pulled over and arrested for possessing marijuana as cargo—a comically long detour through Tennessee, Kentucky, and then West Virginia—instead of just going up I-95. Indeed, by being smack-dab in the middle of the East Coast, SB 903 turns Virginia into a giant roadblock for the transport of federally-legal hemp throughout those eastern States. As a result, manufacturers of retail hemp products that are legal outside of Virginia but become illegal marijuana upon crossing into Virginia, like Franny's Farmacy, face much higher costs as their shippers will either increase charges to cover the cost of the detour, or to account for the inherent risk their drivers will take shipping Banned Products through Virginia. *See* Ex. 4 at ¶9.

To what benefit? The Commonwealth will certainly claim that Delta-8 THC products are harmful to minors, but that problem is ameliorated (if not eliminated) by the fact that this lawsuit is not seeking to challenge SB 903's packaging laws that forbid products packaged in a way that could be attractive to minors. The prohibition on the sale of industrial hemp and its extracts to any buyer on Earth who might use it to violate the "total THC" standard is not extracting any benefit measurable to Virginia—it only denies such products to those in other States who are otherwise legally able to manufacture, buy, sell, and transact in federally-legal hemp, like Franny's Farmacy. Compared to the massive disruption and burden caused by SB 903, any possible benefits are miniscule at best.

In sum, SB 903 violates both the core antidiscrimination principle of the dormant Commerce Clause, and inflicts economic burdens to interstate commerce far in excess of any benefits rendered to Virginia in violation of the *Pike* test, making it likely that the Plaintiffs will ultimately prevail on the merits.

### C.      Courts Have Enjoined Similar Prior Efforts by the States.

Courts in other States have issued preliminary injunctions against similar efforts to attack Delta-8 THC and related products in contravention to the Farm Act. *See Kentucky Hemp Association v. Quarles*, Case No. 21-CI-00836 (Boone Cir. Ct., Div. I, Feb. 28, 2022) (copy attached as **Exhibit Five**) (enjoining state officials from enforcing decision of the Kentucky Department of Agriculture classifying Delta-8 THC as a Schedule 1 controlled substance); *SASS Group, LLC v. State of Georgia*, Case No. 2022CV362007 (Fulton Sup. Ct. April 15, 2022) (attached hereto as **Exhibit Six**) (construing definition of hemp via Delta-9 concentration as excluding consideration of isomers).

The case of *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541 (7th Cir. 2020) involved a challenge to an Indiana law that criminalized the manufacture, possession, or delivery of smokable hemp. The district court granted a preliminary injunction enjoining enforcement of the law on the basis that it was preempted by the Farm Act. On appeal, the Seventh Circuit agreed that an injunction was warranted, but chose to read the Farm Act's preemption clause ("No State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with [federal law] through the State") narrowly, and the clause permitting the States to regulate the "production" of hemp "more stringent[ly]" more broadly, even though the latter grant of power clearly applies only to cultivation of the plant. 7 U.S.C. § 1639p(a)(3)(A); *and see* 7 U.S.C. § 1639p(a)(2) (setting forth requirements of a State plan, which includes the need to

"maintain relevant information regarding land on which hemp is produced in the State"); *and see* the Virginia Plan. While Indiana could not prohibit the possession of smokable hemp as it was being transported through the State, the panel was "unconvinced that the express preemption clause, standing alone, precludes a state from prohibiting the possession and sale of industrial hemp within the state." 965 F.3d at 547. The panel also held that conflict preemption did not prohibit Indiana from criminalizing smokable hemp, likening the situation to that of the salvia plant, a psychoactive drug not listed in the CSA that is nevertheless illegal in most states. *Id.* at 548. Thus, the panel concluded that an injunction "preventing Indiana from enforcing its law against those transporting smokable hemp through Indiana in interstate commerce" was appropriate. *Id.* at 549.

Notably, the *C.Y. Wholesale* decision does not discuss the scope of interstate commerce as it was applied in *Gonzales*. In that case, the U.S. Supreme Court emphasized that "interstate commerce" included purely intrastate activities that "substantially affect" interstate commerce. 545 U.S. at 17. Under that rubric, to allow a state to legalize a subset of marijuana for health reasons would frustrate Congress' desire to ban all interstate commerce in marijuana, leaving a "gaping hole" that could not have been intended. *Id.* at 22. Concurrently, to allow a state to ban a substance that Congress intended to be protected in interstate commerce would create a similar loophole, one that would render the Farm Bill a dead letter if all the states independently decided to make hemp illegal. The Seventh Circuit also did not address how, for example, a shipment of hemp from Ohio to a buyer in Indiana (or a shipper in Indiana to Ohio) would not qualify as interstate commerce or "transportation or shipment . . . through the State," which it certainly would. Had the Seventh Circuit's view of the scope of interstate commerce prevailed in

*Gonzales*, and CSA's ban on marijuana only concerned the transport of marijuana from one state to another, the outcome would have been reversed.

