IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

<table>
<tr><td>NORTHERN VIRGINIA HEMP AND<br>AGRICULTURE LLC, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>THE COMMONWEALTH OF VIRGINIA, et al.,<br><br>     Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>1:23-cv-1177 (LMB/IDD)</td></tr>
</table>

<u>MEMORANDUM OPINION</u>

Before the Court is a Motion for Preliminary Injunction ("Motion") filed by plaintiffs
Northern Virginia Hemp and Agriculture LLC ("NOVA Hemp"), Rose Lane, and Franny's
Operations, Inc. ("Franny's Farmacy") (collectively, "plaintiffs"), asking for an order enjoining
defendants[1] from implementing or enforcing those provisions of Virginia law that impose a limit
on substances containing tetrahydrocannabinol ("THC") according to their concentration of
"total THC" or a "synthetic derivative of THC" instead of the concentration of delta-9 THC as
defined in the Agriculture Improvement Act of 2018, 7 U.S.C. § 1639o(1) (the "Farm Act"); and
from implementing or enforcing those portions of Virginia law that restrict the interstate
commerce of hemp.  For the reasons that follow, plaintiffs' Motion will be denied.

---

[1] Defendants in this civil action are the Commonwealth of Virginia; Governor Glenn Youngkin;
Attorney General Jason Miyares; the Virginia Board of Agriculture and Consumer Services;
Commissioner Joseph Guthrie; the Virginia Cannabis Control Authority; and every
Commonwealth Attorney in Virginia (collectively, the "Commonwealth," "Virginia," or
"defendants").

# I. BACKGROUND

## A. **Factual Background**

Under the federal Controlled Substances Act, 21 U.S.C. § 801 et seq., "marijuana" is

defined as "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof;

the resin extracted from any part of such plant; and every compound, manufacture, salt,

derivative, mixture, or preparation of such plant, its seeds or resin." 21 U.S.C. § 802(16)(A).

"Hemp" or "industrial hemp" is defined as "the plant Cannabis sativa L. and any part of that

plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts,

and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol [('THC')]

concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1); see also

21 U.S.C. § 802(16)(B)(i). Marijuana and any part of the plant Cannabis sativa L. with a delta-9

THC concentration above 0.3 percent are Schedule I controlled substances. See 21 U.S.C.

§§ 812, Schedule I, (c)(10), (17); see also [Dkt. No. 24] Ex. 2 at 1 ("DEA Letter").

In 2018, Congress amended the Controlled Substances Act through passage of the Farm

Act which removed "industrial hemp" from the federal definition of marijuana. See Pub. L. No.

115-334, § 12619 (Dec. 20, 2018); see also 7 U.S.C. § 1639o(1); 21 U.S.C. § 802(16)(B)(i). The

Farm Act requires the United States Department of Agriculture ("USDA") to promulgate

regulations and guidelines to administer a program for production of "industrial hemp." Hemp

production may be administered directly by the USDA or by a state or Indian tribe that has a

USDA-approved plan. See 7 U.S.C. §§ 1639p, 1639q. Although the Farm Act relaxes the

federal regulations concerning hemp, it permits states to enact "more stringent" regulations of

hemp production than those set out in federal regulations. See 7 U.S.C. § 1639p(a)(3)(A)

("Nothing in this subsection preempts or limits any law of a State or Indian tribe that i) regulates

the production of hemp; and ii) is more stringent than this subchapter.").

The Farm Act further includes a rule of construction stating that "[n]othing in this title or an amendment made by this title prohibits the interstate commerce of hemp [as defined in 7 U.S.C. § 1639o(1)] or hemp products."  Pub. L. No. 115-334 § 10114(a) (codified at 7 U.S.C. § 1639o note).  The Farm Act also includes an express prohibition on state laws that prevent the transportation or shipment of industrial hemp through the state:

> TRANSPORTATION OF HEMP AND HEMP PRODUCTS—No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 (as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.

Pub. L. No. 115–334, § 10114(b).  Thus, federal law preempts state laws that attempt to regulate the "transportation or shipment" of industrial hemp "through" the state, but does not preempt state regulation of other aspects of industrial hemp, such as the growth, production, sale, and use of industrial hemp and hemp products.  See, e.g., 7 U.S.C. § 1639p (allowing states to have the regulatory authority over the production of hemp by submitting to the Secretary of Agriculture a plan to monitor and regulate that production).[2]

After the passage of the Farm Act—which defined "industrial hemp" in reference to the proportion of delta-9 THC it contains at the federal level—states began seeing an increase in products that contained elevated levels of THC in the form of delta variants, such as delta-8 THC.  Both the Centers for Disease Control and Prevention and the Food and Drug Administration have raised concerns about the elevated levels of delta-8 THC in hemp products, which can result in a product that is more intoxicating when combined with delta-9 THC.  See [Dkt. No. 24] Exs. 3, 4.

---

[2] Virginia is among the states, territories, and Indian tribes that has a USDA-approved plan.  See https://www.ams.usda.gov/sites/default/files/media/VAHempPlan.pdf.

After receiving reports of children getting ill from consuming hemp products containing delta-8 THC, lawmakers in Virginia began exploring legislative avenues to "curb access to such products." [Dkt. No. 13] at 5; see also [Dkt. No. 24] at 7 (explaining the "marked increase in emergency calls related to delta-8 consumption in Virginia, particularly those that involved pediatric exposure"). The Virginia Secretary of Agriculture and Forestry convened a task force "to analyze and make recommendations regarding whether any statutory or regulatory modifications are necessary to ensure the safe and responsible manufacture and sale of industrial hemp extracts and other substances containing [THC] that are intended for human consumption." [Dkt. No. 24] at 6 (the "Task Force").[3] The Task Force's mandate was to "advise the General Assembly on the best way to distinguish between legal, non-intoxicating hemp products[4] and illegal, intoxicating cannabis products and the regulatory framework that aids in enforcement." Id. at 7. The Virginia legislature wrote and passed Senate Bill 903 ("SB 903") in response to the growing concerns regarding delta-8 and other adulterated hemp products on the market.

