**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-2192**

───────────────

NORTHERN VIRGINIA HEMP AND AGRICULTURE, LLC; ROSE LANE; FRANNY'S OPERATIONS, INC.,

Plaintiffs – Appellants,

v.

COMMONWEALTH OF VIRGINIA; GLENN YOUNGKIN, Governor of the Commonwealth of Virginia, in his official capacity; JASON S. MIYARES, Attorney General for the Commonwealth of Virginia, in his official capacity; BOARD OF AGRICULTURE AND CONSUMER SERVICES; JOSEPH GUTHRIE, Commissioner of the Virginia Department of Agriculture and Consumer Services, in his official capacity; VIRGINIA CANNABIS CONTROL AUTHORITY; STEVE DESCANO, Commonwealth's Attorney for the County of Fairfax, in his capacity; BUTA BIBERAJ, Commonwealth's Attorney for the County of Loudoun, in her official capacity; BRYAN L. PORTER, Commonwealth's Attorney for the City of Alexandria, in his official capacity; AMY ASHWORTH, Commonwealth's Attorney for the County of Prince William, in her official capacity; PARISA DEHGHANI-TAFTI, Commonwealth's Attorney for the County of Arlington and the City of Falls Church, in her official capacity; SCOTT C. HOOK, Commonwealth's Attorney for the County of Fauquier, in his official capacity; BRYAN CAVE, Commonwealth's Attorney for the County of Page, in his official capacity; R. ALLEN NASH, Commonwealth's Attorney for the County of Mecklenburg, in his official capacity; KRYSTYN REID, Commonwealth's Attorney for the County of York and the City of Poquoson, in her official capacity; VINCENT DONOGHUE, Commonwealth's Attorney for the County of Essex, in his official capacity; COOPER BROWN, Commonwealth's Attorney for the County of Franklin, in his official capacity; DIANA WHEELER O'CONNELL, Commonwealth's Attorney for the County of Orange, in her official capacity; MEGAN L. CLARK, Commonwealth's Attorney for the County of Prince Edward, in her official capacity; MICHAEL T. HURD, Commonwealth's Attorney for the County of Middlesex, in his official capacity; R. E. CHALKLEY, Commonwealth's Attorney for the County of Hanover, in his official capacity; COLIN D. STOLLE, Commonwealth's Attorney for the City of Virginia Beach, in his official capacity; MARC ABRAMS, Commonwealth's

Attorney for the County of Page, in his official capacity; MEREDITH ADKINS, Commonwealth's Attorney for the County of King and Queen, in her official capacity; JOHN R.H. ALEXANDER, Commonwealth's Attorney for the County of Botetourt, in his official capacity; GERALD D. ARRINGTON, Commonwealth's Attorney for the County of Buchanan, in his official capacity; KEMPER M. BEASLEY, III, Commonwealth's Attorney for the County of Buckingham, in his official capacity; ANTON A. BELL, Commonwealth's Attorney for the City of Hampton, in his official capacity; JOHN S. BELL, Commonwealth's Attorney for the County of Warren, in his official capacity; CLARISSA BERRY, Commonwealth's Attorney for the County of Madison, in her official capacity; TRAVIS BIRD, Commonwealth's Attorney for the County of Spotsylvania, in his official capacity; WILLIAM BLAINE, Commonwealth's Attorney for the County of Brunswick, in his official capacity; DAYNA KENDRICK BOBBITT, Commonwealth's Attorney for the County of Patrick, in her official capacity; JONATHAN BOURLIER, Commonwealth's Attorney for the County of Dinwiddie, in his official capacity; TOM C. BOWEN, III, Commonwealth's Attorney for the County of Mathews, in his official capacity; THOMAS E. BOWERS, Commonwealth's Attorney for the City of Salem, in his official capacity; BRANDON BOYLES, Commonwealth's Attorney for the County of Grayson and City of Galax, in his official capacity; ERIC BRANSCOM, Commonwealth's Attorney for the County of Floyd, in his official capacity; ROGER D. BROOKS, Commonwealth's Attorney for the County of Carroll and the City of Galax, in his official capacity; TIFFANY BUCKNER, Commonwealth's Attorney for the City of Petersburg, in her official capacity; DONALD S. CALDWELL, Commonwealth's Attorney for the City of Roanoke, in his official capacity; W. LYLE CARVER, Commonwealth's Attorney for the County of Amherst, in his official capacity; D. MICHAEL CAUDILL, Commonwealth's Attorney for the County of Goochland, in his official capacity; ROBERT CERULLO, Commonwealth's Attorney for the County of Powhatan, in his official capacity; ALFRED G. COLLINS, Commonwealth's Attorney for the City of Colonial Heights, in his official capacity; EDWIN CONSOLVO, Commonwealth's Attorney for the County of Greene, in his official capacity; ERIC A. COOKE, Commonwealth's Attorney for the City of Franklin and the County of Southampton, in his official capacity; H. FULLER CRIDLIN, Commonwealth's Attorney for the County of Lee, in his official capacity; JOSHUA CUMBOW, Commonwealth's Attorney for the County of Washington, in his official capacity; STACEY DAVENPORT, Commonwealth's Attorney for the County of Chesterfield, in her official capacity; DEREK DAVIS, Commonwealth's Attorney for the County of Surry, in his official capacity; STEVEN C. DAVIS, Commonwealth's Attorney for the County of Wise and the City of Norton, in his official capacity; MELISSA A. DOWD, Commonwealth's Attorney for the County of Highland, in her official capacity; MATTHEW DUNNE, Commonwealth's Attorney for the County of Craig, in his official capacity; JOHN DUSEWICZ, Commonwealth's Attorney for the County of Gloucester, in his official capacity;