The Seventh Circuit's comparison of hemp to salvia fails because there is no federal law or regulation protecting salvia in interstate commerce, while hemp enjoys such protection. *See* 7 C.F.R. § 990.63. Once Congress decided that hemp shall be protected in interstate commerce, it expressly and implicitly forbid the States from passing laws that might "substantially affect" that commerce, which certainly would include the possession, sale, purchase, and manufacture of hemp products, even on an intrastate basis, just like California's medical marijuana did in *Gonzales*. While the Seventh Circuit was correct that an injunction was appropriate, its proposed ambit was too narrow given the scope of interstate commerce as defined in *Gonzales*.

For these reasons, Plaintiffs are likely to prevail on the merits because SB 903 has either been expressly or impliedly preempted by federal law, and it violates the dormant Commerce Clause, thus fulfilling the first *Winter* factor.

## II. Plaintiffs Are Each Likely to Suffer Irreparable Harm Without an Injunction.

A preliminary injunction should not be issued simply to prevent the possibility of some remote future injury—there must be a "sufficient immediacy and reality" of such. *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (*quoting Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (threat of injury must be both "real and immediate," not "conjectural" or "hypothetical")). It must be "likely" that the asserted harm will occur if no injunction is issued. *Aslanturk v. Hott*, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020); *and see Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007) (when a court "cannot say with confidence that the harm is more likely than not to occur at all," the movant has failed to meet their burden) (*quoting In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 530 (4th Cir. 2003)).

The immediate effect of SB 903's "total THC" standard has been to make the Banned Products illegal in Virginia. *See* Affidavit of Travis Clay Lane, attached hereto as **Exhibit Seven**, ¶¶6, 10; *and see* Affidavit of Rose Lane, attached hereto as **Exhibit Eight**, ¶¶7, 9; *and see* Ex. 4, ¶7-8. The Plaintiffs each are persons or corporations that manufactured, purchased, sold, consumed, or transported those Banned Products inside Virginia prior to July 1, 2023, but no longer can without risking arrest, fines, loss of registration, or other punishments available under Virginia law because those Banned Products are now considered to be illegal marijuana. Ex. 7 at ¶7, Ex. 8 at ¶11, Ex. 4 at ¶¶5-6, 8, 12. Plaintiffs are therefore not only irreparably harmed through the harm they will suffer in lost business and lost access to products, *see* Ex. 7 at ¶¶7-9, 11; Ex. 8 at ¶¶5-7, 9-12; Ex. 4 at ¶¶10, 13-14—which cannot be later recovered against the Commonwealth at fault for enacting the unconstitutional provision—but they are also irreparably harmed because they face punitive and criminal consequences if they choose to ignore Virginia's blatantly unconstitutional law. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."); *and see Morales*, 504 U.S. at 381-82 (upholding injunction against enforcement of state laws that were pre-empted by the Airline Deregulation Act of 1978); *and see Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (holding that a company suffers irreparable harm from paying an allegedly unconstitutional tax where there was "no remedy whereby restitution of the money so paid may be enforced"). Indeed, Virginia has recently started issuing fines under the new law.[13] "[C]omplying with a regulation later held

---

[13] In August, Virginia began issuing fines against businesses like NOVA Hemp and the Franny's Farmacy franchise that stock and sell products that violate the new "total THC" standard. *See* Graham Moomaw, *Hemp retailers face big fines as Va.'s tougher THC law takes effect*, *Virginia Mercury*, https://www.nvdaily.com/hemp-retailers-face-big-fines-as-v-a-s-tougher-thc-law-takes-effect/article_ffdf29ee-191c-5474-be49-314126a1d8ae.html (Aug. 6, 2023).

invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment).

Those harms are not limited to the Plaintiffs, as studies of the economic impact of SB 903 shows that the law will result in a reduction of around $450 million in retail sales in Virginia, potentially leading to the loss of approximately 3,400 jobs, and resulting in a reduction of approximately $130 million in wages. *Compare* Beau Whitney, *Hemp Derived Cannabinoids: An Economic Impact Analysis of Cannabinoid Retail in Virginia*, p. 4 (March 9, 2023) (estimating sales of hemp-derived cannabinoids in 2023 would reach $562 million in Virginia alone, just in the retail market, employing 4,263 workers and paying an estimated $161 million in wages, with a net positive economic impact of over $2.5 billion on the Virginia economy), attached hereto as **Exhibit Nine**, *with* Beau Whitney, *Virginia Hemp Ban: The Economic Impacts of SB 903*, p. 6 (August 30, 2023), attached hereto as **Exhibit Ten** (describing how SB 903 will wipe out roughly 80% of the retail market for hemp products). To that must be added the increased costs that hemp companies like Franny's Farmacy will face when they ship their products up and down the East Coast, as transporters of federally-legal hemp products will have to detour around Virginia to avoid potential criminal or civil liability as their cargos become illegal marijuana in the Commonwealth. *See* Ex. 4 at ¶9.