SB 903 implemented a significant change to the standard for hemp products in Virginia. Instead of the delta-9 THC standard implemented by the Farm Act, SB 903 requires hemp products offered for sale not to exceed a "total THC" standard that assesses the combined concentration of all forms of THC. See Va. Code § 3.2-4112. The "total THC" standard requires that hemp products, industrial hemp extracts, or any other consumable substance "(a) contain[ ] a total [THC] concentration of no greater than 0.3 percent and (b) contain[ ] either no

---

[3] In December 2022, the Task Force released Virginia's "Report of the Task Force to Analyze and Make Recommendations Regarding Whether Any Statutory or Regulatory Modifications are Necessary to Ensure the Safe and Responsible Manufacture and Sale of Industrial Hemp Extracts and Other Substances Containing [THC] that are Intended for Human Consumption in the Commonwealth" (the "delta-8 Report"), https://rga.lis.virginia.gov/Published/2022/RD679/pdf.

[4] Under Virginia law, "hemp products" include edible, topical, and smokable hemp products. Va. Code § 3.2-4112.

more than two milligrams of total [THC] per package or an amount of cannabidiol that is no less

than 25 times greater than the amount of total [THC] per package." Va. Code §§ 3.2-4112, 3.2-

4126(B), 3.2-5145.1, 3.2-5145.4, 4.1-600.  Cannabis oils are limited to "10 milligrams of [THC]

per dose."  Va. Code § 54.1-3408.3(A).  The total THC levels for these products is determined

by measuring "any naturally occurring or synthetic [THC]," regardless of whether it is delta-9

THC or an isomer thereof, such as delta-8.  Id.  Only those products that do not exceed the

Virginia law's "total THC" standard are deemed permissible hemp and therefore are excluded

from Virginia's definition of marijuana.[5]  See Va. Code §§ 4.1-600, 18.2-247(D), 54.1-3401,

54.1-3408.  Marijuana is still an illegal substance in Virginia, and with the exception of

possessing small amounts for personal use, the possession, sale, or consumption of marijuana

carries criminal penalties.  See Va. Code §§ 18.2-247(D), 18.2-248, 18.2-248.1, 18.2- 371.2.

Thus, under SB 903, a seller of hemp products can no longer claim that a product is compliant

for sale in Virginia simply because it contains less than 0.3 percent delta-9, if it also contains

heightened levels of delta-8 or some other THC variant.  According to plaintiffs, this results in

hundreds of hemp products meeting the federal standard but failing the Virginia standard.  See

[Dkt. No. 29] Ex. 1 ("Banned Products").

      SB 903 also prohibits "processor[s]  [from] sell[ing] industrial hemp or a substance

containing an industrial hemp extract . . . to a person if the processor knows or has reason to

know that such person will use the industrial hemp or substance containing an industrial hemp

extract in a substance that [exceeds the 'total THC' standard in SB 903]."  See Va. Code § 3.2-

---

[5] SB 903 also made it unlawful under the Virginia Consumer Protection Act ("VCPA") to "sell
or offer for sale any substance intended for human consumption, orally or by inhalation, that
contains a synthetic derivative of [THC]" regardless of concentration, subject to limited
exceptions.  Va. Code § 59.1-200(A)(70).  Violators face civil penalties of between $2,500 and
$5,000 per violation.  Va. Code § 59.1-206.

4116(C) (the "Sales Restriction"). A "processor" is defined as a person registered to process industrial hemp pursuant to subsection A of § 3.2-4115, which empowers the Virginia Commissioner of Agriculture and Consumer Services to "establish a registration program to allow a person to grow, handle, or process industrial hemp in the Commonwealth." See Va. Code §§ 3.2-4112, 3.2-4115. If a licensed Virginia processor violates the Sales Restriction provision, "with a culpable mental state greater than negligence," their registration may be denied, suspended, or revoked. Va. Code § 3.2-4118(A). Plaintiffs contend that the Sales Restriction provision prevents Virginia hemp processors from selling their raw, federally-compliant product to anyone, anywhere in the world, who might use the processed hemp to make a retail product that violates Virginia's "total THC" standard, "even if it is legal to do so where the buyer is located, and even if that buyer has no intention of selling those products in Virginia." [Dkt. No. 13] at 6.[6]

SB 903 left mostly undisturbed a previously enacted provision that shields a "federally licensed hemp producer or grower or his agent" from criminal prosecution under Virginia's criminal drug code, including for "the possession or growing of industrial hemp or any Cannabis sativa with a [THC] concentration that does not exceed the total [THC] concentration percentage established in federal regulations applicable to negligent violations located at 7 C.F.R. § 990.6(b)(3)." See Va. Code § 3.2-4113(A). This provision also prohibits the prosecution of any "handler or his agent or processor or his agent . . . for the possession, handling, or processing of industrial hemp." Id.

---

[6] SB 903 also includes packaging and labeling restrictions, designed in part to ensure that children are not drawn to the packaging (e.g., no edibles "in the shape of a human, animal, vehicle, or fruit," and no "copycat" packaging designed to make the hemp product look like another consumer product, such as candy). See Va. Code §§ 3.2-4123; 3.2-5145.4. Plaintiffs are not challenging the packaging and labeling restrictions. [Dkt. No. 6] at 6.

Plaintiff NOVA Hemp manufactures hemp products, bulk cannabinoids, and hemp fiber for sale in Virginia.  Franny's Farmacy is a North Carolina corporation that produces and sells hemp-derived products.  Its subsidiary, Franny's Franchising, Inc., operates franchises in various states, including Virginia, which sell its hemp-derived products.  Rose Lane is a Virginia resident who uses hemp products to help mitigate her arthritis symptoms.  See [Dkt. No. 29] ¶¶ 66-91.  NOVA Hemp and Franny's Farmacy allege that SB 903 has negatively impacted their businesses, preventing them from shipping and transporting hemp products through Virginia, [Dkt. No. 13] Ex. 7 ¶¶ 6-11; id. Ex. 4, and Rose Lane alleges that she is unable to obtain delta-8 hemp products she previously used to help ease her arthritis symptoms, [Dkt. No. 13] Ex. 8 ¶ 9.