2

JOSH O. ELROD, Commonwealth's Attorney for the City of Buena Vista, in his official capacity; ROY F. EVANS, Commonwealth's Attorney for the County of Smyth, in his official capacity; RAMIN FATEHI, Commonwealth's Attorney for the City of Norfolk, in his official capacity; DANIEL FELLHAUER, Commonwealth's Attorney for the County of Scott, in his official capacity; SUSAN FIERRO, Commonwealth's Attorney for the County of Prince George, in her official capacity; LESLIE M. FLEET, Commonwealth's Attorney for the County of Appomattox, in his official capacity; JEFFREY GAINES; ANN GARDNER, Commonwealth's Attorney for the County of Alleghany and the City of Covington, in her official capacity; MASHA L. GARST, Commonwealth's Attorney for the County of Rockingham and the City of Harrisonburg, in her official capacity; ARTHUR L. GOFF, Commonwealth's Attorney for the County of Rappahannock, in his official capacity; WILLIAM E. GREEN, Commonwealth's Attorney for the County of Charlotte, in his official capacity; NATHAN GREEN, Commonwealth's Attorney for the County of James City and the City of Williamsburg, in his official capacity; JUSTIN GRIFFITH, Commonwealth's Attorney for the County of Pulaski, in his official capacity; KERI GUSMANN, Commonwealth's Attorney for the County of King George, in her official capacity; HOWARD E. GWYNN, Commonwealth's Attorney for the City of Newport News, in his official capacity; JEFFREY HAISLIP, Commonwealth's Attorney for the County of Fluvanna, in his official capacity; G. ANDY HALL, Commonwealth's Attorney for the City of Martinsville, in his official capacity; MATTHEW R. HAMEL, Commonwealth's Attorney for the City of Chesapeake, in his official capacity; WENDY J.D. HANNAH, Commonwealth's Attorney for the County of Cumberland, in her official capacity; LEE RANDOLPH HARRISON, Commonwealth's Attorney for the County of Amelia, in his official capacity; BETHANY HARRISON, Commonwealth's Attorney for the County of Lynchburg, in her official capacity; ROBERT HASKINS, Commonwealth's Attorney for the County of Pittsylvania, in his official capacity; BEN HEIDT, Commonwealth's Attorney for the County of Caroline, in his official capacity; JAMES HINGELEY, Commonwealth's Attorney for the County of Albemarle, in his official capacity; BRIAN HOLOHAN, Commonwealth's Attorney for the County of Roanoke, in his official capacity; ELIZABETH K. HUMPHRIES, Commonwealth's Attorney for the City of Fredericksburg, in her official capacity; MICHAEL D. JONES, Commonwealth's Attorney for the County of Wythe, in his official capacity; DAVID L. LEDBETTER, Commonwealth's Attorney for the City of Waynesboro, in his official capacity; ROBERT M. LILLY, JR., Commonwealth's Attorney for the County of Giles, in his official capacity; TIM MARTIN, Commonwealth's Attorney for the County of August, in his official capacity; TRACY QUACKENBUSH MARTIN, Commonwealth's Attorney for the County of Halifax, in her official capacity; PAUL A. MCANDREWS, Commonwealth's Attorney for the County of Campbell, in his official capacity; COLETTE WALLACE MCEACHIN, Commonwealth's Attorney for the City of Richmond, in her official capacity; R. E. MCGUIRE, Commonwealth's Attorney for the County

of Louisa, in his official capacity; JARED L. MOON, Commonwealth's Attorney for the City of Lexington and the County of Rockbridge, in his official capacity; STEPHANIE MORALES, Commonwealth's Attorney for the City of Portsmouth, in her official capacity; J. SPENCER MORGAN, Commonwealth's Attorney for the County of Accomack, in his official capacity; WESLEY NANCE, Commonwealth's Attorney for the County of Bedford, in his official capacity; ANDREW NESTER, Commonwealth's Attorney for the County of Henry, in his official capacity; JOSH NEWBERRY, Commonwealth's Attorney for the County of Dickenson, in his official capacity; RICHARD NEWMAN, Commonwealth's Attorney for the City of Hopewell, in his official capacity; MICHAEL NEWMAN, Commonwealth's Attorney for the City of Danville, in his official capacity; ERIC L. OLSEN, Commonwealth's Attorney for the County of Stafford, in his official capacity; MARY K. PETTITT, Commonwealth's Attorney for the County of Montgomery, in her official capacity; GEORGETTE PHILLIPS, Commonwealth's Attorney for the County of Isle of Wight, in her official capacity; JAMES CHRISTOPHER PLASTER, Commonwealth's Attorney for the County of Tazewell, in his official capacity; JOSEPH D. PLATANIA, Commonwealth's Attorney for the City of Charlottesville, in his official capacity; NARENDRA PLEAS, Commonwealth's Attorney for the City of Suffolk, in her official capacity; CHRISTIAN EDWARD REHAK, Commonwealth's Attorney for the City of Radford, in his official capacity; T. SCOTT RENICK, Commonwealth's Attorney for the County of New Kent, in his official capacity; VINCENT L. ROBERTSON, Commonwealth's Attorney for the County of Sussex, in his official capacity; DANIEL RUTHERFORD, Commonwealth's Attorney for the County of Nelson, in his official capacity; JULIA HUTT SICHOL, Commonwealth's Attorney for the County of Westmoreland, in her official capacity; JOHN C. SINGLETON, Commonwealth's Attorney for the County of Bath, in his official capacity; ANTHONY G. SPENCER, Commonwealth's Attorney for the County of Lancaster, in his official capacity; ROSS P. SPICER, Commonwealth's Attorney for the County of Frederick, in his official capacity; JORDAN SPIERS, Commonwealth's Attorney for the County of Lunenburg, in her official capacity; ZACHARY A. STOOTS, Commonwealth's Attorney for the County of Russell, in his official capacity; SHANNON L. TAYLOR, Commonwealth's Attorney for the County of Henrico, in her official capacity; JACK ARNOLD THORNTON, III, Commonwealth's Attorney for the County of Northampton, in his official capacity; ELIZABETH A. TRIBLE, Commonwealth's Attorney for the County of Richmond, in her official capacity; ROBERT H. TYLER, Commonwealth's Attorney for the County of Charles City, in his official capacity; PAUL WALTHER, Commonwealth's Attorney for the County of Culpeper, in his official capacity; LEANNE WATROUS, Commonwealth's Attorney for the County of Nottoway, in her official capacity; PATRICIA TAYLOR WATSON, Commonwealth's Attorney for the County of Greensville, in her official capacity; TIFFANY M. WEBB, Commonwealth's Attorney for the County of King William, in her official capacity; PATRICK D. WHITE, Commonwealth's Attorney for the

County of Bland, in his official capacity; ANNE MCCARDELL WILLIAMS, Commonwealth's Attorney for the County of Clarke, in her official capacity; AMANDA MCDONALD WISELEY, Commonwealth's Attorney for the County of Shenandoah, in her official capacity; JERRY ALLEN WOLFE, Commonwealth's Attorney for the City of Bristol, in his official capacity; JANE WRIGHTSON, Commonwealth's Attorney for the County of Northumberland, in her official capacity; HEATHER HOVERMALE, In her official capacity as the Commonwealth's Attorney for the City of Winchester; KYLE KILGORE, In his official capacity as the Commonwealth's Attorney for the County of Scott; M. BRETT HALL, In his official capacity as the Commonwealth's Attorney for the County of Wise and the City of Norton,

Defendants – Appellees.

------------------------------

AMERICAN TRADE ASSOCIATION FOR CANNABIS AND HEMP,

Amicus Supporting Appellees.

————————————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:23-cv-01177-LMB-IDD)

————————————

Argued: May 9, 2024                                    Decided: January 7, 2025

————————————

Before THACKER, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

————————————

Affirmed in part, vacated in part and remanded by published opinion. Judge Quattlebaum wrote the opinion in which Judge Thacker and Judge Benjamin join.

————————————

**ARGUED:** James Nelson Markels, CROESSMANN & WESTBERG, P.C., Vienna, Virginia, for Appellants. Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Thomas Westberg-Croessmann, CROESSMANN & WESTBERG, P.C., Tysons, Virginia, for Appellants. Jason S. Miyares, Attorney General, Steven G. Popps, Deputy Attorney General, Cal Brown, Senior Assistant Attorney General, Andrew N. Ferguson, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. Seth A. Goldberg, Robert M. Palumbos, William R. Heaston, DUANE

MORRIS LLP, Philadelphia, Pennsylvania, for Amicus Curiae.