The Defendants may argue that since the Plaintiffs did not bring this lawsuit until two months after SB 903 went into effect, there is no irreparable harm. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (holding that "delay" in pursuing claims can "indicate an absence of the kind of irreparable harm required to support a preliminary injunction.") (*quoting Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (CA2 1985)). However,

Plaintiffs were unsure as to how SB 903 was going to be enforced. It wasn't until approximately a month after SB 903 went into effect that Virginia began issuing fines and taking other punitive measures against entities in the same position as the Plaintiffs. *See* note 13, *supra*. The instant situation is similar to that in the *Kentucky Hemp Association* case, where, as here, the plaintiffs initiated their lawsuit until after "enforcement action ensued," and then "elected to serve all parties and await appearances of counsel before moving for injunctive relief." Ex. 5, p.13. That court noted that "delay is not as determinative because the alleged harm [of ongoing government enforcement] might be of a continuing nature." *Id.* at p.14. The same is true here.

The Plaintiffs are being and will continue to be irreparably harmed if SB 903's "total THC" standard is not enjoined. This factor clearly weighs in the Plaintiffs' favor.

### III.    The Balance of Equities and the Public Interest Favors the Plaintiffs.

When a case is against the government, the last two prongs of the *Winter* test "merge" into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 524 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Where a state law conflicts with the purposes of a federal law, the public interest favors the latter. *See Seaman v. Virginia*, 593 F. Supp. 3d 293, 328 (W.D. Va. 2022) (while "States have an interest in seeing that their statutes are given effect . . . the Supremacy Clause provides that federal law is supreme in the event of a conflict, and therefore any State interest in enforcement of its laws must comparably give way

28

when they conflict with federal law."); *and see R.K. v. Lee*, 575 F. Supp. 3d 957, 992-93 (M.D. Tenn. 2021) (issuing injunctive relief against Tennessee law that conflicted with the ADA).

While the Commonwealth certainly has an interest in enforcing SB 903 and will also argue that SB 903 was enacted for the purpose of protecting minors from various products containing isomers of Delta-9 THC, there are several reasons why the equities and public interest nevertheless weigh in favor of an injunction. ***First***, as argued above, SB 903 conflicts with the Farm Act, and under the Supremacy Clause there is a stronger public interest in enforcing federal laws than there is in enforcing a conflicting State law. ***Second***, in enacting the Farm Act, Congress already analyzed the effect that legalizing hemp would have on public health and welfare, and decidedly concluded that only Delta-9 THC needed limiting as opposed to the various isomers. As the decision in *Gonzales* makes clear, if a State comes to a different conclusion as to whether a particular product is beneficial to the public's health and well-being, the answer is to petition Congress to change course. ***Third***, the injunction sought herein does not seek to enjoin the operation of the packaging laws contained in SB 903, which suitably protect minors that might be attracted to such products. ***Fourth***, without injunctive relief, the Plaintiffs would face irreparable harm as noted above, while there is no comparable harm to the Commonwealth separate and apart from the public health issue already addressed above. And ***fifth***, the Commonwealth has no public interest in enforcing its laws beyond its own boundaries, as Va. Code § 3.2-4116(C) seeks to do by prohibiting the sale of Virginia products to anyone anywhere in the world who might use them to create products that violate the "total THC" standard, even if that buyer had no intention of selling those products in Virginia.

Taken together, the equities and public interest, considered as one under *Nkem*, both weigh decisively in favor of the Plaintiffs.

IV.     **Conclusion.**

WHEREFORE, the Plaintiffs herein respectfully request that the Court grant this Motion and enter the preliminary injunction requested as against the Defendants, along with any other relief this Court deems just and necessary.

Respectfully submitted,

*/s/ James N. Markels*
James N. Markels (VSB #68399)
Email: jnm@cwattorney.com
Thomas W. Croessmann (VSB #88086)
Email: twc@cwattorney.com
Philip R. Croessmann (VSB #27779)
Email: prc@cwattorney.com
CROESSMANN & WESTBERG, P.C.
8000 Towers Crescent Drive, #1575
Vienna, VA 22182
Phone: (703) 483-3550
Facsimile: (703) 349-3414
*Counsel for the Plaintiffs*


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 6th day of September, 2023, a true and accurate copy of the foregoing was filed electronically using the CM/ECF system, and that there are no counsel of record for the defendants at this time.

*/s/ James N. Markels*
James N. Markels (VSB #68399)
CROESSMANN & WESTBERG, P.C.
8000 Towers Crescent Drive, #1575
Vienna, VA 22182
Phone: (703) 483-3550
Facsimile: (703) 349-3414
Email: jnm@cwattorney.com