Plaintiffs seek a declaratory judgment holding that SB 903 is either expressly or impliedly preempted by the Farm Act.  [Dkt. No. 29] ¶¶ 92-124 (Counts I and II, respectively).  Plaintiffs also bring two claims under 42 U.S.C. § 1983 asserting that SB 903 violates the Commerce Clause and the Dormant Commerce Clause of the U.S. Constitution.  [Dkt. No. 29] ¶¶ 125-36 (Counts III and IV, respectively).  Plaintiffs request that the Court enjoin defendants from enforcing most of SB 903.

**B.  Procedural History**

SB 903 was passed by the Virginia legislature on February 7, 2023, and Governor Youngkin signed it into law on April 12, 2023.  [Dkt. No. 29] ¶ 12.  On July 1, 2023, SB 903 became effective in the Commonwealth.  Plaintiffs filed their Complaint on September 1, 2023, [Dkt. No. 1], along with a Motion for Preliminary Injunction, [Dkt. No. 6], seeking to "preserve the status quo that existed before the issue in controversy occurred—i.e., the federal standard for marijuana that Virginia enforced before SB 903 was implemented."  [Dkt. No. 13].  On September 26, 2023, plaintiffs filed an Amended Complaint as a matter of right under Fed. R.

7

Civ. P. 15(a).  [Dkt. No. 29].  Oral argument has been held and for the reasons discussed below, plaintiffs' Motion for Preliminary Injunction will be denied.

## II. DISCUSSION

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).  To be entitled to such relief, plaintiffs must show "that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Metro Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013); see also Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008).  Although no single factor is dispositive, the first Winter factor is most important.  Accident, Injury & Rehab., PC v. Azar, 943 F.3d 195, 201 (4th Cir. 2019) ("Because a preliminary injunction affords temporary relief before trial of the type that can be granted permanently after trial, it is an 'extraordinary remedy' and may be granted only 'upon a clear showing that plaintiff is entitled to such relief." (quoting Winter, 555 U.S. at 22 (emphasis in original))).

### A.  Likelihood of success on the merits

"A party seeking a preliminary injunction must establish that he is likely to succeed on the merits of at least one claim." Roe v. Shanahan, 359 F. Supp. 3d 382, 409 (E.D. Va. 2019).  To meet this burden, the party must show more than merely "a grave or serious question for litigation," Sarsour v. Trump, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017) (emphasis and citation omitted), but need not show "a certainty of success," League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted).  Plaintiffs first argue that under the federal preemption doctrine, the Farm Act preempts the restrictions imposed by SB 903.  To establish a valid preemption claim under the Constitution's Supremacy Clause, a party must

establish that Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) (quoting FMC Corp. v. Holliday, 498 U.S. 52, 56-57 (1990)). Implied preemption includes field preemption, Arizona v. United States, 567 U.S. 387, 399 (2012), and two versions of conflict preemption: impossibility preemption, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), and obstacle preemption, Hines v. Davidowitz, 312 U.S. 52, 67 (1941). Importantly, a court's consideration of a preemption claim "starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725 (1981). This presumption is even stronger "'in a field which the States have traditionally occupied,' such as health and safety." Pinney v. Nokia, Inc. 402 F.3d 430, 454 (4th Cir. 2005) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).

### 1. Express Preemption

Plaintiffs make two arguments to support their claim that the Farm Act expressly preempts SB 903—one rooted in the federal and state definitions of industrial hemp and the other relating to the ability of Virginia hemp processors to ship or transport industrial hemp through the Commonwealth. Express preemption exists when Congress declares its intention to preempt state regulation through a direct statement in the text of a federal law, see Cox v. Shalala, 112 F.3d 151, 154 (4th Cir. 1997); therefore, an express preemption claim rises and falls with the text of the federal statute.

It is not likely that plaintiffs will prevail on their express preemption argument because the Farm Act, while including one explicit preemption clause, also includes an equally explicit denial of preemption. Specifically, the Farm Act clearly provides that "[n]o State . . . shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with

9

subtitle G of the Agricultural Marketing Act of 1946 . . . through the State," Pub. L. 115-334,

§ 10114 (codified at 7 U.S.C. § 1639o note); however, it also includes, under the heading "No

preemption," a clear, unambiguous statement declining to preempt state laws regulating hemp

production, by stating:

> No preemption.  Nothing in this subsection preempts or limits any
> law of a State or Indian tribe that—(i) regulates the production of
> hemp; and (ii) is more stringent than this subchapter.

Pub. L. 115-334, § 10113 (codified at 7 U.S.C. § 1639p).

In spite of this clear language, plaintiffs argue that the Farm Act defines industrial hemp

"solely in reference to its concentration of delta-9 THC, which by doing so naturally excluded

considerations of the other natural and synthetic isomers of THC, including delta-8." [Dkt. No.

13] at 11.  In plaintiffs' view, Congress "legalized hemp solely according to its concentration of

delta-9 THC and mandated that the interstate commerce in hemp as so defined could not be

inhibited by the States," [Dkt. No. 13] at 11, and thus did not allow states to impose a stricter

standard for industrial hemp.  This argument ignores the express permission granted to states and

Indian tribes in the Farm Act to enact "more stringent" regulations of hemp production.  See

7 U.S.C. § 1639p.  Virginia did just that when its legislature made the decision to regulate the

manufacture and sale of hemp products in the Commonwealth that contain higher concentrations

of THC, including variants such as delta-8.  Plaintiffs' attempt to narrow the word "production"

in the federal statute so as to not include Virginia's regulation of hemp manufacturing, purchase,

and sale within the Commonwealth is not supported by a plain reading of the Farm Act's text.

Cf. [Dkt. No. 13] at 12.  The only activity the Farm Act expressly preempts is any state-imposed

restrictions on the interstate transportation and shipment of industrial hemp through the

Commonwealth.  Other than that limitation, the Farm Act expressly permits states to retain

"primary regulatory authority over the production of hemp."  7 U.S.C. §§ 1639p(a), (a)(3)A).