————————————

QUATTLEBAUM, Circuit Judge:

Virginia recognized it had a marijuana problem. For years, federal law has classified marijuana as a controlled substance. But in the 2018 Farm Bill, Congress excluded "hemp"—which it defined as Cannabis sativa L. and any part of that plant "with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent,"—from the definition of marijuana. 7 U.S.C. § 1639*o*. Yet, many hemp products that contain less than 0.3% delta-9 tetrahydrocannabinol[1] can still be psychoactive. For example, delta-8 THC, especially when combined with delta-9 THC, can be quite intoxicating. Even so, after the 2018 Farm Bill, such products are no longer controlled under federal law, as long as they contain no more than 0.3 percent delta-9 THC.

Following the 2018 Farm Bill, federal agencies warned about the psychoactive effects of products with other strains of THC that are not federally banned. Virginia lawmakers received these warnings. They also received reports about children in Virginia acquiring and consuming these products. With this information, they took action, passing Virginia Senate Bill 903, which was signed into law in 2023. That bill, in part, regulates the retail sale of hemp products based on their "*total* tetrahydrocannabinol concentration," regardless of whether the THC is delta-9, delta-8 or another natural or synthetic form. Va. Code Ann. §§ 3.2-4112, 3.2-5145.1 (emphasis added). S.B. 903 limits the concentration of total THC in hemp offered for retail sale to no more than 0.3%. *Id.* Also, S.B. 903 prohibits Virginia "processors" from selling hemp products—even those complying with federal

---

[1] Tetrahydrocannabinol is more commonly known as THC. And delta-9 THC is the most psychoactive strain of THC.

law—to a person the processor knows or has reason to know will use the industrial hemp or extract in a substance that contains a total THC concentration of more than 0.3%. *Id.* § 3.2-4116. As a result, certain hemp products that are legal under federal law—for example, those containing less than 0.3% delta-9 THC but more than 0.3% delta-8 THC—cannot lawfully be used for many purposes under Virginia law.

Three plaintiffs—a Virginia citizen who used now-outlawed hemp products to relieve arthritis pain, a Virginia entity that made and sold hemp products to the public and an out-of-state entity that produced and sold hemp products (and also runs a retail subsidiary with a location in Virginia)—sued the Commonwealth of Virginia to challenge S.B. 903.[2] They claimed that the 2018 Farm Bill preempts S.B. 903's more restrictive total THC standard and its prohibition on Virginia processors selling hemp products to purchasers they know or have reason to know will use the products in violation of Virginia's total THC standard. They also claim the Virginia law violates the Dormant Commerce Clause of the United States Constitution. After they moved for a preliminary injunction on these grounds, the district court denied the motion on the merits. But in doing so, it also appears to have concluded that the plaintiffs did not plead sufficient facts showing that they were regulated hemp processors under Virginia law and thus lack standing to challenge S.B. 903's provision preventing Virginia processors from selling hemp products to others who will use those products in violation of the total THC standard. This interlocutory appeal of the denial of the motion for preliminary injunction followed.

---

[2] They also sued various state officials and entities, but for convenience, we will refer to the defendants collectively as the Commonwealth.

We agree with the district court that the plaintiffs have not alleged sufficient facts showing they are licensed processors engaged in processing hemp products. As a result, they lack standing to challenge S.B. 903's prohibition of Virginia processors from selling hemp products to others who will use those products in violation of the total THC standard. Absent standing on the part of the named plaintiffs as to that claim, the district court lacked jurisdiction to consider the merits of the preliminary injunction motion. So, it should have dismissed that claim without prejudice. Therefore, the district court's order as to the Virginia processors claim is vacated, and we remand with instructions for the district court to dismiss the complaint without prejudice to the extent it challenges S.B. 903's prohibition on processors.

As to the plaintiffs' challenge to S.B. 903's total THC standard, we affirm the district court's denial of injunctive relief. Under federalism principles engineered into the Constitution, states retain the power to regulate "matters of health and safety." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). That power permits Virginia, as a separate sovereign, to enact legislation addressing psychoactive products affecting its citizens, including children. While the Supremacy Clause limits what a state can do, the plaintiffs have not shown that federal law preempts Virginia's total THC standard, either expressly or implicitly. Nor do they show that the total THC standard violates the Dormant Commerce Clause. So, for the reasons explained below, we affirm that part of the district court's order.

## I.   The 2018 Farm Bill and S.B. 903

We start with some background on the regulations at issue here. Passed in 1970, the Controlled Substances Act (the "CSA"), Pub. L. 91-513, tit. II, 84 Stat. 1242, criminalized growing, possessing or using marijuana, a Schedule I drug. The CSA defined marijuana broadly. It included "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." 21 U.S.C. § 802(16)(A).

In the Agricultural Act of 2014 (the "2014 Farm Bill"), Pub. L. No. 113-79, 128 Stat. 649, Congress began chipping away at the CSA's broad criminalization of marijuana. It recognized the "legitimacy of industrial hemp research." *Id.* at 912. So despite the CSA, Congress permitted institutions of higher education and state departments of agriculture to grow or cultivate industrial hemp for research purposes without prior approval by the Drug Enforcement Administration if growing or cultivating industrial hemp is "allowed under the laws of the State." *Id.* The 2014 Farm Bill defined "industrial hemp" as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." *Id.* So through this bill, Congress permitted growing hemp for research purposes so long

as its concentration of delta-9 THC—the most psychoactive component of cannabis[3]—did not exceed 0.3%.

In 2018, Congress went further. In the Agriculture Improvement Act of 2018 (the "2018 Farm Bill"), Pub. L. No. 115-334, 132 Stat. 4490, Congress formally legalized "hemp." First, it defined "hemp" in essentially the same way that the 2014 Farm Bill defined "industrial hemp"—the plant Cannabis sativa L. and any part of that plant, including derivatives, that do not have more than 0.3% delta-9 THC.[4] *Id.* at 4908 (codified at 7 U.S.C. § 1639*o*(1)). Second, it amended the CSA, which lists marijuana as a controlled substance, to exclude hemp from the definition of marijuana.[5] *Id.* at 5018 (codified at 21 U.S.C. § 802(16)). As a result, hemp products containing, for example, more than 0.3%

---

[3] Dan J. Tennenhouse, *Attorney's Medical Deskbook* § 33:37 (4th ed. 2023–24 update).

[4] The actual definition of "hemp" under the 2018 Farm Bill is "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639*o*(1).