When faced with a similar challenge to an Indiana state law restricting the sale or use of

smokable hemp products that was more stringent than the federal standard, the United States

Court of Appeals for the Seventh Circuit reversed a broad injunction imposed by the district

court and held that the Farm Act "authorizes the states to continue to regulate the production of

hemp, and its express preemption clause places no limitations on a state's right to prohibit the

cultivation or production of industrial hemp or derivative products."  C.Y. Wholesale, Inc. v.

Holcomb, 965 F.3d 541, 546 (7th Cir. 2020) (Wood, J.).  In its opinion, the Seventh Circuit

rejected the proposed distinction put forth by the law's challengers that Indiana's regulation of

the "manufacturing" of hemp products somehow did not fit neatly into the Farm Act's language

allowing states to regulate the "production" of hemp more stringently than the federal standard.[7]

The Seventh Circuit went on to explain that the Farm Act's express preemption clause—standing

alone—also does not preclude a state from prohibiting the possession and sale of industrial hemp

or hemp products within the state.  C.Y. Wholesale, 965 F.3d at 547.

In Duke's Investments LLC v. Char, when faced with an express preemption challenge to

a state-law definition of "hemp" that—like the Virginia statute—included delta-8 THC,[8] a

Hawai'i  federal district court concluded that the "Farm Act does not require the State of Hawai'i

---

[7] In C.Y. Wholesale, plaintiffs argued that "production" refers only to the growing of crops,
while "manufacture" refers to the act of converting raw hemp into another form, i.e., a smokable
product.  965 F.3d at 546.  Plaintiffs here make similar arguments, attempting to constrain the
reading of "production" in the Farm Act to not include the creation of hemp products that contain
delta-8 THC.  The Seventh Circuit did not accept that argument, nor will this Court.

[8] In Duke's Investments, the court declined to invalidate on express preemption grounds the state
law which prohibited "the sale, possession for purpose of sale, offer, or distribution . . . of delta-8
THC and delta-10 THC" within Hawai'i.  See 2022 WL 17128976, at *7.

11

to allow [the plaintiff] to sell and/or distribute its hemp products" that are violative of state law within Hawai'i.  In both cases, the federal courts refused to read the Farm Act's express preemption provision as to production so broadly as to usurp all authority from the states to regulate the sale and possession of hemp products within a state in a manner that is more stringent than that provided under federal law.

Instead of engaging with the language of the statute and the federal precedent interpreting the scope of the Farm Act's preemption provision, plaintiffs point to Gonzalez v. Raich, 545 U.S. 1 (2005), which upheld Congress's authority to criminalize intrastate possession of marijuana under its Commerce Clause power, despite state legalization efforts.  Plaintiffs' inversion of the holding in Raich is inapposite to this civil action.  If Congress chooses to make a substance—here, industrial hemp as defined by its delta-9 THC level—legal at the federal level with respect to the Controlled Substances Act, that does not mean that Congress has mandated that the substance must be legal in every state.  Nor does it mean that Congress has mandated that any product that simply includes industrial hemp as one ingredient or derivative among many must be legalized by every state legislature.  Plaintiffs' repeated efforts to analogize this case to Raich are unpersuasive.

Moreover, plaintiffs' citations to April in Paris v. Bonta, 2023 WL 2392818 (E.D. Cal. Mar. 7, 2023) and Man Hing Ivory & Imports, Inc. v. Deukmejian, 702 F.2d 760 (9th Cir. 1983), do not support their argument.  Those cases relied on the text of the federal Endangered Species Act ("ESA"), which expressly protected the interstate trade of a commodity that a state attempted to ban.  Unlike in the ESA, Congress rarely mandates that potentially hazardous substances must be legal for retail sale or use within the states, and it did not do so in the Farm Act with respect to industrial hemp.  Express preemption turns on the precise language of the

12

statute, and the Farm Act does not prohibit state regulation of the production, manufacture, sale, or consumption of industrial hemp, including hemp composed of delta-8 or other delta variants. To the contrary, as previously discussed, the Farm Act explicitly provides authority to the states to impose "more stringent" regulations on hemp production.

Plaintiffs further challenge SB 903, arguing that its Sales Restriction provision is expressly preempted by the Farm Act. Virginia Code § 3.2-4116(C) provides:

> A processor shall not sell industrial hemp or a substance containing an industrial hemp extract, as defined in § 3.2-5145.1, to a person if the processor knows or has reason to know that such person will use the industrial hemp or substance containing an industrial hemp extract in a substance that (i) contains a total [THC] concentration that is greater than 0.3 percent or (ii) contains more than two milligrams of total [THC] per package and does not contain an amount of cannabidiol that is at least 25 times greater than the amount of total [THC] per package.

Id. At the outset, this argument fails because by not having pleaded sufficient facts showing that they are Virginia "processors" subject to potential enforcement under Va. Code § 3.2-4116(C), none of these plaintiffs have standing to raise this argument. SB 903 defines a "processor" as a person registered to process industrial hemp pursuant to subsection A of § 3.2-4115, which empowers the Virginia Commissioner of Agriculture and Consumer Services to "establish a registration program to allow a person to grow, handle, or process industrial hemp in the Commonwealth." Va. Code §§ 3.2-4112, 3.2-4115. The only enforcement mechanism for a violation under § 3.2-4116(C) is the "denial, suspension, or revocation" of a Virginia hemp processor's registration with the Commonwealth. Va. Code § 3.2-4118(A).

The Amended Complaint alleges that NOVA Hemp is "a Virginia limited liability corporation . . . operat[ing] a retail store in the Commonwealth." [Dkt. No. 29] ¶ 66. NOVA Hemp is described as operating its retail store "pursuant to a valid Virginia registration issued by

13

[the Virginia Department of Agriculture and Consumer Services]," id.; however,  the Amended Complaint does not allege that NOVA Hemp is a Virginia "processor" as defined under Virginia law.  Nor does it allege that NOVA Hemp is subject to impending enforcement under the Sales Restriction provision, as an entity that either sells industrial hemp or a substance containing an industrial hemp extract "to a person" outside of the Commonwealth, or that NOVA Hemp regularly makes sales to third-parties knowing that they intend to violate Virginia's total THC standard.