[5] Congress' exact language excludes from the definition of marijuana under 21 U.S.C. § 802(16)(A) "(i) hemp, as defined in section 1639*o* of Title 7; or (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination." 21 U.S.C. § 802(16)(B)(i)–(ii).

delta-8 THC and less than 0.3% delta-9 THC are now excluded from the CSA's definition of marijuana and that Act's penalties.[6]

In the years that followed the 2018 Farm Bill's passage, Virginia lawmakers grew concerned about the availability of now unregulated hemp products that contained delta-8 and other forms of THC. Those products, alone or in combination with delta-9 THC, can have psychoactive effects.[7] The federal government expressed similar concerns. The Centers for Disease Control and the Food and Drug Administration warned that products labeled only with delta-9 THC content understate the psychoactive potential of the now unregulated hemp products. They also reported an increased number of delta-8 THC adverse events involving children. Viriginia lawmakers received similar reports involving Virginia citizens, including children.

---

[6] There may be questions about how far the 2018 Farm Bill's hemp exclusion extends. For example, does § 1639*o*(1)'s reference to derivatives include any hemp product manufactured using a part of the Cannabis sativa L. plant? In *AK Futures LLC v. Boyd St. Distro, LLC*, the Ninth Circuit said yes. 35 F.4th 682, 690 (9th Cir. 2022) (holding the exclusion applies to "products that are sourced from the cannabis plant [that] contain no more than 0.3 percent delta-9 THC"); *see also Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165 (4th Cir. 2024). But the outer contours of the hemp exclusion do not affect the outcome of this decision.

[7] *See* Matthew J. Lohr, *Report of the Task Force to Analyze and Make Recommendations Regarding Whether Any Statutory or Regulatory Modifications are Necessary to Ensure the Safe and Responsible Manufacture and Sale of Industrial Hemp Extracts and Other Substances Containing Tetrahydrocannabinol that are Intended for Human Consumption in the Commonwealth* (2022), https://rga.lis.virginia.gov/Published/2022/RD679/PDF [https://perma.cc/EW6P-UZA4].

Faced with what it viewed as a threat to health and safety, Virginia's legislature passed S.B. 903, which the governor signed into law on April 12, 2023. S.B. 903 addressed these concerns by amending several existing Virginia Code provisions and adding several new provisions concerning THC, industrial hemp and regulated hemp products. S.B. 903 limits the amount of THC that can be included in "hemp product[s]"[8] and "industrial hemp extract[s]."[9] When a "hemp product" or an "industrial hemp extract" is "offered for retail sale," its "total tetrahydrocannabinol concentration" must not exceed 0.3% and it can contain no more than "two milligrams of total [THC] per package." Va. Code Ann. §§ 3.2-4112, 3.2-5145.1.[10] The statute defines "total tetrahydrocannabinol" to mean the sum "of the percentage by weight of tetrahydrocannabinol and the percentage by weight of tetrahydrocannabinolic acid." *Id.* § 3.2-4112.[11] Importantly, that 0.3% concentration applies to any form of THC, not just delta-9.

---

[8] A "[h]emp product" under S.B. 903 "means a product, including any raw materials from industrial hemp that are used for or added to a food or beverage, that . . . contains industrial hemp and has completed all stages of processing needed for the product . . . ." Va. Code Ann. § 3.2-4112.

[9] An "[i]ndustrial hemp extract" is an extract of industrial hemp intended for human consumption. Va. Code Ann. § 3.2-5145.1.

[10] Under S.B. 903, the hemp product or industrial hemp extract offered for retail sale can have the 0.3% total THC concentration and can contain more than two milligrams of total THC per package if the product or extract contains an amount of cannabidiol "that is no less than 25 times greater than the amount of total tetrahydrocannabinol per package." Va. Code Ann. §§ 3.2-4112, 3.2-5145.1.

[11] Virginia law defines "[t]etrahydrocannabinol" as "any naturally occurring or synthetic tetrahydrocannabinol, including its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific

What does this mean? The bottom line is the THC cap for hemp products and industrial hemp extracts offered for retail sale in Virginia is 0.3% "total tetrahydrocannabinol," not just delta-9 THC. And hemp processors[12] cannot sell industrial hemp or a substance containing an industrial hemp extract to a person the processor knows or has reason to know will use those products in a way that violates the total THC limit under Virginia law. *Id.* § 3.2-4116.

As for enforcement, in addition to imposing certain testing, packaging, labeling and licensing requirements for regulated hemp products offered for sale, *see id.* § 3.2-4123(A)(1), S.B. 903 imposes civil penalties for offering for sale a regulated hemp product in excess of the total THC limit, *see id.* § 3.2-4126. S.B. 903 also amended Virginia's criminal code. Although marijuana is still considered a controlled substance in Virginia, growers, handlers and federally licensed hemp producers face no criminal liability for growing, handling or processing "industrial hemp in the Commonwealth for any lawful purpose." *Id.* § 3.2-4113. Further, federally licensed producers and growers are protected from criminal liability for possessing or growing federally compliant hemp through Virginia. *See id.*

---

chemical designation and any preparation, mixture, or substance containing, or mixed or infused with, any detectable amount of tetrahydrocannabinol." Va. Code Ann. § 3.2-4112.

[12] A "[p]rocessor" is a person registered pursuant to subsection A of Virginia Code § 3.2-4115 to process industrial hemp. Va. Code Ann. § 3.2-4112. Subsection A of § 3.2-4115 empowers the Virginia Commissioner of Agriculture and Consumer Services to "establish a registration program to allow a person to grow, handle, or process industrial hemp in the Commonwealth." *Id.* § 3.2-4115(A).

## II. Amended Complaint and Preliminary Injunction

A few months after S.B. 903 went into effect, Northern Virginia Hemp and Agriculture LLC ("NOVA Hemp"), Franny's Operations, Inc. ("Franny's Farmacy") and Virginia resident Rose Lane sued the Commonwealth in district court seeking declaratory and injunctive relief. The plaintiffs alleged that because certain portions of S.B. 903 impose a stricter standard on hemp products than the 2018 Farm Bill, federal law preempts those portions of the Virginia statutes. The plaintiffs also sought relief under 42 U.S.C. § 1983, maintaining that S.B. 903 violates the Dormant Commerce Clause.

According to the amended complaint, NOVA Hemp is a Virginia limited liability corporation, licensed to do business in the Commonwealth of Virginia that sells various products and substances containing THC in a retail store located in Marshall, Virginia. In an affidavit supporting the motion for a preliminary injunction, a managing member of NOVA Hemp said that it "manufactur[es] hemp products for retail sale in Virginia" and "processes and sells bulk cannabinoids, hemp food products, and hemp fiber for sale to manufacturers." J.A. 298–99. NOVA Hemp claims that S.B. 903 bans approximately 95% of the products it manufactured and sold prior to July 1, 2023.

Rose Lane is an elderly adult resident of Virginia who suffers from arthritis and other ailments. She used a variety of hemp products for relief but says that she can no longer purchase those products because they have been banned under S.B. 903. She also claims to be concerned that she could be prosecuted for possession of marijuana under Virginia criminal law because she still has a small quantity of the now-banned hemp products.