Moreover, the Amended Complaint describes Rose Lane as an individual residing in Virginia who prefers to purchase delta-8 hemp products at retail outlets.  Id. ¶¶ 74-80.  She is undisputedly not subject to the enforcement mechanisms of the Sales Restriction provision, and the Amended Complaint describes Franny's Farmacy as "a North Carolina corporation that engages in the production and sale of hemp products and substances . . . in compliance with federal and North Carolina law."  Id. ¶ 81.  Although Franny's Farmacy claims to "purchase[] hemp from growers and processors in other States," the Amended Complaint does not state whether Franny's Farmacy is a Virginia processor or that it purchases industrial hemp from licensed Virginia processors.[9]  On this record, plaintiffs have not adequately alleged that they are regulated Virginia "processors" under the Sales Restriction provision of SB 903, as the allegations in the Amended Complaint mostly rely upon the hypothetical actions of third-parties not before the Court.

---

[9] Defendants also contend that Franny's Farmacy has failed to demonstrate that it is licensed under an approved state plan or by the federal government to ship industrial hemp in interstate commerce.  The Court need not reach this issue given that plaintiffs are not Virginia processors as contemplated in Va. Code § 3.1-4112 and subject to that provision's proscriptions.

Accordingly, plaintiffs have failed to demonstrate that they would be successful on the merits of their express preemption claim, both because SB 903 does not expressly offend the text of the Farm Act and because plaintiffs have not demonstrated that they are Virginia processors subject to the Sales Restriction provision.

### 2. Field Preemption

Plaintiffs next argue that SB 903 is subject to field preemption, a doctrine which prohibits state regulation of "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Arizona, 567 U.S. at 399. Essentially, plaintiffs argue that because "Congress has 'occupied the field' as to whether a given substance is legal as hemp, or illegal as marijuana," the states are left with no authority to regulate the substance or its derivative products. See [Dkt. No. 6] at 16. But field preemption exists only in the rare circumstance where "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (cleaned up).

Again, plaintiffs' argument ignores the clear text in the Farm Act that expressly grants states the authority to regulate hemp production by empowering them to enact more stringent regulations than that provided by federal law. 7 U.S.C. § 1639p(a)(3)(A) ("Nothing in this subsection preempts or limits any law of a State or Indian tribe that (i) regulates the production of hemp; and (ii) is more stringent than this title"). The Farm Act also created a process by which states could design and implement their own hemp regulatory production plans, instead of following the federal plan, so long as the state received approval from the Secretary of the

15

USDA.  Virginia submitted a plan of its own, and it has been approved by the USDA.[10]  These features are not the hallmark of Congress occupying the entirety of a legislative field so as to disempower the states; quite the opposite.[11]

### 3. Conflict Preemption

Next, plaintiffs assert a theory of conflict preemption premised on the notion that SB 903 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in passing the Farm Act.  [Dkt. No. 13] at 17.[12]  Specifically, plaintiffs argue that the Farm Act created an interstate market for hemp which SB 903 obstructs by making a large number of products that are legal under the federal standard illegal in Virginia.  Id.  Assessing a conflict preemption claim requires "a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict."  Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981) (citation omitted).  In making this determination, a court "should not seek out conflicts . . . where none clearly exists."  College Loan Corp. v. SLM Corp., 396 F.3d 588, 598 (4th Cir. 2005) (cleaned up).  Rather, to prevail on this theory, plaintiffs must show that the state statute clearly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

---

[10] See Plan to Regulate Hemp Production in the Commonwealth of Virginia, https://www.ams.usda.gov/sites/default/files/media/VAHempPlan.pdf.

[11] Plaintiffs' citation to Pacific Gas & Electric Company v. State Energy Resource Conservation & Development Commission, 461 U.S. 190 (1983), does not support their field preemption claim, as that case involved the "regulation" and "control of the safety of nuclear aspects of energy generation."  The field of nuclear safety concerns has repeatedly been understood to be an area of regulation in which Congress has occupied the entire field except when it expressly cedes power to the states.  See 461 U.S. at 212.

[12] Plaintiffs concede there is no basis for conflict preemption premised on impossibility.  "It is not impossible for a person to comply with both SB 903 and the Farm Act, as there are substances and products that are legal under both."  [Dkt. No. 13] at 17.

Congress." Chi. & N. W. Transp. Co., 450 U.S. at 317 (citation omitted).  Before finding that a federal law preempts a state statute, a court must determine that the state statute (here, SB 903) stands as an obstacle to the objectives of the federal law (here, the Farm Act).  See H&R Block E. Enters., Inc. v. Raskin, 591 F.3d 718, 723 (4th Cir. 2010).  A state law is an obstacle to federal law when it "interferes with the methods by which the federal statute was designed to reach [its] goal." Columbia Venture, LLC v. Dewberry & Davis, LLC, 604 F.3d 824, 830 (4th Cir. 2010) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 103 (1992)) (emphasis in original).

Plaintiffs argue that by implementing the "total THC" standard, Virginia has converted a large segment of hemp from being a legal product back into marijuana, which is an illegal Schedule I controlled substance.  See Va. Code §§ 4.1-600, 18.2-247, 18.2-248, 18.2-248.1, 18.2-371.2.  But when assessing a similar conflict preemption claim challenging an Indiana state hemp statute, the Seventh Circuit disagreed, explaining that:

> Although Congress may have relaxed federal restrictions on low-THC cannabis in order to facilitate a market for hemp, the [Farm Act] indicates that the states were to remain free to regulate industrial hemp production within their own borders. Despite legalizing industrial hemp on the federal level, the Farm [Act] expressly permits the states to adopt rules regarding industrial hemp production that are "more stringent" than the federal rules.  Pub L. 115-334 § 10113 (codified at 7 U.S.C. § 1639p). The federal government has adopted a similar stance towards other psychoactive drugs, such as salvia, which are not scheduled by the DEA but which some states nonetheless choose to criminalize. Congress' silence on these drugs does not, through conflict preemption, preclude their proscription, nor does the 2018 Farm [Act's] lenience toward industrial hemp.  See Puerto Rico Dep't of Cons. Affs. v. Isla Petroleum Corp., 485 U.S. 495, 500 (1988).  We see nothing in the 2018 Farm [Act] that supports the inference that Congress was demanding that states legalize industrial hemp, apart from the specific provisions of the express preemption clause.