Franny's Farmacy is a North Carolina corporation that produces and sells hemp products and substances containing THC and CBD in compliance with federal and North Carolina law. Franny's also has a subsidiary company called Franny's Franchising, Inc. that operates a series of franchises, including one in Warrenton, Virginia. Franny's claims its Virginia franchise sells hemp products manufactured by Franny's. Franny's claims that S.B. 903 criminalized the sale in Virginia of over 100 of its hemp products, even though they are legal under federal law. As a result, Franny's claims a loss of sales in Virginia, as well as losses due to the inability to sell its hemp products to other retailers in Virginia and the inability to ship its products through Virginia. Franny's also says that it is unable to purchase industrial hemp, including extracts, from any Virginia processors.

The plaintiffs' motion for a preliminary injunction sought to enjoin S.B. 903's new "total THC" standard and Va. Code § 3.2-4116(C)'s prohibition of Virginia hemp processors from selling industrial hemp or substances containing industrial hemp extract to a person the processor knows or has reason to know will use the hemp to make a product that violates the total THC standard.[13] According to the plaintiffs, these provisions impose regulations that are more stringent than the 2018 Farm Bill's 0.3% delta-9 THC standard. To the plaintiffs, that means hundreds of products not banned by federal law cannot be legally sold in Virginia or to out-of-state purchasers. Thus, the plaintiffs argued the 2018 Farm Bill's delta-9 THC standard preempts these provisions. The plaintiffs also argued that these provisions violate the Constitution's Dormant Commerce Clause.

---

[13] The plaintiffs refer to Va. Code § 3.2-4116(C) as the "sales restriction" provision so we will use that phrase from time to time.

The district court denied the plaintiffs' motion. First, it held they were unlikely to prevail on their preemption arguments. As for express preemption, the court explained that the 2018 Farm Bill only explicitly prohibits states from interfering with the interstate transportation or shipment of hemp or hemp products that are legal under federal law. And it, the court explained, contains an "equally explicit denial of preemption" of state laws regulating hemp production in a more stringent manner than federal law. J.A. 748. The district court also rejected the plaintiffs' field preemption argument based on the 2018 Farm Bill's provisions permitting states to design and implement their own hemp regulatory plans. As for conflict preemption, it reasoned that the 2018 Farm Bill's provision preventing states from impeding the interstate transportation or shipment of hemp and hemp products that comply with federal law does not preclude states from creating laws that regulate the sale of hemp more stringently.

Second, the district court concluded that the plaintiffs had not sufficiently pled that any of the plaintiffs were Virginia processors subject to S.B. 903's restriction on the sale of hemp to someone who will use it to exceed the total THC standard. As such, the court held that the plaintiffs failed to establish standing to challenge that provision. And the court concluded that Franny's, as the only non-Virginia plaintiff, failed to plead that it had been impeded from purchasing federally compliant hemp from a Virginia processor to be used to create a product in violation of Virginia's total THC standard. But while it stated that this conclusion meant the plaintiffs' lacked standing to challenge the sales restriction provision, the court did not dismiss that challenge for lack of jurisdiction. Instead, the court

17

concluded that none of the plaintiffs sufficiently alleged harm to show a likelihood of success on the merits.

Third, the district court rejected the plaintiffs' Dormant Commerce Clause claims. Because the plaintiffs conceded that S.B. 903's standards apply to all hemp, regardless of origin, and do not appear to favor the Commonwealth's economic interests, the court focused on whether the state law unjustifiably burdened the interstate flow of articles of commerce. And the court said that the laws did not, ultimately concluding that the plaintiffs failed to plead facts plausibly showing a burden on interstate commerce or a challenge rooted in nonspeculative anti-discrimination principles.

Last, the district court addressed the remaining preliminary injunction factors, finding that the plaintiffs had not shown their alleged financial harms amounted to an irreparable injury. It further found that their claims of harm were undercut by their delay in filing their motion for a preliminary injunction such that the balance of equities and the public interest cut against granting the injunction.

Following the district court's denial of their motion for a preliminary injunction, the plaintiffs timely appealed. We have jurisdiction to consider this appeal from the interlocutory order of the district court pursuant to 28 U.S.C. § 1292(a)(1).

### III.    Standing

Before addressing whether the plaintiffs made a clear showing of likelihood of success on the merits on their preemption and Dormant Commerce Clause claims, we must address the threshold question of standing. The Commonwealth maintains that the

plaintiffs lack standing to assert that Va. Code § 3.2-4116(C)—which, to repeat, prohibits Virginia processors from selling hemp made in Virginia to someone the processor knows or has reason to know will sell it in violation of Virginia's total THC standard—is preempted because that provision applies to only Virginia-licensed processors. The Commonwealth argues that the plaintiffs do not allege that they are such licensed processors and, therefore, have not been directly injured by the Virginia law.[14]

"Although the order before us is a denial of a preliminary injunction, which we normally review for abuse of discretion, standing is a question of law that we review de novo." *Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 631 n.2 (4th Cir. 2007) (citations omitted). "Standing implicates the court's subject matter jurisdiction." *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). "An appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934); *see also S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 n.4 (4th Cir. 2013) ("Given the court's lack of jurisdiction over the case, any alternative holdings based on consideration of and conclusions on the merits were beyond the power of the district court.").

---

[14] To have standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The plaintiffs' primary response to the Commonwealth's standing challenge relates to Franny's alleged injuries. They do not claim that Franny's is a Virginia processor. Instead, they assert that because of the sales restriction, Franny's cannot buy, as an out-of-state buyer, Virginia hemp and extracts from Virginia processors. But "[w]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.").

Our *Lane v. Holder* decision addressed this principle in a case, which like this one, involved downstream purchasers seeking to challenge laws regulating potential suppliers. 703 F.3d 668 (4th Cir. 2012). In *Lane*, the plaintiffs sought injunctive and declaratory relief against the enforcement of federal and Virginia laws restricting who could sell handguns. The plaintiffs were not sellers of handguns nor Virginia residents but sought to purchase such weapons from retailers who were now regulated by the new laws. In affirming the district court's dismissal of the complaint for lack of standing, we held in part that because the plaintiffs were not burdened directly by the challenged laws, they suffered no constitutional injury that affected them in a "personal and individual way." *Id*. at 672 (citing *Lujan*, 504 U.S. at 560 n.1). We also held that the plaintiffs had not shown their alleged injury was traceable to the challenged laws. We explained that the challenged laws and regulations simply did not apply to the plaintiffs, but instead applied to the federal

firearms licensees from whom they would buy handguns. *Id*. at 672. We acknowledged that consumers "burdened by regulation of the sellers they transact with may be able to establish that they have suffered an injury in fact, as the Supreme Court has made clear in the context of Commerce Clause litigation." *Id*. (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997)). But we emphasized that the would-be purchasers there did not establish the required burden for standing purposes, highlighting that minor inconveniences, additional costs and logistical hurdles do not constitute an "absolute deprivation" of the plaintiffs' rights. *Id*. at 673.

Like the plaintiffs in *Lane*, § 3.2-4116(C) does not "require nor forbid any action on the part of [Franny's]." *Summers*, 555 U.S. at 493. And the plaintiffs have not pled or shown that § 3.2-4116(C) directly burdens Franny's as a potential hemp purchaser from a licensed Virginia processor. Therefore, Franny's alleged injuries do not confer standing to challenge § 3.2-4116(C). Also, Rose Lane's alleged injuries would suffer from the same fatal standing flaws as Franny's.