C.Y. Wholesale, 965 F.3d at 548.  Similarly, in Duke's Investments, the district court rejected a conflict preemption challenge to a state-law definition of "hemp" that included delta-8.  See Duke's Invs., 2022 WL 17128976, at *13-15.  Agreeing with the Seventh Circuit, the district court denied a request for injunctive relief because "Congress' silence in the 2018 Farm Act on matters beyond regulating hemp production does not necessarily preclude the [state] from regulating areas in addition to hemp production."  Id. at *14.  The court based this conclusion on two key observations about the Farm Act.  First, the "Farm Act explicitly provides that it does not preempt states from creating laws that "regulate[] the production of hemp . . . more stringently."  Id. at *13 (alteration in original) (citations omitted).  Second, the "Farm Act says nothing about whether a state may prohibit possession or sale of industrial hemp."  Id. at *13-14 (citing C.Y. Wholesale, 965 F.3d at 546).  For the same reason, this Court finds that with respect to the regulation of the production and sale of hemp products containing varying amounts of delta-8 THC or other THC variants manufactured and sold in Virginia, SB 903 is not in conflict with the Farm Act either through theories of impossibility or obstacle preemption.

In the Amended Complaint, plaintiffs posit a scenario in which North Carolina-based Franny's Farmacy is forced to detour industrial hemp shipments around Virginia to its franchise location in Connecticut or subject itself to potential criminal liability by bringing products illegal under Virginia law into the Commonwealth.  Under this scenario, plaintiffs argue that SB 903 interferes with interstate commerce and frustrates Congress' decision to preempt state laws that prevent the shipment of industrial hemp through a state.  See [Dkt. No. 29] ¶ 90.  Plaintiffs' resort to this hypothetical does not support their claim for injunctive relief primarily because Franny's Farmacy has not alleged that any of its shippers have actually had to detour around

18

Virginia or that its shipping costs have increased because of SB 903.[13]  Moreover, SB 903 left

Va. Code § 3.2-4113(A) largely unchanged.  That provision shields hemp producers and their

agents who transport federally compliant hemp products through Virginia from criminal liability.

The relevant provision provides in part:

> "It is lawful for a grower, his agent, or a federally licensed hemp
> producer to grow, a handler or his agent to handle, or a processor or
> his agent to process industrial hemp in the Commonwealth for any
> lawful purpose.  No federally licensed hemp producer or grower or
> his agent shall be prosecuted under Chapter 11 (§ 4.1-1100 et seq.)
> of Title 4.1 [marijuana possession law] or [Virginia's criminal drug
> laws] for the possession or growing of industrial hemp or any
> Cannabis sativa with a [THC] concentration that does not exceed the
> total [THC] concentration percentage established in federal
> regulations applicable to negligent violations located at 7 C.F.R.
> § 990.6(b)(3).  No handler or his agent or processor or his agent shall
> be prosecuted under Chapter 11 (§ 4.1-1100 et seq.) of Title 4.1 or
> § 18.2-247, 18.2-248.01, 18.2-248.1, or 18.2-250 or issue a
> summons or judgment for the possession, handling, or processing of
> industrial hemp.

Va. Code § 3.2-4113(A).  Moreover, Virginia law continues to exempt "industrial hemp"

possessed by individuals, or their agents, who are registered with the Virginia Department of

Agriculture and Consumer Services or who hold a federal license issued by the USDA from the

definition of "marijuana," and thus from potential criminal liability.  See Va. Code. § 18.2-

247(D); accord Char, 2022 WL 17128976, at *7 (D. Haw. Nov. 22, 2022) ("The question, then,

is whether the prohibition against distributing hemp products containing delta-8 THC or delta-10

within Hawai'i frustrates the ability to engage in the interstate transportation of hemp products,

as defined by the 2018 Farm Act.  The answer is no. . . . A licensed hemp producer may still ship

its hemp through Hawai'i without violating" the state statute at issue.").

---

[13] At oral argument, plaintiff's counsel conceded that Franny's Farmacy relies on third-party shippers to transport its products from North Carolina to other states; however, those companies are not parties to this civil action.

A different issue emerges with respect to the Sales Restriction provision, the portion of SB 903 regulating the sale of industrial hemp by a Virginia processor to a person who then uses the industrial hemp to create a hemp product violative of Virginia law.  Plaintiffs argue that Virginia processors, as defined in Va. Code § 3.2-4112, are prohibited from selling their hemp to anyone, anywhere in the world who might use their product to create another product that might violate the Virginia "total THC" standard—even if it is legal to create such a product in the buyer's location.

For example, plaintiffs claim that SB 903 could prevent a Virginia hemp processor from selling federally-compliant industrial hemp to a Maryland buyer because the Maryland buyer intends to manufacture a hemp product that does not comply with Virginia's "total THC" standard, even though the buyer is compliant with Maryland law.  [Dkt. No. 13] at 19.  To plaintiffs, this type of impediment frustrates the "transportation or shipment of hemp . . . through the State," Pub. L. 115-334, § 10114 (codified at 7 U.S.C. § 1639o note), thereby conflicting with the provision of the Farm Act that prohibits states from interfering with the transportation or shipment of federally compliant hemp and hemp products through the state.

As previously explained, plaintiffs' have not sufficiently pleaded that they are Virginia processors, as defined by Virginia law, subject to the Sales Restriction provision, or that they engage in the conduct contemplated by the challenged provision; therefore, plaintiffs do not have standing to raise this issue.  Moreover, the only non-Virginia plaintiff, Franny's Farmacy, has also failed to plead that it has been impeded from purchasing federally-compliant hemp from a Virginia processor to be used to create a product that is violative of Virginia's total THC standard.  For these reasons, plaintiffs have not sufficiently alleged harm resulting from the Sales Restriction provision of SB 903 to show a likelihood of success on the merits.