Finally, NOVA Hemp did not allege sufficient facts to support standing to challenge § 3.2-4116(C). *See Bishop v. Bartlett*, 575 F.3d 419, 426 (4th Cir. 2009). In the operative complaint, the plaintiffs allege that NOVA Hemp is "authorized to do business in the Commonwealth of Virginia" and operates a retail store that "sells a variety of hemp products and other substances containing THC pursuant to a valid Virginia registration issued to it by [the Virginia Department of Agriculture and Consumer Services]." J.A. 124. But the complaint does not allege that NOVA Hemp is a licensed Virginia processor as defined by Va. Code § 3.2-4115. Nor does the complaint allege that NOVA Hemp is subject

21

to sales restriction provision. The bare allegations are insufficient for the same reasons as the allegations about Franny's and Lane's injuries.

Looking further into our record on appeal, in an affidavit filed with their motion for a preliminary injunction, a managing member of NOVA Hemp wrote that NOVA Hemp is in the business of "manufacturing hemp products for retail sale in Virginia" and that it also "processes and sells bulk cannabinoids, hemp food products, and hemp fiber for sale to manufacturers." J.A. 298–99. While these statements hint that NOVA Hemp might be a processor harmed by the sales restriction, the affidavit does not confirm that it is a hemp processor licensed under Virginia law. Even so, in another filing below, perhaps they get closer. In their reply brief in support of their motion for preliminary injunction, the plaintiffs responded to the contention that none of the plaintiffs were licensed Virginia processors primarily by pointing to Franny's injuries. But in a footnote, they added, "Defendants are well-aware that NOVA Hemp *is* a licensed Virginia processor," citing the Virignia Department of Agriculture and Consumer Services processor list last visited on September 26, 2023, the day plaintiffs filed their amended complaint.[15] J.A. 681. At first blush, the allegations in that footnote might seem sufficient to confer standing. However,

---

[15] NOVA Hemp is listed as a registered industrial hemp processor with the Virginia Department of Agriculture and Consumer Services on a list updated on July 25, 2024. *See* Registered Industrial Hemp Processors, Va. Dep't of Agric. & Consumer Servs., https://www.vdacs.virginia.gov/pdf/processor-list.pdf (last visited July 29, 2024) [https://perma.cc/RS49-A3L7]. However, neither the complaint nor the affidavit in support of the motion for a preliminary injunction specifically assert that NOVA Hemp's referenced registration was one for industrial hemp processing as opposed to one for sales or another lawful purpose.

in the same footnote, the plaintiffs concede that "since NOVA Hemp does not presently cultivate industrial hemp, and it is forced under Virginia law to abide by the unconstitutional 'total THC' standard, it is not affected by the Sales Restriction." *Id*. Also, nowhere does NOVA Hemp express below, or to us on appeal, any intention to engage in any conduct arguably impacted by the sales restriction. *See generally Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Accordingly, even accepting the plaintiffs' allegations as true, the plaintiffs do not allege an injury to NOVA Hemp from § 3.2-4116(C) sufficient to create standing to challenge the statute. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements.")

And since none of the plaintiffs have alleged standing, we lack jurisdiction to consider their challenge to § 3.2-4116(C)'s sales restriction. *See S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 181–82 (recognizing that plaintiffs bear the burden of establishing standing and that this Court is "powerless to create [our] own jurisdiction by embellishing otherwise deficient allegations of standing" (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990))). As a result, we vacate that portion of the plaintiffs' appeal and remand for the district court to dismiss that claim without prejudice.

That leaves the plaintiffs' standing to challenge S.B. 903's total THC standard. The Commonwealth does not contest the plaintiffs' standing on this aspect of their complaint, but, since we must assess our jurisdiction, we do so here. Beginning with NOVA Hemp, the plaintiffs allege that S.B. 903 has directly caused it lost revenue by banning over 95% of the products that it used to sell and which are legal under federal law. Typically,

"financial harm is a classic and paradigmatic form of injury in fact." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017)). Whether or not NOVA Hemp is a "processor" under Virginia law, the complaint alleges S.B. 903's total THC standard caused it direct harm sufficient to create standing. *See Babbitt*, 442 U.S. at 298 (explaining that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" but does not have to wait until the consummation of the threatened injury to obtain relief). And where there are multiple plaintiffs, at least one must have standing to seek each form of relief requested in the complaint, and once that is satisfied, it is unnecessary to consider the other plaintiffs. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023). Thus, the plaintiffs have standing to challenge S.B. 903's total THC standard.[16]

## IV. Merits

With our jurisdiction established, we turn to the merits of the plaintiffs' challenge to the district court's denial of their motion for a preliminary injunction.[17]

---

[16] Franny's also asserts that it has suffered sufficient direct economic loss. And Rose Lane contends that her inability to purchase hemp products that are legal under federal law creates standing. According to the plaintiffs, this creates not just a minor inconvenience, but a total inability to purchase hemp products Lane has been using to treat her arthritis symptoms. In light of our decision that NOVA Hemp has standing to challenge S.B. 903's total THC standard, we need not consider these arguments.

[17] Below, the Commonwealth also moved to dismiss the amended complaint for lack of jurisdiction based on standing and for failure to state a claim. But the district court never

## A.  Standard of Review

We review a district court's decision to deny a preliminary injunction for abuse of discretion. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). In so doing, we review the court's factual findings for clear error and legal conclusions de novo. *Id.* A district court abuses its discretion when it applies an incorrect preliminary injunction standard, rests its decision on a clearly erroneous finding of material fact or misapprehends the law with respect to the underlying issues in litigation. *See Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).

To obtain a preliminary injunction, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) an injunction is in the public interest. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated*, 559 U.S. 1089 (2010). Because a preliminary injunction is an extraordinary remedy, the plaintiffs shoulder a heavy burden on an appeal challenging the district court's denial. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024).

## B.  Preemption

With that standard in mind, we turn to the question of whether the plaintiffs have satisfied the first preliminary injunction factor by establishing a likelihood of success on the merits of their claim that the 2018 Farm Bill preempts S.B. 903's total THC standard.

---

ruled on the motion, so it is not before us. Even so, we have addressed the Commonwealth's standing arguments as those issues relate to the federal courts' jurisdiction over the plaintiffs' claims.

First, some background on preemption. Under the Supremacy Clause of the Constitution, federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, if a state law "conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). But under the federalism principles baked into the Constitution, states are separate sovereigns. So, we apply the Supremacy Clause with "the basic assumption that Congress did not intend to displace state law." *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 589–90 (4th Cir. 2002) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). In fact, a federal statute is presumed not to preempt a state provision. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *CSX Transp.*, 507 U.S. at 664 ("[P]re-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))). This presumption is strongest when Congress legislates a field traditionally occupied by the states. *See Medtronic, Inc.*, 518 U.S. at 485. And states have long possessed primary responsibility in our federal system for protecting the health and safety of their citizens. *Id.* at 475, 485.