20

### 4. Commerce Clause Claims

Although plaintiffs appear to raise claims under the Constitution's Commerce Clause and Dormant Commerce Clause, their arguments rely nearly exclusively on a Dormant Commerce Clause violation by alleging that SB 903 impedes the interstate commerce of industrial hemp. [Dkt. No. 29] ¶¶ 125-36. At the "very core" of the Dormant Commerce Clause is an "antidiscrimination principle" that "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Nat'l Pork Producers Council v. Ross, 143 S. Ct. 1142, 1153 (2023) (opinion of Gorsuch, J.) (cleaned up). There is no evidence in the record that SB 903 seeks to advantage in-state firms or disadvantage out-of-state rivals. Plaintiffs concede that "the 'Total THC' standard of SB 903, since it applies to all hemp regardless of where it comes from, is not a discriminatory law that appears to favor the Commonwealth's economic interests over those who reside elsewhere." [Dkt. No. 6] at 20.

"If there is no discrimination, a court will consider . . . whether the state laws 'unjustifiably . . . burden the interstate flow of articles of commerce.'" Ass'n for Accessible Medicines v. Frosh, 887 F.3d 664, 668 (4th Cir. 2018) (quoting Oregon Waste Sys. Inc. v. Dep't of Env't. Quality of Or., 511 U.S. 93, 98 (1994)). Plaintiffs argue that SB 903's Sales Restriction provision "is patently discriminatory to interstate commerce, as it will effectively forbid out-of-state buyers, like Franny's Farmacy, from having access to Virginia hemp." [Dkt. No. 13] at 20-21 (citing Va. Code § 3.2-4116(C)). Franny's Farmacy asserts in its affidavit that the Sales Restriction will likely result in increased costs for the company by reducing the number of growers offering raw hemp for sale to non-Virginia manufacturers like Franny's Farmacy who are not otherwise required to manufacture products in compliance with Virginia law. This is so

because the law forbids a Virginia processor from selling to anyone who does not abide by Virginia's standard. Id. at 21.

This challenge to SB 903 fails for multiple reasons. First, this is another attempt by plaintiffs to challenge the Commonwealth's decision to control the production of industrial hemp within its borders, which the Farm Act has expressly said the Commonwealth may do. Second, the Sales Restriction provision is a condition for registration imposed on licensed Virginia hemp processors; it does not have enforcement reach outside of the Commonwealth. See Va. Code § 3.2-4118 (listing the enforcement mechanisms as denying, suspending, or revoking a licensed Virginia hemp processor's registration with the Commonwealth). Third, the alleged burdens on interstate commerce are incidental and plaintiffs have not alleged any facts showing that this provision of SB 903 was motivated by a desire to undertake economic protectionism or to discriminate against out-of-state hemp businesses.

Plaintiffs ask this Court to apply Pike balancing,[14] which requires a plaintiff to plead facts plausibly showing that a challenged law imposes "substantial burden on interstate commerce" followed by a "showing that those burdens clearly outweigh the benefits of a state or local practice." See Nat'l Pork Producers Council, 143 S. Ct. at 1168 (Sotomayor, J., concurring).[15] Applying Pike balancing does not help plaintiffs because, as the Supreme Court in National Pork Producers Council observed, there is "no clear line" separating the Pike line of cases from the Court's antidiscrimination precedents, id. at 1157, and plaintiffs have already failed to allege a

---

[14] See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

[15] In National Pork Producers Council, the Supreme Court explained that extraterritorial effects of state legislation do not automatically result in a Commerce Clause violation. 143 S. Ct. at 1153.

challenge rooted in antidiscrimination principles. Plaintiffs have also failed to plead facts plausibly showing that the Sales Restriction provision imposes substantial burdens on interstate commerce to which they are subjected.

In Exxon Corporation v. Governor of Maryland, 437 U.S. 117 (1978), the Supreme Court took up a Dormant Commerce Clause case involving a Maryland law prohibiting petroleum producers from operating retail gas stations in the state. Because Maryland had no in-state petroleum producers at the time, Exxon argued that the state law's "divesture requirements" fell "solely on interstate companies" and threatened to force some companies to "withdraw entirely from the Maryland market" or incur new costs to remain. Id. at 125-27. The Supreme Court found that the allegations in Exxon's complaint were insufficient to demonstrate a substantial burden on interstate commerce. The parties did not dispute that Maryland's law favored one business structure (independent gas station retailers) over another (vertically-integrated production and retail petroleum firms). Id. The state law also promised to increase retail gas prices for Maryland drivers, allowing some to question its "wisdom." Id. at 124; see also id. at 128. But the Supreme Court found that Exxon failed to plead plausible facts that Maryland was "discriminating against interstate commerce." Id. at 125.[16]

If the Maryland law in Exxon did not impose a sufficient burden on interstate commerce to warrant further scrutiny, the same must be said for SB 903. In Exxon, vertically-integrated petroleum businesses faced a choice: they could divest their production capacities or withdraw from the Maryland market. Here, plaintiffs have at least as much choice: they may buy and sell

---

[16] Maryland's law encouraged competition from interstate retail gas station firms that did not produce petroleum, 437 U.S. at 125-27, but the law's "practical effect" was not to protect in-state producers; it was to shift market share from one set of out-of-state firms (vertically-integrated businesses) to another (retail gas station firms). Id.

their hemp in conformity with the Commonwealth's requirements; they may purchase their raw product from non-Virginia processors for manufacture of their delta-8-infused products; or they may withdraw from Virginia's market entirely.  Certainly, some may question the "wisdom" of a law that threatens to disrupt the existing practices of hemp industry participants, including one that may lead to higher consumer prices or a lack of consumer choice in products, see id. at 128; however, the Dormant Commerce Clause does not protect a "particular structure or method[] of operation" that is preferable to existing market participants.  See id. at 127.