The presumption against preemption can be overcome in one of three ways. *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023). First, through "express preemption," Congress clearly expresses an intention for a federal law to preempt state law. *Id.*; *H & R Block E. Enters. v. Raskin*, 591 F.3d 718, 723 n.9 (4th Cir. 2010). To determine if Congress clearly expressed an intent to preempt state law, we ask if the text and structure of the federal statute shows Congress's preemptive purpose. *See Shaw v. Delta Air Lines,*

*Inc.,* 463 U.S. 85, 95 (1983). If the statute contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent. *CSX Transp.*, 507 U.S. at 664.

Second, under "field preemption," Congress expresses an intent to preempt state regulation in a certain area by comprehensively regulating that area. "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Field preemption reflects an intent to displace state law altogether, which "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (cleaned up) (quoting *Rice*, 331 U.S. at 230). Importantly, though, rarely does Congress legislate so comprehensively in a particular field that there is no room for "supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)).

Finally, state regulation can conflict with federal law in a way that creates "conflict preemption." *Guthrie*, 79 F.4th at 337. Conflict preemption can be either "direct conflict preemption" or "obstacle preemption." *Id.* Direct conflict preemption, also called impossibility preemption, occurs when compliance with both federal and state regulations is impossible. *Id.* Obstacle preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes of the federal law. *Id.* Assessing a conflict preemption claim requires "a two-step process of first ascertaining the construction

27

of the two statutes and then determining the constitutional question [of] whether they are in conflict." *H & R Block E. Enters.*, 591 F.3d at 723 (alteration in original) (quoting *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)). But a court should not find conflict preemption unless preemption was "the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (quoting *Rice*, 331 U.S. at 230). Stated more clearly, courts should not seek out conflicts where none clearly exist. *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005).

The plaintiffs maintain that the district court erred in rejecting their claim that the 2018 Farm Bill preempted S.B. 903's total THC standard. They insist express, field and conflict preemption all support their argument. We address each of these theories in turn.

### 1. Express Preemption

The plaintiffs base their express preemption argument on statutory notes to 7 U.S.C. § 1639*o*. In those notes, a rule of construction states that "[n]othing in [the 2018 Farm Bill] prohibits the interstate commerce of hemp . . . or hemp products." 7 U.S.C. § 1639*o*, Statutory Notes and Related Subsidiaries. And another note adds that a state cannot prohibit the transportation or shipment of hemp or hemp products produced in accordance with federal law through a state. *Id.* According to the plaintiffs, these provisions make clear that the federal government was creating a nationwide market for hemp with a delta-9 THC concentration of no more than 0.3%. So, they argue that S.B. 903's total THC standard is expressly preempted.

But the plaintiffs' argument overread those statutory notes. Far from clearly expressing an intent to preempt state law, they signal no broad limitations on the states.

The rule of construction says only that nothing in the Act itself prohibits the interstate commerce of hemp or hemp products. That provision doesn't say anything about what states may or may not do in regulating hemp. The only specific prohibition these statutory notes place on states is that they cannot prevent hemp or hemp products that comply with federal law from being transported through the states.[18] The 2018 Farm Bill says nothing about the ability of states to regulate the sale of hemp products within their borders. The plaintiffs' argument effectively would rewrite the 2018 Farm Bill's statutory notes.

Not only is the plaintiffs' express preemption argument undermined by the statutory notes' actual language, it also would render part of the second note superfluous. If the rule of construction that says "[n]othing in [the 2018 Farm Bill] prohibits the interstate commerce of hemp . . . or hemp products" means states cannot take any action that impacts the interstate commerce of hemp, that would also preclude states from impeding the shipment of federally compliant hemp within their borders. So, why have the second note? That separate statutory note would be superfluous if the plaintiffs' reading of the interstate commerce language were correct. We generally interpret statutes in a way that does not

---

[18] S.B. 903 complies with that prohibition. It states that "it is lawful for a grower, his agent, or a federally licensed hemp producer to grow, a handler or his agent to handle, or a processor or his agent to process industrial hemp in the Commonwealth for any lawful purpose." Va. Code Ann. § 3.2-4113(A). And it also provides that "[n]o federally licensed hemp producer or grower or his agent shall be prosecuted . . . for the possession or growing of industrial hemp or any Cannabis sativa with a tetrahydrocannabinol concentration that does not exceed the total tetrahydrocannabinol concentration percentage established in federal regulations applicable to negligent violations located at 7 C.F.R. § 990.6(b)(3)." Va. Code Ann. § 3.2-4113(A). By shielding federally licensed producers of industrial hemp from prosecution, this provision likewise shields from prosecution the transportation of federally compliant hemp products through the state.

render portions superfluous. *Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 356 (4th Cir. 2013). Doing so here forecloses the plaintiffs' interpretation of § 1639*o*'s statutory notes.

What's more, if anything, the 2018 Farm Bill expressly sanctions state regulation. The statute states that it does not preempt or limit a state from regulating the "production of hemp" in ways that are more stringent than federal law. 7 U.S.C. § 1639p(a)(3)(A). In the face of this provision, the plaintiffs' express preemption argument crumbles. True, that provision only mentions the production of hemp. It does not mention the sale of hemp or hemp products. But to state the obvious, silence cannot constitute express preemption. *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) ("The [2018 Farm Bill] authorizes the states to continue to regulate the production of hemp, and its express preemption clause places no limitations on a state's right to prohibit the cultivation or production of industrial hemp."). Because the 2018 Farm Bill "says nothing about whether a state may prohibit possession or sale of industrial hemp," *id.* at 546, the plaintiffs have not shown likelihood of success on the merits of their express preemption argument.

### 2. Field Preemption

The plaintiffs next claim that Congress regulated the definition of legal hemp so completely in the 2018 Farm Bill that, under field preemption, it left no room for states to regulate hemp. But the Farm Bill does not come close to this level of regulation. In fact, it expressly carves out a substantial role for state regulation.

Under the 2018 Farm Bill, if a state desires "primary regulatory authority over the production of hemp," it can submit a plan to the Secretary of the Department of Agriculture.

7 U.S.C. §1639p(a)(1).[19] By establishing a system by which states can set up detailed plans if they desire "primary regulatory authority over the production of hemp," Congress left plenty of room for state regulation. *Id.* But Congress didn't stop there. As already noted, it expressly permitted states to regulate the production of hemp in a manner more stringent than what is set forth in the 2018 Farm Bill. *Id.* § 1639p(a)(3)(A). Further, the CSA expressly disclaims an intent of Congress to occupy the field of "criminal penalties" for controlled substances. 21 U.S.C. § 903. Congress was clear. Despite the 2018 Farm Bill, the states retain a significant role in the regulation of hemp.

S.B. 903 fits comfortably in the regulatory role left by Congress. S.B. 903's total THC standard regulates the sale of hemp products and extracts in Virginia because of their psychoactive chemical content. Such regulation relates directly to the health and safety of its citizens. Thus, the district court correctly found that the plaintiffs have not established a likelihood of success on their field preemption claim.

### 3. Conflict Preemption

The crux of the plaintiffs' conflict preemption argument is that S.B. 903's total THC standard conflicts with Congress's "intent" in the 2018 Farm Bill to create a nationwide market for hemp and hemp products. The plaintiffs argue that, after the 2018 Farm Bill, the only role left for the states is regulating the cultivation of hemp within their borders. States are not permitted, according to the plaintiffs, to define what constitutes hemp or

---

[19] A state plan must include, among other things, procedures for testing delta-9 THC concentrations of hemp, disposal of non-compliant hemp, annual testing and inspections and submitting relevant information to the Department of Agriculture. 7 U.S.C. § 1639p(a)(2).

restrict any THC product that is not also outlawed by federal law. Yet, the plaintiffs insist that is what S.B. 903 does. They argue that S.B. 903's total THC standard bans the sale of hemp products that the federal government determined to be legal. So, they argue that S.B. 903 creates a direct conflict between state and federal law and stands as an obstacle to Congress' intent to create a nationwide market for hemp.

But there are several problems with this argument. First, the plaintiffs have cited nothing in the statutory text, nor have they identified any other authority, to support their argument that Congress intended to create a nationwide hemp market. In fact, by expressly permitting states to regulate the production of hemp more stringently than federal law, the 2018 Farm Bill actually recognizes the states' ability to regulate the production and sale of industrial hemp extracts and hemp products within their borders. True, the 2018 Farm Bill does not permit a state to prohibit the interstate transportation or shipment of hemp that complies with federal law. But S.B. 903 does not do that. In fact, although marijuana is considered a controlled substance in Virginia, under S.B. 903, federally licensed producers and growers are protected from criminal liability in transporting federally compliant hemp through Virginia. Also, federally licensed hemp producers face no criminal liability for growing or processing "industrial hemp in the Commonwealth for any lawful purpose." Va. Code Ann. § 3.2-4113(A).

When the actual language of the statutes is considered, S.B. 903 is not in direct conflict with the purpose of the Farm Bill. Nor does it pose an obstacle to its purposes. In sum, the district court properly rejected the plaintiffs' conflict preemption argument.

### C. Dormant Commerce Clause

The plaintiffs also assert that S.B. 903 violates the Dormant Commerce Clause by impeding the interstate commerce of industrial hemp. As a result of that restriction, the plaintiffs claim that out-of-state purchasers, like Franny's, cannot purchase Virginia products.

To assess this claim, we review some basics on the Dormant Commerce Clause. The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Since this authority rests solely within the power of Congress, states are prohibited from enacting laws that unduly burden interstate commerce. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007); *see also Brown v. Hovatter*, 561 F.3d 357, 362 (4th Cir. 2009) ("[I]t is well-established that th[e] affirmative grant of authority [in the Commerce Clause] implies a 'negative' or 'dormant' constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce."). This "negative implication" of the Commerce Clause is often called the Dormant Commerce Clause. *Sandlands C & D LLC v. Cnty. of Horry*, 737 F.3d 45, 51 (4th Cir. 2013).

In considering a Dormant Commerce Clause challenge to a state statute, we first ask if the state law discriminates against interstate commerce. *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005). "In this context, '"discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *United Haulers*, 550 U.S. at 338 (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)). This

antidiscrimination principle—preventing state protectionism designed to benefit in-state economic interests by burdening out-of-state competitors—is at the "very core" of the Court's Dormant Commerce Clause jurisprudence. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

As the district court found, the plaintiffs have presented no evidence that S.B. 903 seeks to or does advantage in-state entities by disadvantaging out-of-state entities. Any limitation on buying hemp products that complies with federal law but not S.B. 903's total THC standard applies to in-state purchasers and out-of-state purchasers alike. Out-of-state processors and retailers are placed in the same position as their Virginia counterparts. *See Brown*, 561 F.3d at 364 (finding that the Maryland Morticians Act did not purport to regulate activity outside of Maryland nor did it treat out-of-state persons any differently than in-state persons). That is not discrimination.

If, as here, there is no discrimination, courts then consider whether the state laws "unjustifiably . . . burden the interstate flow of articles of commerce." *Id.* at 363 (quoting *Or. Waste Sys.,* 511 U.S. at 98). "In addressing whether a state law unjustifiably burdens interstate commerce, the courts generally apply the so-called *Pike* test, under which the challenged law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Brown*, 561 F.3d at 363 (alteration in original) (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)). But for the same reasons S.B. 903 does not discriminate against out-of-state interests, it places no undue burden on them either. State regulation that applies equally to in-state and out-of-state interests does not offend the Dormant Commerce Clause.

Making a specific Dormant Commerce Clause argument, Franny's also claims S.B. 903 will potentially increase its costs of purchasing hemp. According to Franny's, licensed Virginia processors will not sell hemp to out-of-state buyers that intend to make and sell hemp products that violate Virginia law—such as delta-8 THC products. This argument fails as well. First, Franny's claims about increased costs are speculative. Franny's has not shown that its costs of purchasing hemp have increased or that it has lost out on any opportunity to purchase from Virginia processors. Second, S.B. 903 only applies to Virginia processors. It has no effect on Franny's ability to purchase hemp products that comply with federal law from other states. And finally, any increased costs that Franny's might potentially incur is no different than the costs incurred by in-state purchasers. As a result, this argument fails to establish a likelihood of success as to the Dormant Commerce Clause claim.

Last, Franny's argues that even if it can acquire hemp products from states besides Virginia, S.B. 903 deprives it of the unique qualities of Virginia grown hemp. Unfortunately for Franny's, this argument fails both on the evidence and the law. First, Franny's offers no evidence that Virginia hemp, like fine wine coming from premier vineyards, contains benefits not found in hemp from other states. Second, even if it does contain unique benefits, once again, the inability to obtain Virginia hemp for use in a substance that contains a total THC concentration of more than 0.3% applies equally to Virginia sellers.

To conclude, the plaintiffs have failed show a likelihood of success on their Dormant Commerce Clause claim.

35

### D.  Remaining Preliminary Injunction Factors

The plaintiffs' failure to show a likelihood of success on the merits dooms their request for a preliminary injunction. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023) ("[D]enying a preliminary injunction only takes the rejection of a single factor." (emphasis omitted)). Given our resolution of the plaintiffs' likelihood of success on the merits, we need not reach the remaining factors and contentions of error by the district court. *See Bristol Univ. v. Accrediting Council for Indep. Colleges & Sch.*, 691 F. App'x 737, 744 (4th Cir. 2017).


### V.

The plaintiffs seek the extraordinary relief of a preliminary injunction enjoining parts of state statutes designed to promote the health and safety of its citizens. But as the district court properly found, they have not shown that they are entitled to such relief. Nor have they shown any abuse of discretion by the court in assessing and analyzing the equitable factors. Accordingly, we affirm the order of the district court denying plaintiffs' motion for a preliminary injunction as to S.B. 903's total THC standard. We vacate the portions of the district court order that deny relief on the merits with respect to the sales restriction provision and remand to the district court to dismiss the relevant claims without prejudice, and for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART AND REMANDED*