In assessing a similar claim under an Indiana state law, the Seventh Circuit also refused to reverse a district court's decision not to enjoin the state law at issue on the basis of the Dormant Commerce Clause.  The plaintiff in that case relied upon Kassel v. Consolidated Freightways Corp. of Del., 450 U.S. 662, (1981), in which the Supreme Court struck down an Iowa law precluding trucks from pulling 65-foot trailers on the state's highways on the ground that the law "substantially burden[ed] the interstate flow of goods by truck."  Id. at 671. According to the plaintiff, the state law burdened interstate commerce in the same way, by precluding a major industry from shipping its goods through the state by truck.  The Seventh Circuit disagreed, finding that "this argument does not show sufficient promise of success on the merits to warrant a preliminary injunction.  Further, this argument adds nothing of substance to [plaintiff's] express preemption theory."  C.Y. Wholesale, 965 F.3d at 548.  The same reasoning applies here.  Plaintiffs have fully ventilated this argument in their preemption claim, which has an insufficient likelihood of success on the merits.

Ultimately, to satisfy the first Winter factor,  plaintiffs must plead sufficient facts to make a plausible claim that SB 903 will inflict substantial harm to interstate commerce; facts that render that outcome a "speculative" possibility are not enough.  Bell Atl. Corp. v. Twombly, 550

24

U.S. 544, 555-57 (2007).  In an effort to meet this standard, plaintiffs allege facts suggesting that certain out-of-state hemp firms will find it difficult to comply with SB 903 and may choose not to do so.  At the preliminary injunction stage, that is not enough to demonstrate a likelihood of success on the merits to warrant extraordinary relief.

### B.  Irreparable injury

To support the issuance of a preliminary injunction, plaintiffs must face an injury with "sufficient immediacy and reality."  O'Shea v. Littleton, 414 U.S. 488, 497 (1974) (quoting Golden v. Zwickler, 394 U.S. 103, 109 (1969) (requiring that the threat of injury be "real and immediate," not "conjectural" or "hypothetical")).  It must be "likely" that the asserted harm will occur if no injunction is issued.  Aslanturk v. Hott, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020); see also Emmett v. Johnson, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007) (holding that when a court "cannot say with confidence that the harm is more likely than not to occur at all," the movant has failed to meet their burden) (quoting In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 530 (4th Cir. 2003)).

Plaintiffs' place the alleged irreparable harm they face in two buckets: financial burdens and criminal liabilities.  Franny's Farmacy speculates that it may have to "pay increased shipping costs to ship its retail hemp products from North Carolina to states north of Virginia, like [its franchise] in Connecticut, because shippers do not want to incur the risk of being arrested for transporting those products into or through Virginia, as those products are considered marijuana under Virginia law."  [Dkt. No. 13] Ex. 4 ¶ 9 (cleaned up).  Plaintiffs further allege that "[a]s a direct and sole result of SB 903, the Franny's Farmacy franchise in Warrenton, VA has suffered a 90% drop in sales, as many of the popular retail hemp products it stocked prior to July 1, 2023 are now illegal in Virginia under the new law."  Id. ¶ 10.  NOVA Hemp claims that "[a]s a direct and sole result of SB 903's stricter THC standard, NOVA Hemp has faced an immediate loss of

25

approximately 90% of its revenue from selling raw hemp and hemp products. . . . That impact is anticipated to cause NOVA Hemp to have to lay off employees in the future as its revenue has shrunk drastically, reduce production by 95%, and potentially having to close its retail store and / or its production facility." [Dkt. No. 13] Ex. 7 ¶¶ 7-8.

Plaintiffs' allegations of harm are undercut by the delay with which they undertook filing this civil action to enjoin enforcement of SB 903.  The law was passed on February 7, 2023, and Governor Youngkin signed it on March 29, 2023.  Plaintiffs waited until September 1, 2023 to bring this civil action.   This "inordinate delay in initiating a preliminary injunction proceeding . . . 'indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction.'" Provident Pharm., Inc. v. Amneal Pharms., LLC, No. 3:08-cv-393, 2008 WL 3843505, at *3 (E.D. Va. Aug. 15, 2008) (quoting Quince Orchard Valley Citizens Ass'n, 872 F.2d at 80 (4th Cir. 1989)).  Moreover, as the Court has previously found, plaintiffs' argument as to potential criminal liability is not supported by the relevant provisions in SB 903.  See supra at 17-19.

### C. Balance of the equities and the public interest

When an injunction is sought against government actors, the requirements that a movant establish that the balance of equities and public interest favor injunctive relief merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Plaintiffs put forward four arguments addressing these requirements.  First, because SB 903 allegedly conflicts with federal law, enforcing the Constitution's Supremacy Clause must prevail.  Second, in enacting the Farm Act, Congress analyzed the effect that legalizing hemp would have on public health and welfare, and concluded that only delta-9 THC needed limiting as opposed to other variants.  Third, the requested injunction does not challenge the packaging laws contained in SB 903 which suitably protects minors attracted to such products.  And fourth, Virginia has no public interest in enforcing its

laws beyond state boundaries through Va. Code § 3.2-4116(C).  None of these arguments is persuasive.

On this record, defendants have demonstrated that delta-8 THC is a credible threat to the Virginia population, and there is a strong public interest in protecting the citizens of the Commonwealth from substances like delta-8, including a vulnerable population, such as children, from hospitalizations and poisonings.  [Dkt. No. 24] at 29, Exs. 7-8.  The decision to advance that interest was done by the elected policymakers of Virginia, and this Court must defer to those political and social welfare judgments.  Moreover, as discussed above, plaintiffs have failed to demonstrate that there is a likelihood they will be successful on either their preemption or constitutional claims, which undermines the majority of the reasons they have proffered to support the third and fourth Winter factors.  Accordingly, the balance of the equities and the public interest tilt in favor of the Commonwealth.

### III. CONCLUSION

Because plaintiffs have not demonstrated either a likelihood of success on the merits or irreparable injury if SB 903 remains in effect, and because they have failed to show that the balance of equities and public interest weigh in favor of an injunction, their Motion for Preliminary Injunction [Dkt. No. 6] will be denied by an Order to be issued with this Memorandum Opinion.

Entered this _30_ day of October, 2023.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge